JENNER & BLOCK LLP
Andrew J. Thomas (SBN 159533)
ajthomas@jenner.com
Lisa J. Kohn (SBN 260236)
lkohn@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:  (213) 239-5100
Facsimile:   (213) 239-5199

JENNER & BLOCK LLP
Susan J. Kohlmann (Pro Hac Vice to be filed)
skohlmann@jenner.com
Alison I. Stein (Pro Hac Vice to be filed)
astein@jenner.com
Jacob L. Tracer (Pro Hac Vice to be filed)
jtracer@jenner.com
919 Third Avenue
New York, NY 10022
Telephone:  (212) 891-1690
Facsimile:   (212) 891-1699

*Attorneys for Plaintiff Waverly Scott Kaffaga,
as Executor of the Estate of Elaine Anderson Steinbeck*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CV14-08699-SVW(RZx)

| | |
|---|---|
| WAVERLY SCOTT KAFFAGA, AS EXECUTOR OF THE ESTATE OF ELAINE ANDERSON STEINBECK, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS STEINBECK, GAIL KNIGHT STEINBECK, and THE PALLADIN GROUP INC., <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br><br> **[1] BREACH OF CONTRACT** <br><br> **[2] DECLARATORY JUDGMENT** <br><br> **[3] SLANDER OF TITLE** <br><br> **[4] INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br><br> **DEMAND FOR JURY TRIAL** |

FILED
CLERK, U.S. DISTRICT COURT
NOV 10 2014
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Plaintiff Waverly Scott Kaffaga, as executor of the Estate of Elaine Anderson Steinbeck (the "Estate"), by and through its undersigned counsel, Jenner & Block LLP, brings this action against defendants Thomas Steinbeck, Gail Knight Steinbeck, and The Palladin Group Inc. (collectively, the "Defendants") for declaratory and injunctive relief and damages.  Plaintiff alleges as follows:

**NATURE OF THE ACTION**

1.       Plaintiff brings this action for declaratory and injunctive relief and to recover damages related to Defendants' knowing breach of a 1983 settlement agreement that conferred upon Elaine Steinbeck (and later, her daughter Waverly Kaffaga, Executor of her Estate) the complete power and authority to exploit the copyrights in the works of Nobel laureate John Steinbeck (the "Steinbeck Works"). Plaintiff also seeks to recover damages related to Defendants' slander of title to the Estate's copyright ownership of and control interest in the Steinbeck Works and their intentional interference with the Estate's prospective economic advantage and business relationships related to the exploitation of the Steinbeck Works.

2.       Defendants have breached the 1983 Settlement Agreement by, *inter alia*, interfering in and impairing the Estate's exploitation of the Steinbeck Works, improperly and fraudulently claiming that they possess certain rights with respect to the exploitation of the Steinbeck Works that they do not possess, and acting in complete contravention of multiple court orders that have held that the 1983 Settlement Agreement makes clear that Defendants retain no power or authority to negotiate, authorize, or take action with respect to the exploitation of rights in the Steinbeck Works.

3.       John Steinbeck ("Steinbeck") was a prolific writer who left behind a wealth of intellectual property.  His works are considered classics of Twentieth Century American literature.  Throughout his life, though he entered into numerous licensing agreements involving his copyrighted works, Steinbeck was careful to

1  renew and to retain ownership over his copyrights to prevent his works from
2  falling into the public domain.

3       4.     Steinbeck filed and obtained copyright registrations for all his works.
4  When Steinbeck died in 1968, he left a will in which he passed all his copyright
5  interests and intellectual property rights to his widow, Elaine Steinbeck.  He did
6  not leave any intellectual property rights to his two sons from a previous marriage,
7  Thomas ("Thom") Steinbeck and John Steinbeck IV.  Steinbeck's will provided a
8  sum total of $50,000 in trust for each of his two sons.

9       5.     As a result of Steinbeck's will, Elaine Steinbeck owned outright those
10 works with respect to which Steinbeck had renewed the copyrights during his
11 lifetime (the "Early Steinbeck Works").  But under the federal copyright laws,
12 Thom Steinbeck and John Steinbeck IV, in addition to Elaine Steinbeck, were
13 entitled to royalty payments with respect to those works for which the copyrights
14 renewed after Steinbeck's death (the "Late Steinbeck Works").

15      6.     In 1983, in connection with litigation brought by Thom Steinbeck and
16 John Steinbeck IV regarding royalty distributions for the Late Steinbeck Works,
17 Elaine Steinbeck, Thom Steinbeck, and John Steinbeck IV entered into a
18 settlement agreement (the "1983 Settlement Agreement").  In the 1983 Settlement
19 Agreement, Thom Steinbeck and John Steinbeck IV (on behalf of themselves and
20 their heirs and assigns) ceded "complete power and authority" over the exploitation
21 of the Late Steinbeck Works to Elaine Steinbeck (and her heirs and assigns) in
22 exchange for an increased share of royalty payments.  The royalty shares of Thom
23 Steinbeck and John Steinbeck IV increased to one-third each, rather than the 25%
24 share to which each was entitled under the 1974 royalty distribution agreement
25 then in effect.  In exchange for gaining the complete power and authority to exploit
26 the Late Steinbeck Works, Elaine Steinbeck's share decreased to one-third of the
27 royalties generated by the Late Steinbeck Works, rather than the 50% share to
28 which she was entitled.

COMPLAINT

1      7.    Thom Steinbeck and John Steinbeck IV negotiated for and willingly

2 undertook their obligations in the 1983 Settlement Agreement and benefitted from

3 increased royalty distributions for decades.  Nevertheless, Thom Steinbeck and his

4 wife and attorney-in-fact Gail Knight Steinbeck, both acting through The Palladin

5 Group Inc., and sometimes purporting to act for John Steinbeck IV and his

6 beneficiaries, have engaged in a steady campaign since 1983—both in and out of

7 the courtroom—to overturn Steinbeck's will and ignore their obligations under the

8 1983 Settlement Agreement.

9      8.    In direct contravention of the 1983 Settlement Agreement and

10 multiple orders of various federal courts, Defendants repeatedly have interfered

11 with Elaine Steinbeck's (and the Estate's) ability to exploit the Steinbeck Works

12 by, *inter alia*, improperly claiming that they have rights related to the exploitation

13 of the Steinbeck Works and inserting themselves into ongoing negotiations

14 between the Estate and third parties.

15 **THE PARTIES**

16 **Plaintiff**

17      9.    Plaintiff, Waverly Scott Kaffaga, is the Executrix of the Will of Elaine

18 Steinbeck (the "Will").  The Estate manages the assets of Elaine Steinbeck

19 pursuant to her Will.  Before she died in 2003, Elaine Steinbeck was a resident of

20 New York.  The Will of Elaine Steinbeck was admitted to Probate in the

21 Surrogate's Court for the County of New York, New York in 2003.

22 **Defendants**

23      10.    Upon information and belief, Defendant Thomas Steinbeck is an

24 individual residing at 1482 East Valley Road, Suite 100, Santa Barbara, California

25 93108.

26      11.    Upon information and belief, Defendant Gail Knight Steinbeck is an

27 individual residing at 1482 East Valley Road, Suite 100, Santa Barbara, California

28 93108.  She is the wife and attorney-in-fact of Thomas Steinbeck.

1     12.     Upon information and belief, Defendant The Palladin Group, Inc. is a

2    suspended California corporation with its principal place of business at 1482 East

3    Valley Road, Suite 100, Santa Barbara, California  93108.  Upon information and

4    belief, Defendants Thomas Steinbeck and Gail Knight Steinbeck are President and

5    Managing Partner, respectively, of The Palladin Group.  Upon information and

6    belief, California's Franchise Tax Board suspended The Palladin Group for failure

7    to meet tax requirements.

8                              **JURISDICTION AND VENUE**

9     13.     This is a declaratory action pursuant to the Federal Declaratory

10   Judgment Act, 28 U.S.C. §§ 2201-02, and for damages due to breach of contract,

11   slander of title, and intentional interference with prospective economic advantage.

12   This Court has jurisdiction over the subject matter of this action pursuant to 28

13   U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different

14   states and the amount in controversy exceeds seventy-five thousand dollars

15   ($75,000), exclusive of interest and costs.

16    14.     This Court has personal jurisdiction over Defendants Thomas

17   Steinbeck and Gail Knight Steinbeck because they both reside in this judicial

18   district.

19    15.     This Court has personal jurisdiction over Defendant The Palladin

20   Group, Inc. because it is a California corporation and because it is headquartered

21   and conducts business operations in this judicial district.

22    16.     Venue is proper in this judicial district pursuant to 28 U.S.C.

23   § 1391(b)(1) because all Defendants are residents of California and at least one

24   Defendant resides in this judicial district.  Upon information and belief, all

25   Defendants reside or are headquartered in this judicial district.

26                            **THE STEINBECK WORKS**

27    17.     Author John Steinbeck was born on February 27, 1902 and died on

28   December 20, 1968.  During his lifetime, he authored no fewer than 35 works and

-5-

1   obtained copyright registrations for all of them.  The 1962 recipient of the Nobel
2   Prize for literature, John Steinbeck is one of America's most significant Twentieth
3   Century writers whose works are highly acclaimed, studied academically in high
4   schools and colleges, and enjoyed by millions of readers to this day.

5   18.    At the time the Steinbeck Works were written and first published,
6   federal law required renewal of a copyright registration 28 years after the copyright
7   for a particular work is first obtained.  *See* 17 U.S.C. § 304(a).  Upon information
8   and belief, John Steinbeck renewed the copyright registrations for his works
9   whenever such renewal was due and available during his lifetime.  Upon
10  information and belief, John Steinbeck filed copyright renewal registrations for the
11  following works, among others: *Cup of Gold* (©1929), *The Pastures of Heaven*
12  (©1932), *To a God Unknown* (©1933), *The Red Pony* (©1937), *Tortilla Flat*
13  (©1935), *In Dubious Battle* (©1936), *Of Mice and Men* (©1937), *Of Mice and*
14  *Men* (Play) (©1937), *Murder at Full Moon* (©1938), *The Long Valley* (©1938),
15  *The Grapes of Wrath* (©1939), *Forgotten Village* (©1941), and *The Sea of Cortez*
16  (©1941).  These works, renewed by Steinbeck, are referred to herein as the "Early
17  Steinbeck Works."

18  19.    John Steinbeck also authored the following works that were published
19  in or after 1942 and entered their renewal term after his death: *The Moon is Down*
20  (©1942), *The Moon is Down* (Play) (©1942), *Bombs Away* (©1942), *Cannery Row*
21  (©1945), *The Pearl* (©1945), *The Wayward Bus* (©1947), *A Russian Journal*
22  (©1948), *Burning Bright* (©1950), *Log from the Sea of Cortez* (©1951), *East of*
23  *Eden* (©1952), *Sweet Thursday* (©1954), *The Short Reign of Pippin JV* (©1957);
24  *Once There Was a War* (©1958), *The Winter of Our Discontent* (©1961), *Travels*
25  *with Charley* (©1962), and *America and Americans* (©1966).  Copyrights for these
26  works, upon information and belief, were renewed jointly by Elaine Steinbeck,
27  Thom Steinbeck, and John Steinbeck IV as Steinbeck's statutory heirs pursuant to
28  17 U.S.C. § 304(a)(1)(C).  These works are referred to herein as the "Late

-6-

1  Steinbeck Works."  Collectively, the Early Steinbeck Works and the Late
2  Steinbeck Works are referred to herein as the "Steinbeck Works."

3  **OWNERSHIP OF THE COPYRIGHTS IN THE STEINBECK WORKS**

4      20.    Upon his death in 1968, Steinbeck's will bequeathed all his rights in
5  the copyrights to the Steinbeck Works to his widow, Elaine Steinbeck.  There were
6  no rights in these copyrights given to either Thom Steinbeck or John Steinbeck IV,
7  Steinbeck's biological children.  Nevertheless, in communications with third
8  parties regarding the Steinbeck Works, Defendants misleadingly refer to
9  themselves as the "Steinbeck Family," while omitting the beneficiaries of the
10  Estate, the family of John Steinbeck's wife to whom he bequeathed all his
11  copyright interests, which they refer to as the "Scott Family."

12      21.    With respect to the Early Steinbeck Works, which Steinbeck renewed
13  himself, Elaine Steinbeck inherited the entire copyright interest because these
14  rights passed through Steinbeck's will.

15      22.    With respect to the Late Steinbeck Works, which were not yet subject
16  to renewal at the time of Steinbeck's death, the ownership of the copyrights went
17  to Elaine Steinbeck, Thom Steinbeck, and John Steinbeck IV pursuant to the
18  statutorily created renewal provisions under the Copyright Act of 1976, 17 U.S.C.
19  § 304(a)(1)(C).

20      23.    In 1974, Elaine Steinbeck, Thom Steinbeck, and John Steinbeck IV
21  entered into a royalty distribution agreement, pursuant to which Thom Steinbeck
22  and John Steinbeck IV each received 25 percent of the royalties generated from the
23  Late Steinbeck Works and Elaine Steinbeck received the remaining 50 percent.

24  **THE 1983 SETTLEMENT AGREEMENT**

25      24.    Thirteen years after John Steinbeck's death, Thom Steinbeck and John
26  Steinbeck IV sued Elaine Steinbeck contesting the 1974 royalty distribution
27  agreement.  Thom Steinbeck and John Steinbeck IV alleged, among other things,
28

1   that Elaine Steinbeck, along with John Steinbeck's literary agent—McIntosh &

2   Otis ("M&O")—had engaged in fraud, deception, and misrepresentation.

3       25.    In 1982, the district court granted summary judgment in favor of

4   Elaine Steinbeck and dismissed Thom Steinbeck and John Steinbeck IV's

5   complaint, concluding that the 1974 royalty distribution agreement was "specific

6   and unambiguous." *See John Steinbeck, IV and Thom Steinbeck v. Elaine*

7   *Steinbeck*, No. 81 Civ. 6105 (S.D.N.Y. Dec. 8, 1982) (order granting summary

8   judgment). Thom Steinbeck and John Steinbeck IV appealed the district court's

9   decision to the United States Court of Appeals for the Second Circuit (the "Second

10  Circuit"). Before the appellate court issued a ruling, Elaine Steinbeck, Thom

11  Steinbeck, and John Steinbeck IV entered into the 1983 Settlement Agreement. A

12  true and correct copy of the Southern District of New York's order granting

13  summary judgment is attached hereto as Exhibit 1.

14      26.    In exchange for a greater share of royalties, Thom Steinbeck and John

15  Steinbeck IV signed an agreement that surrendered "complete power and

16  authority" to Elaine Steinbeck to exercise their copyright interests in Steinbeck's

17  works, including the power and authority to execute contracts in their name.

18  Specifically, the agreement conferred upon Elaine Steinbeck "***the complete power***

19  ***and authority to negotiate, authorize and take action with respect to the***

20  ***exploitation . . . of rights in the works of John Steinbeck in which [John***

21  ***Steinbeck IV] and [Thom Steinbeck] have or will have renewal and termination***

22  ***rights***."

23      27.    In order to effectuate the 1983 Settlement Agreement, Thom

24  Steinbeck and John Steinbeck IV signed identical powers of attorney appointing

25  Elaine Steinbeck as their "attorney-in-fact" to "negotiate and sign contracts and

26  agreements or otherwise take and authorize action on my behalf . . . with respect to

27  the works of John Steinbeck in which I now have or will have . . . rights under U.S.

28

1   Copyright Law." True and correct copies of the 1983 Settlement Agreement and

2   the accompanying powers of attorney are attached hereto as Exhibit 2.

3       28.   The 1983 Settlement Agreement stated that it "shall bind the Parties

4   and their heirs, successors and assigns." Exhibit 2, ¶ 14.

5       29.   Upon Elaine Steinbeck's death in 2003, ownership of the Early

6   Steinbeck Works passed to Plaintiff Waverly Scott Kaffaga and the other

7   beneficiaries named in Elaine Steinbeck's Will. The Will granted Waverly Scott

8   Kaffaga, as executor of the Estate, the "the power and authority to negotiate,

9   arrange, execute, acknowledge, contract and deliver . . . any and all contracts for

10  the sale, leasing, licensing, sub-licensing or other disposition of any literary or

11  other works owned or controlled" by Elaine Steinbeck while she was alive. A true

12  and correct copy of Elaine Steinbeck's Will is attached hereto as Exhibit 3.

13                      **THE 2004 LITIGATION**

14      30.   In June 2004, Thom Steinbeck and Blake Smyle, the sole surviving

15  child of John Steinbeck IV, sued Plaintiff and other Estate beneficiaries, including

16  Elaine Steinbeck's sister, daughter, and grandchildren (collectively the "Estate

17  Defendants"), as well as M&O and several other defendants associated with the

18  Steinbeck legacy, in the United States District Court for the Southern District of

19  New York (the "Southern District"), in a matter captioned *Thomas Steinbeck and*

20  *Blake Smyle v. McIntosh & Otis, Inc., et al.*, No. 04 CIV 5497 (the "2004

21  Litigation").

22      31.   Thom Steinbeck and Blake Smyle alleged yet again that the

23  defendants had engaged in a conspiracy to deprive them of their rights in the

24  intellectual property of John Steinbeck. Specifically, Thom Steinbeck and Blake

25  Smyle asserted claims against the Estate Defendants for trademark infringement,

26  fraud, breach of fiduciary duty, promissory estoppel, unjust enrichment, imposition

27  of a constructive trust, and declaratory relief claiming they had effectively

28  terminated publishing agreements with the Penguin Group ("Penguin") relating to

the Late Steinbeck Works.  Under a series of publishing agreements (the "Penguin Publishing Agreements"), Penguin has the right to publish all the Steinbeck Works.

32.     The Estate Defendants asserted three counterclaims against Thom Steinbeck and Blake Smyle, including seeking a declaratory judgment that the 1983 Settlement Agreement is valid.

33.     The 2004 Litigation resolved any outstanding questions regarding ownership of the interests in and control over the exploitation of the Steinbeck Works in favor of the Estate.

34.     The Early Steinbeck Works are owned exclusively by Waverly Scott Kaffaga and the beneficiaries of the Estate.  When John Steinbeck died, Elaine Steinbeck inherited his copyrights in the Early Steinbeck Works under the residuary clause in Steinbeck's will.  A true and correct copy of John Steinbeck's will is attached hereto as Exhibit 4. *See also Thomas Steinbeck and Blake Smyle v. McIntosh & Otis, Inc., et al.*, 433 F. Supp. 2d 395, 399 & n.12 (S.D.N.Y. 2006) (Owen, J.).  A true and correct copy of the Southern District's Opinion & Order is attached hereto as Exhibit 5.

35.     In turn, upon Elaine Steinbeck's death, Waverly Scott Kaffaga and the other beneficiaries inherited her interests in the Early Steinbeck Works.  Elaine Steinbeck's Will expressly made "no provision for Thom Steinbeck or Nancy Steinbeck, the successor to John [Steinbeck] IV."  Exhibit 3, Will of Elaine Steinbeck, Article Sixth.  The Second Circuit agreed with the Southern District that, with respect to the Early Steinbeck Works, Steinbeck "bequeathed his interest in these copyrights to his widow, Elaine [Steinbeck]." *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008).  A true and correct copy of the Second Circuit's opinion is attached hereto as Exhibit 6.

36.     With respect to the Late Steinbeck Works, the Second Circuit rejected Thom Steinbeck's and Blake Smyle's attempt to recapture the rights to these works by terminating the Penguin Publishing Agreements for the Late Steinbeck Works.

Subsequently, the Southern District dismissed the remainder of the claims and held that the 1983 Settlement Agreement gave Elaine Steinbeck complete power and authority to exploit the Late Steinbeck Works, even if her decisions were "in her interests and contrary to the sons' interests or objectives." *Thomas Steinbeck and Blake Smyle v. McIntosh & Otis, Inc., et al.*, No. 04-5497, 2009 WL 928171, at *2 (S.D.N.Y. Mar. 31, 2009). A true and correct copy of the district court's Memorandum Decision and Order is attached hereto as Exhibit 7.

37. The Second Circuit affirmed this decision as well, ruling just five days after oral argument that Elaine Steinbeck's heirs had complete power and authority to exploit the Late Steinbeck Works. *See Steinbeck v. Steinbeck Heritage Foundation*, 400 Fed. App'x 572, 576 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 2991 (2011). With respect to the 1983 Settlement Agreement and the Estate Defendants' ability to exploit the works, the Second Circuit held unequivocally:

> The 1983 Agreement increased the Steinbeck sons' shares in certain copyright revenue, from one-quarter to one-third each, and, in return, conferred upon Elaine Steinbeck "the complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck in which [John Steinbeck IV] and [Thom Steinbeck] have or will have renewal or termination rights." 1983 Agreement ¶ 5. *This language is unambiguous and forecloses any argument that the parties intended the Steinbeck sons to retain control over Elaine Steinbeck's exercise of the authority conferred upon her*, as would be necessary to create an agency relationship.

*Id.* (emphasis added). A true and correct copy of the Second Circuit's 2010 summary order is attached hereto as Exhibit 8.

## DEFENDANTS' PATTERN OF IMPROPER CONDUCT

38.   Defendants have refused to live up to the clear terms of the 1983 Settlement Agreement and the court decisions interpreting it.  Instead, Defendants have intentionally—and repeatedly—ignored these decisions and orders, misrepresented their interests in the Steinbeck Works, and interfered with the Estate's potential business relationships and prospective economic advantage with respect to the exploitation of the Steinbeck Works.

39.   Notwithstanding the Second Circuit's clear and unambiguous ruling that Defendants retained "no control" over John Steinbeck's works as a result of the 1983 Settlement Agreement, Defendants, individually and through their agents and attorneys-in-fact, have repeatedly asserted that they have so-called "blocking rights" with respect to exploiting the Late Steinbeck Works, and in certain instances, even with respect to certain Early Steinbeck Works.  These assertions constitute a knowing breach of the 1983 Settlement Agreement and are in complete contravention of the prior orders of the Southern District of New York and the Second Circuit.  Defendants' actions have been ongoing and continue to the present.

40.   On April 24, 2009, during the pendency of the appeal in the 2004 Litigation, and despite the fact that Defendants have no control over the exploitation of the Steinbeck Works, Thom Steinbeck and Gail Knight Steinbeck filed a letter in *The Authors Guild, et al. v. Google, Inc.*, No. 05 Civ. 8136 (DC) (S.D.N.Y.), objecting to a global settlement with Google for the publication of John Steinbeck's works and encouraging other authors in the suit to "stop [the settlement] in its tracks right now."

41.   In September 2009, Defendants sought to derail an agreement with Steinbeck's longtime publisher, Penguin, to publish audio books of the Steinbeck Works.  Upon receiving notice from M&O that the Estate planned to enter into an agreement with Penguin for the audio books, Gail Knight Steinbeck responded that

she and Thom Steinbeck would not consent to the agreement unless Thom Steinbeck had "APPROVAL" over the reader and the cover art for audio versions of *all* the Steinbeck Works and received an advance in excess of $111,000.

42.     In later correspondence dated November 17, 2009, Defendants, through Gail Knight Steinbeck, pressured M&O to publish the audio books for *all* the Steinbeck Works with their preferred publisher and stated that failing to contact Defendants' publisher would not be "working in the best interests of Thom [Steinbeck], Blake [Smyle], and Nancy [Steinbeck]."

43.     In late November and early December 2009, counsel for the Estate brought this conduct to the attention of Judge George B. Daniels, United States District Judge for the Southern District of New York.  The Court addressed the issue at a court conference on December 2, 2009, saying:

> I don't want to harshly say this, but they can go to their grave thinking that they deserve more.  It doesn't matter.  It doesn't matter.  This issue is decided.  If anybody thinks this issue is not decided, you can hand them a copy of various decisions in this case, including this stipulation that makes it clear that they have no rights to assert beyond what the limits are that have been set by the court. . . .  I assume every time you heard about such a situation, and you made it clear to them that this has been in litigation for years, and to the extent that they are claiming that they have some greater rights than what has been determined by this court, it should be clear to everybody and clear to their lawyers who you negotiated with that there is absolutely no basis for them to do that.

Conference Transcript, at 8-9.  A true and correct copy of the December 2, 2009 conference is attached hereto as Exhibit 9.

44.     Five years later, the Estate and its beneficiaries are being irreparably harmed by Defendants' intentional breach of the 1983 Settlement Agreement,

-13-

1  slander of title, tortious interference, and total disregard for the court decisions that

2  decided the issue of control over the Steinbeck Works.

3       45.    In 2012, the Executive Director of the National Steinbeck Center in

4  Salinas, California received several calls from Gail Knight Steinbeck purporting to

5  expressly forbid the National Steinbeck Center from negotiating with the Grammy-

6  nominated band Mumford & Sons regarding a concert to help promote John

7  Steinbeck, the City of Salinas, California, and The National Steinbeck Center.

8  Gail Knight Steinbeck, on behalf of Thom Steinbeck and the "Steinbeck Family,"

9  represented—again in direct contravention of the 1983 Settlement Agreement and

10  the court decisions—that they controlled the exploitation of the Steinbeck Works

11  with respect to concerts.

12       46.    In 2013, Gail Knight Steinbeck, purportedly on behalf of Thom

13  Steinbeck and the "Steinbeck Family," again interfered with The National

14  Steinbeck Center, this time attempting to thwart The National Steinbeck Center's

15  efforts to plan an anniversary celebration and create a documentary film

16  concerning *The Grapes of Wrath*, an Early Steinbeck Work.  Gail Knight

17  Steinbeck misrepresented to various third parties that she, on behalf of Thom

18  Steinbeck and the "Steinbeck Family," had control over the exploitation of those

19  rights.

20       47.    Defendants' interference with prospective business relationships and

21  economic advantage persists.  On August 14, 2013, Gail Knight Steinbeck signed

22  an email from The Palladin Group to M&O stating that "John Steinbeck's family

23  controls 2/3's of the character rights, and [would] not agree to" a Steinbeck-related

24  parody.

25       48.    On September 27, 2013, Gail Knight Steinbeck and The Palladin

26  Group, purportedly on behalf of "the family of John Steinbeck," emailed to M&O

27  a "formal demand for a copy of whatever contract you have negotiated for film

28

-14-

1   rights to 'East of Eden,'" threatening that M&O must "do what is in the best

2   interests of the family of John Steinbeck."

3        49.     Starting in June 2013 and still continuing as of the filing of this

4   Complaint, Defendants have interfered with the Estate's ongoing negotiations with

5   two major motion picture studios for potential projects concerning the making of

6   (1) a new film version of *The Grapes of Wrath*, an Early Steinbeck Work, by

7   DreamWorks Studios ("DreamWorks"); and (2) the making of a new film version

8   of *East of Eden* by Universal Studios, Inc. ("Universal") and Imagine

9   Entertainment ("Imagine").

10        50.     Upon information and belief, Defendants have contacted

11   DreamWorks employees directly and have repeatedly misrepresented their

12   ownership rights and control over the Steinbeck Works.  Upon information and

13   belief, Defendants have threatened DreamWorks with litigation if DreamWorks

14   continues to work with the Estate on the *Grapes of Wrath* project.  DreamWorks

15   hired outside counsel to address Gail Knight Steinbeck's allegations and ultimately

16   agreed to go forward with negotiations subject to insisting on indemnification

17   language to address Defendants' claims. The project is still being negotiated.

18        51.     Upon information and belief, beginning in or around March 2014 and

19   for several months thereafter, Gail Knight Steinbeck contacted Universal in

20   connection with a potential transaction concerning the making of a new film

21   version of *East of Eden*.  In that conversation, Gail Knight Steinbeck claimed to

22   have blocking rights and insisted that Thom Steinbeck be made a producer on the

23   project.

24        52.     Finally, in October of 2014, the Estate learned that one year earlier

25   (on October 11, 2013), The Palladin Group, Thom Steinbeck, and Nancy

26   Steinbeck, with Gail Knight Steinbeck acting as their "attorney-in-fact," filed a

27   petition with the State Labor Commissioner of the State of California under

28   Section 1700.44 of the California Labor Code (the "Talent Agencies Act").  The

-15-

petition alleges that RWSG Literary Agency, a sub-agent of M&O negotiating various deals for the Estate, had violated the Talent Agencies Act by operating without the proper license. A true and correct copy of Defendants' Petition to Determine Controversy (the "Petition"), No. TAC-33186, is attached hereto as Exhibit 10.

53.     The Petition is the latest salvo in Defendants' campaign of interference with the Estate's prospective business relationships. The Petition, a public filing, is replete with misrepresentations concerning the Steinbeck Works. Specifically, the Petition asserts that Defendants "either own[] or control[] 2/3" of the Steinbeck intellectual property at issue; that "[a]ll literary contracts for the right and title to John Steinbeck's works list Petitioners as Author"; and that there is not a "clean chain of title" to the Steinbeck Works at issue. Each of these statements is utterly false. *See* Exhibit 10 at 2-3. The California State Labor Commissioner served the Petition on the sub-agent a year after it was filed, on September 29, 2014, and directed the sub-agent to file and serve an answer. The Estate was made aware of the Petition on October 1, 2014 by M&O.

54.     On October 10, 2014, an article about Defendants' Petition appeared in the *Hollywood Reporter*. In the article, Gail Knight Steinbeck falsely states that "RSWG has no right to make any deal without consulting with the family and getting their agreement, and they do not have that consent." Gail Knight Steinbeck's statement represents a blatant interference with the Estate's prospective economic advantage, is a breach of the 1983 Settlement Agreement, and is made in contravention of the judicial orders of the Southern District of New York and the Second Circuit. Those court decisions and the 1983 Settlement Agreement make clear that Defendants do not in fact have any right to be consulted before the Estate exploits any Steinbeck Work. The *Hollywood Reporter* article, titled *Steinbeck's Family Files Complaint Against L.A. Agent*, is available

1    at: http://www.hollywoodreporter.com/thr-esq/john-steinbeck-s-family-files-
2    739992.

3          55.    To no avail, counsel for Plaintiff has demanded that Defendants cease
4    their interference in breach of their obligations under the 1983 Settlement
5    Agreement.  On September 16, 2013, counsel for Plaintiff notified Defendants in a
6    letter that their interference with the potential DreamWorks transaction "may well
7    obstruct and likely will devalue the transaction not only for the Estate and its
8    beneficiaries but for Thom [Steinbeck] and Blake [Smyle] as well."  The letter
9    requested confirmation that Defendants would agree "to cease and desist from
10   interfering with the Estate's 'complete authority' to negotiate and enter into a
11   transaction with DreamWorks on behalf of the Estate, its beneficiaries and Thom
12   [Steinbeck] and Blake [Smyle]."

13         56.    Defendants responded through Gail Knight Steinbeck, stating (falsely)
14   that "legitimate assertions of legal rights do not impermissibly interfere with the
15   [Estate's] right to negotiate with anyone."

16         57.    Most recently, on September 4, 2014, counsel for Plaintiff notified
17   Defendants that it had come to Plaintiff's attention that Defendants had been in
18   direct contact with Universal and Imagine employees in connection with the
19   potential making of a new *East of Eden* motion picture, and had falsely claimed to
20   have "blocking rights" over any movie deal.  Counsel notified Defendants that
21   their interference "is destructive, threatens the success of the project and
22   jeopardizes the Estate's ability to exploit the Steinbeck Works and properly protect
23   them."  Counsel received no response.

24         58.    In view of Gail Knight Steinbeck's interference—and unaware that
25   Gail Knight Steinbeck had filed a claim with the California Department of
26   Labor—RWSG Literary Agency advised that it would no longer work with M&O.
27   Other sub-agents working with M&O have come forward seeking indemnity from
28   the Estate to shield themselves from the Defendants.

1

**IRREPRABLE HARM TO PLAINTIFF**

2    59.    Unless permanently enjoined by this Court, Defendants will continue

3    to engage in the foregoing conduct, including their continued breach of the 1983

4    Settlement Agreement, slander of title, and their intentional interference with

5    potential business relationships and prospective economic advantage by

6    misrepresenting their authority with respect to the exploitation of the Steinbeck

7    Works.  Defendants have made, and, unless enjoined, will continue to make

8    statements that are false, misleading, and contrary to the prior court orders of the

9    Southern District of New York and the Second Circuit.

10    60.    Defendants' conduct has sparked a series of news articles that have

11    cast doubt over the Estate's complete authority to exploit the Steinbeck Works.

12    For example, on October 23, 2014, the Associated Press published an article about

13    the California Petition.  The article, distributed through the Associated Press's wire

14    service to more than 1,000 publications read by millions of people, parrots the

15    Petition's false allegation that "Thomas Steinbeck 'either owns or controls' 66.6

16    percent of domestic rights" to the Steinbeck Works.  Multiple news outlets

17    reprinted the Associated Press article, including ABC News, Salon, and the United

18    Kingdom's *Daily Mail*.  In addition, on October 14, 2014, the *Courthouse News*

19    *Service* published a similar article on the Petition.  The Associated Press article (as

20    published by ABC News), titled *Steinbeck Heirs Fight Over Control of Movie*

21    *Rights*, is available at: http://abcnews.go.com/Entertainment/wireStory/steinbeck-

22    heirs-fight-control-movie-rights-26410093.  The *Courthouse News Service* article,

23    titled *Fight Over Rights to John Steinbeck Novels*, is available at:

24    http://www.courthousenews.com/2014/10/14/72408.htm.

25    61.    Defendants' conduct has caused and will continue to cause Plaintiff to

26    suffer irreparable harm for which there is no adequate remedy at law.  Defendants'

27    conduct has interfered with and will continue to interfere with the Estate's ability

28    to negotiate with third parties to exploit the Steinbeck Works.  As a direct result of

1 Defendants' interference, parties have been reluctant to enter into business
2 relationships with the Estate, have asked for indemnification from the Estate
3 against claims by Defendants, and have caused third parties to reject opportunities
4 to exploit the Steinbeck Works.

5     62.     Defendants' false and misleading claims that Defendants have rights
6 with respect to the exploitation of the Steinbeck Works has caused and will
7 continue to cause irreparable harm to Plaintiff in that such misconduct (1) deceives
8 third parties who are interested in partnering with the Estate in the exploitation of
9 the Steinbeck Works; (2) damages the Estate's reputation and ability to negotiate
10 favorable terms for such transactions; (3) damages the Estate's goodwill with third
11 parties; and (4) undermines the Estate's ability to engage in future projects for
12 exploitation of the Steinbeck Works.

13                            **FIRST CLAIM FOR RELIEF**
14                            **BREACH OF CONTRACT**

15     63.     Plaintiff incorporates herein by reference all of the allegations and
16 averments contained in Paragraphs 1 through 62 of this Complaint.

17     64.     Elaine Steinbeck was a party to the 1983 Settlement Agreement,
18 which granted her certain rights such as the "complete power and authority to
19 negotiate, authorize and take action with respect to the exploitation" of the Late
20 Steinbeck Works and the power to make decisions concerning their management in
21 her "sole discretion." Plaintiff and the Estate's other beneficiaries now hold all of
22 Elaine Steinbeck's interests in and rights deriving from the 1983 Settlement
23 Agreement.

24     65.     Plaintiff has performed all of the Estate's obligations under the 1983
25 Settlement Agreement, and Defendants have received increased royalties pursuant
26 to the 1983 Settlement Agreement for more than 30 years.

27

28

1  66. The 1983 Settlement Agreement is binding upon the executors,

2 administrators, successors, representatives, heirs, and assigns, of Elaine Steinbeck,

3 Thom Steinbeck, and John Steinbeck IV.

4  67. Defendants have breached the 1983 Settlement Agreement by, *inter*

5 *alia*, interfering in and impairing the Estate's exploitation of the Steinbeck Works,

6 improperly claiming Defendants have control over the exploitation of the

7 Steinbeck Works, and ignoring orders of the Southern District of New York and

8 the Second Circuit, which have interpreted the 1983 Settlement Agreement and

9 clarified that Defendants retained no authority or control over the exploitation of

10 the Steinbeck Works.  By their conduct, Defendants also have breached the

11 implied covenant of good faith and fair dealing with respect to the 1983 Settlement

12 Agreement.

13  68. As a result of Defendants' material breaches of the 1983 Settlement

14 Agreement, Plaintiff has incurred and continues to suffer damages.  So long as

15 Defendants continue to breach the 1983 Settlement Agreement, the Estate's ability

16 to exploit the Steinbeck Works is severely impaired and the goodwill and value of

17 the Works is irreparably harmed.

**SECOND CLAIM FOR RELIEF**

**DECLARATORY RELIEF – 28 U.S.C. § 2201(a)**

20  69. Plaintiff incorporates herein by reference all of the allegations and

21 averments contained in Paragraphs 1 through 62 of this Complaint.

22  70. An actual controversy exists with respect to Defendants' assertions of

23 rights and interference in Plaintiff's exercise of its complete power and authority

24 over the Steinbeck Works.

25  71. Defendants relentlessly have contended, on their own and through

26 their agents and attorneys-in-fact, that they have the power and authority to control

27 the Steinbeck Works, which they do not have.  Defendants have thereby interfered

28

1    with and impaired Plaintiff's ability successfully to exploit the Steinbeck Works to

2    the detriment of Plaintiff and the Estate's other beneficiaries.

3        72.    Defendants have already had a full and fair opportunity to litigate the

4    scope of their rights relating to the Steinbeck Works in both the Southern District

5    of New York and the Second Circuit.

6        73.    In the Southern District and Second Circuit, Defendants already

7    litigated whether they retain any control over the Steinbeck Works and whether

8    they retain ownership interests in the Early Steinbeck Works.

9        74.    The Second Circuit held that "[t]he 1983 Agreement increased the

10   Steinbeck sons' shares in certain copyright revenue, from one-quarter to one-third

11   each, and, in return, conferred upon Elaine Steinbeck 'the complete power and

12   authority to negotiate, authorize and take action with respect to the exploitation

13   and/or termination of rights in the works of John Steinbeck in which [John

14   Steinbeck IV] and [Thom Steinbeck] have or will have renewal or termination

15   rights' . . . . *This language is unambiguous and forecloses any argument that the*

16   *parties intended the Steinbeck sons to retain control over Elaine Steinbeck's*

17   *exercise of the authority conferred upon her*, as would be necessary to create an

18   agency relationship." *Steinbeck v. Steinbeck Heritage Foundation*, 400 Fed. App'x

19   572, 576 (2d Cir. 2010), *cert. denied* 131 S. Ct. 2991 (2011). The Second Circuit's

20   decision was a final judgment on the merits.

21       75.    Defendant Thom Steinbeck was a party to all relevant litigation in the

22   Southern District and Second Circuit. Upon information and belief, Defendants

23   Gail Knight Steinbeck and The Palladin Group are in privity with Defendant Thom

24   Steinbeck.

25       76.    Accordingly, by this action, Plaintiff seeks a judgment pursuant to 28

26   U.S.C. § 2201 declaring that, under the doctrine of collateral estoppel, the

27   decisions issued by the Southern District of New York and the Second Circuit

28   Court of Appeals interpreting the 1983 Settlement Agreement bar any claim of

1  right that Defendants might assert with respect to (1) control over the Steinbeck

2  Works and/or (2) the ownership of the Early Steinbeck Works.

3  **THIRD CLAIM FOR RELIEF**

4  **SLANDER OF TITLE**

5       77.    Plaintiff incorporates herein by reference all of the allegations and

6  averments contained in Paragraphs 1 through 62 of this Complaint.

7       78.    The Estate is the sole and exclusive owner of all copyrights in the

8  Early Steinbeck Works and has the sole and exclusive power to control the Late

9  Steinbeck Works.

10       79.    Defendants have slandered the Estate's title to the Early Steinbeck

11  Works and rights in the Late Steinbeck Works and damaged the Estate's ability to

12  exploit the Steinbeck Works.  Defendants have made false claims of ownership and

13  repeatedly have represented both to the public in general and directly to various

14  entertainment entities with which the Estate is negotiating that Defendants have

15  some authority to exploit the Steinbeck Works.

16       80.    Defendants' representations regarding their ownership of the Early

17  Steinbeck Works and ability to control the Late Steinbeck Works are false, and

18  Defendants have made such representations intentionally, maliciously, and with

19  utter disregard for the truthfulness thereof.

20       81.    As a consequence of Defendants' conduct as alleged herein, the Estate

21  has incurred actual and special damages in an amount to be proven at trial.

22       82.    The Estate has also incurred significant attorneys' fees and costs in its

23  attempt to remove the cloud Defendants have placed on the Estate's ownership of

24  the Early Steinbeck Works and control over the Late Steinbeck Works, including

25  but not limited to attorneys' fees incurred in this action.

26       83.    Defendants' conduct is willful and malicious.

27

28

1

## FOURTH CLAIM FOR RELIEF

2

## INTENTIONAL INTERFERENCE WITH

3

## PROSPECTIVE ECONOMIC ADVANTAGE

4        84.    Plaintiff incorporates herein by reference all of the allegations and

5    averments contained in Paragraphs 1 through 62 of this Complaint.

6        85.    The Estate has an economic relationship with several entertainment

7    entities in an effort to exploit and promote the Steinbeck Works, including but not

8    limited to M&O, Penguin, DreamWorks, Universal, and Imagine.

9        86.    Defendants have knowledge of each of these relationships, as

10    Defendants have made contact with all of those entities concerning the Steinbeck

11    Works and the relationship between those entities and the Estate.

12        87.    Defendants' intentional acts of interference are designed to disrupt

13    these relationships between the Estate and various entertainment entities, as

14    Defendants have asserted falsely to one or more of the entertainment entities that

15    Defendants have "blocking" rights or "approval" rights with respect to certain

16    content, that they control two-thirds of the "character rights," and that M&O does

17    not have authority to enter into a motion picture deal for *East of Eden*.  Defendants

18    have further asserted falsely in a public filing that there is not a "clean chain of

19    title" to certain Steinbeck Works, and they have asserted falsely in at least one

20    news article that they have the right to be consulted.  Finally, Defendants have

21    threatened one of the Estate's potential business partners, DreamWorks, with

22    litigation if DreamWorks worked with the Estate on a film project involving *The*

23    *Grapes of Wrath.*

24        88.    The Estate's relationships have been disrupted, and Defendants'

25    actions have proximately caused the Estate economic harm.  Defendants' conduct

26    has delayed realization of potential transactions with film studios and has

27    significantly increased the risk and cost to the Estate of engaging in negotiations

28    with DreamWorks, Universal/Imagine, and other third parties.

-23-

89.     Defendants' intentional acts are independently wrongful as they are misrepresentations in breach of the 1983 Settlement Agreement.

90.     Defendants' conduct is willful and malicious.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.     For a declaration that, under the doctrine of collateral estoppel, the decisions issued by the Southern District of New York and the Second Circuit Court of Appeals interpreting the 1983 Settlement Agreement bar any claim of right that Defendants might assert with respect to (1) control over the Steinbeck Works and/or (2) the ownership of the Early Steinbeck Works;

B.     For a permanent injunction (1) preventing Defendants and their agents, servants, employees, successors, assigns, and all those acting under their control, from representing in any forum that they have any ownership interest whatsoever in the Early Steinbeck Works and/or any control over the Steinbeck Works; and (2) requiring Defendants to retract or withdraw all representations they have made regarding their purported ownership interest in the Early Steinbeck Works and/or control over the Steinbeck Works;

C.     For judgment and damages against Defendants for breach of contract in an amount to be determined by the Court;

D.     For judgment and damages against Defendants for slander of title in an amount to be determined by the Court;

E.     For judgment and damages against Defendants for intentional interference with prospective economic advantage in an amount to be determined by the Court;

F.     For punitive and exemplary damages in an amount to be determined by the Court;

COMPLAINT

1      G.    For attorneys' fees, costs, pre- and post-judgment interest; and

2      H.    For such other and further relief as the Court deems just and proper.

4  Dated:  November 10, 2014          JENNER & BLOCK LLP

6                        /s Andrew J. Thomas

              By:    Andrew J. Thomas

*Attorneys for Plaintiff Waverly Scott Kaffaga, as Executor of the Estate of Elaine Anderson Steinbeck*

-25-

COMPLAINT

# JURY DEMAND

Plaintiff Waverly Scott Kaffaga, as Executor of The Estate of Elaine Anderson Steinbeck, respectfully requests a jury trial on all issues so triable.

Dated:  November 10, 2014                    JENNER & BLOCK LLP


By: ____/s Andrew J. Thomas____
          Andrew J. Thomas

*Attorneys for Plaintiff Waverly Scott Kaffaga, as Executor of the Estate of Elaine Anderson Steinbeck*

-26-

# EXHIBIT 1

**102**

DEC 9 1982

STEINBECK v. STEINBECK

S. D. OF N.Y.

81 Civ. 6105

ENDORSED MEMORANDUM

*Copies Mailed to Counsel of Record* 12/8/82

OWEN, District Judge

Plaintiffs are the two sons of the author John Steinbeck. Defendant is Elaine Steinbeck the author's second wife. By letter dated January 21, 1974, the entirety of which is reproduced below, plaintiffs authorized McIntosh & Otis, Inc. ("M&O"), John Steinbeck's literary agent, to distribute royalties which had accumulated on certain of the author's works by paying 50% to defendant and 25% to each plaintiff. Since that time, such royalties have been distributed to the parties as provided in the agreement.

Plaintiffs have brought this action to contest the royalties distribution plan. They now contend that they are entitled to receive a one-third share of the royalties each. Moreover, they contend that the January 21, 1974 agreement is void because defendant made "misrepresentations, overreach[ed] and possibly [committed] fraud" at the time of plaintiffs' signing of the agreement. Defendant now moves for summary judgment on the agreement.

As set forth in full below, the agreement is specific and unambiguous in its division of certain royalties. In order to defeat defendant's motion for summary judgment on the agreement, plaintiffs must do more than allege fraud or misrepresentation in conclusory terms. Plaintiffs must bolster their allegations of malfeasance with competent evidence. In their affidavits, plaintiffs say no more about the circumstances leading to their signing of the agreement than the following:

> Based on discussions with my step-mother I was led to believe that the division contained in my letter was what I was entitled to. At no time was I informed by her or McIntosh & Otis that there was any question as to the legalty [sic] of that split of royalties.

Absent a more particularized affidavit contesting the particulars of the contract-making, defendant is entitled to summary judgment on the contract. Defendant's motion is granted and the complaint is dismissed. E.g., Saratoga Vichy Spring Co., Inc. v. Lehman, 491 F.Supp. 141, (N.D.N.Y. 1979), aff'd, 615 F.2d 1037 (2d Cir. 1980).

Submit order on notice.

Dated:    December 8, 1982
          New York, New York

United States District Judge

MICROFILM

DEC 9 1982

# EXHIBIT 2

## SETTLEMENT AGREEMENT

Whereas, John Steinbeck IV and Thom Steinbeck commenced an action in the United States District Court for the Southern District of New York entitled John Steinbeck IV and Thom Steinbeck v. Elaine Steinbeck, 81 Civ. 6105 ("the Action"); and

Whereas, Elaine Steinbeck filed an answer in the Action denying the material allegations of the complaint as amended and liability therefor, and asserting various affirmative defenses; and

Whereas, Elaine Steinbeck moved for summary judgment, which motion was granted on December 8, 1982; and

Whereas, the Action was dismissed with prejudice on December 28, 1982, and judgment in favor of Elaine Steinbeck was entered on January 3, 1983; and

Whereas, John Steinbeck IV and Thom Steinbeck filed a Notice of Appeal to the United States Court of Appeals for the Second Circuit; and

Whereas, John Steinbeck IV and Thom Steinbeck have stated their intention to file an action against Elaine Steinbeck for copyright infringement in connection with the foreign exploitation of the works of John Steinbeck, and against McIntosh and Otis, Inc. ("M & O") for breach of fiduciary duty, and have indicated that they may seek to

challenge the will of John Steinbeck (hereinafter collectively referred to as the "Unasserted Claims"); and

Whereas, John Steinbeck IV and Thom Steinbeck and Elaine Steinbeck (hereinafter the "Parties") are desirous of settling the Action and the Unasserted Claims in order to avoid the burdens and expenses of further litigation,

It is hereby agreed that:

1. Elaine Steinbeck shall pay to John Steinbeck IV and to Thom Steinbeck $66,876.30 each, which amount represents the difference between one-half and one-third of the net royalties received through December 31, 1982 from the domestic exploitation during their copyright renewal terms of those works of John Steinbeck which entered their copyright renewal terms after his death (the "renewed works") and their derivatives which were initially licensed during the renewal terms of the renewed works. As used in this Agreement, the phrase "renewal term" shall mean the 47 year term granted pursuant to the U.S. Copyright Law, 17 U.S.C. § 304(a), irrespective of whether there has been a termination of grants and/or renegotiation of rights pursuant to 17 U.S.C. § 304.

2. The Parties shall each be entitled from December 31, 1982 forward to receive one-third of the net royalties received from the domestic exploitation during their copyright renewal terms (a) of the renewed works and their

2

derivatives which were initially licensed during the renewal terms of the renewed works and may be licensed in the future; and (b) so long as all the Parties are alive, of those works of John Steinbeck which will enter their copyright renewal terms in the future and their derivatives which may be initially licensed during such renewal terms. Upon the death of any of the Parties, all royalties payable under this Paragraph shall be paid to the deceased party's executors, administrators, successors, representatives, heirs and assigns.

3.   Elaine Steinbeck or her executors, administrators, successors, representatives, heirs and assigns are the sole owners of all foreign copyrights in the works of John Steinbeck and all rights deriving therefrom and shall be the sole recipients of all royalties earned from the foreign exploitation of the works of John Steinbeck and their derivatives, including but not limited to: (a) all works which entered their renewal terms after John Steinbeck's death; and (b) all works which will enter their renewal terms in the future; and John Steinbeck IV and Thom Steinbeck hereby relinquish all present and future claims thereto; provided, however, that royalties earned from sales outside the United States of the United States publishers' editions of the

3

renewed works shall be shared in accordance with the terms of paragraphs 1 and 2 above.

4.  All sums due and owing to John Steinbeck IV and to Thom Steinbeck under paragraphs 1 and 2 of this Agreement shall be paid to them through their attorneys, Lowe, Bressler & Kaufman, 2700 Que Street, N.W., Washington, D.C.

5.  The Parties hereby appoint M & O as their literary agent to administer in the future, as it has in the past, all copyrights and rights deriving therefrom in the works of John Steinbeck.  Said appointment shall be terminable solely at the discretion of Elaine Steinbeck.  Elaine Steinbeck and/or her agent shall have the complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck in which John Steinbeck IV and Thom Steinbeck have or will have renewal or termination rights.  In order to effectuate the terms of this Paragraph, John Steinbeck IV and Thom Steinbeck shall each execute, simultaneously with the execution of this Agreement, an irrevocable power of attorney in favor of Elaine Steinbeck in the form attached hereto as Exhibit A.

6.  Elaine Steinbeck and/or the literary agent shall maintain an accurate set of books and records reflecting royalties earned from the domestic exploitation of the

4

orks of John Steinbeck in which John Steinbeck IV and Thom Steinbeck have or will have renewal rights and shall, without notice or demand, provide them with semi-annual accounting statements.

7.   This Agreement shall supersede the letters dated January 21, 1974 from Elizabeth R. Otis to John Steinbeck IV and Thom Steinbeck.  With the exception of said letters, the Parties hereby ratify and confirm all existing contracts and agreements previously executed by them or by M & O on their behalf with respect to those works of John Steinbeck in which they have rights under the U.S. Copyright Law.

8.   Simultaneously with the execution of this Agreement, John Steinbeck IV and Thom Steinbeck shall execute a release in favor of Elaine Steinbeck in the form attached hereto as Exhibit B.

9.   Simultaneously with the execution of this Agreement, John Steinbeck IV and Thom Steinbeck shall execute a release in favor of M & O in the form attached hereto as Exhibit C.

10.   Within five days after the execution of this Agreement, John Steinbeck IV and Thom Steinbeck, through their attorneys, Lowe, Bressler & Kaufman, shall withdraw the Notice of Appeal referred to herein and hereby agree never to assert the Unasserted Claims.

11.   The terms of this settlement shall be kept confidential and shall not be communicated in any way to anyone other than the Parties and their heirs, successors and assigns, their attorneys and accountants, and M & O and its attorneys, except to the extent that disclosure may be required by law.

12.   This Agreement represents a compromise of the claims asserted in the Action and of the Unasserted Claims and is not and shall not be construed, represented or argued to be an acknowledgment of the merits of the claims asserted in the Action or the Unasserted Claims, or an admission of liability on the part of Elaine Steinbeck or M & O.

13.   This Agreement shall not be modified in any way except by a written agreement signed by the Parties.

14.   This Agreement shall bind the Parties and their heirs, successors and assigns.

_Elaine Steinbeck_
Elaine Steinbeck

_John Steinbeck IV_
John Steinbeck IV

Thom Steinbeck

6

## Power of Attorney

I, John Steinbeck IV, hereby irrevocably appoint Elaine Steinbeck my attorney-in-fact to act in my place, to the extent I am permitted by law to act through an agent or attorney-in-fact, as follows: to exercise my rights of renewal and rights to terminate grants to third parties and make new contracts and grants and assignments of copyrights, and to negotiate and sign contracts and agreements and otherwise take and authorize action on my behalf, directly or through such agents or attorneys-in-fact as she, in her sole discretion, may appoint, all solely with respect to the works of John Steinbeck in which I now have or will have renewal or termination rights under the U.S. Copyright Law.

John Steinbeck IV

Dated:

EXHIBIT A

February 16, 1933

<u>Power of Attorney</u>

I, Thom Steinbeck, hereby irrevocably appoint Elaine Steinbeck my attorney-in-fact to act in my place, to the extent I am permitted by law to act through an agent or attorney-in-fact, as follows: to exercise my rights of renewal and rights to terminate grants to third parties and make new contracts and grants and assignments of copyrights, and to negotiate and sign contracts and agreements and otherwise take and authorize action on my behalf, directly or through such agents or attorneys-in-fact as she, in her sole discretion, may appoint, all solely with respect to the works of John Steinbeck in which I now have or will have renewal or termination rights under the U.S. Copyright Law.

Thom Steinbeck

Dated:

February 22, 1983

EXHIBIT A

**𝕬𝖓𝖔𝖜 𝕮𝖍𝖆𝖙** John Steinbeck IV

as RELEASOR,

a consideration of the sum of sixty six thousand eight hundred seventy six and 30/100 dollars

and other good and valuable consideration                    ($ 66,876 30),

received from

Elaine Steinbeck

as RELEASEE;

eceipt whereof is hereby acknowledged, releases and discharges

Elaine Steinbeck

the RELEASEE, RELEASEE'S heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR, RELEASOR'S heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may have or, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE, **except such claims as may arise from the obligations set forth in the Settlement Agreement between the Releasor and Releasee executed contemporaneously herewith**

Whenever the text hereof requires, the use of singular number shall include the appropriate plural number as the text of e within instrument may require.

This RELEASE may not be changed orally.

**In 𝖂𝖎𝖙𝖓𝖊𝖘𝖘 𝖂𝖍𝖊𝖗𝖊𝖔𝖋,** the RELEASOR has hereunto set RELEASOR'S hand and seal on the

ir of FEB 16      19 83

In presence of KAREN C MICHAEL

_____ L.S.

ATE OF COLORADO      COUNTY OF Boulder      ss.

On FEBRUARY 16 19 83 before me KAREN MICHAEL

rsonally came JOHN STEINBECK IV

me known, and known to me to be the individual(s) described in, and who executed the foregoing RELEASE, and duly cknowledged to me that    he    executed the same.

Karen C Michael
NOTARY PUBLIC    May 11 93C
Commi ___ ___

𝕶𝖓𝖔𝖜 𝕿𝖍𝖆𝖙  Thom Steinbeck, AKA Thomas Steinbeck

as RELEASOR,

in consideration of the sum of sixty six thousand eight hundred seventy six and 30/100 dollars
and other good and valuable consideration

($66,876 30 ),

received from   Elaine Steinbeck

as RELEASEE,

receipt whereof is hereby acknowledged, releases and discharges

Elaine Steinbeck

the RELEASEE, RELEASEE'S heirs, executors, adminis-
trators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,
bills, specialties, covenants. contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents,
executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR,
RELEASOR'S heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have
for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this.
RELEASE, except such claims as may arise from the obligations set
forth in the Settlement Agreement between the Releasor
and Releasee executed contemporaneously herewith.

GENERAL ACKNOWLEDGMENT

State of California

County of _____

On this the ___ day of _____, 19__ before me,

Be _____

> the undersigned Notary Public, personally appeared

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) ____ is ____ subscribed to the
within instrument, and acknowledges that ____ he ____ executed it
WITNESS my hand and official seal

Notary's Signature

**Know That** Thom Steinbeck AKA; Thomas Steinbeck, as

as RELEASOR;

n consideration of the sum of  One dollar and no/100

and other good and valuable consideration

($ 1.00    ),

received from   McIntosh and Otis, Inc

as RELEASEE,

receipt whereof is hereby acknowledged, releases and discharges

McIntosh and Otis, Inc.

the RELEASEE, RELEASEE'S heirs, executors, adminis-
:ators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,
ills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents,
recutions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR,
ELEASOR'S heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have
r, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this
ELEASE.

GENERAL ACKNOWLEDGMENT

State of California

County of Alameda
} ss.

On this the 22nd day of February 19 83 before me.

Barbara Grantlangue et a

the undersigned Notary Public, personally appeared

Thom Steinbeck askas Thomas Steinbeck

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s)  is  subscribed to the
within instrument, and acknowledged that  he  executed it
WITNESS my hand and official seal.

Notary's Signature

If the party making pr ment is not the sam-   bare released, delete words, "as RELEASEE" and add names of name-

TOTAL P 18

# EXHIBIT 3

# Last Will and Testament

—(((and)))—

—(((of)))—

## ELAINE ANDERSON STEINBECK

Prepared By:

Steven K. Aronoff, Esq.
475 Park   nue South, 23rd Floor
New York, .ew York 10016

I, ELAINE ANDERSON STEINBECK, of the City and State of New York, being of sound and disposing mind and memory, do hereby make, publish and declare this instrument as and for my Last Will and Testament, hereby revoking all other and former Wills and Codicils by me at any time heretofore made.

FIRST: I direct that all my just debts, funeral and testamentary expenses shall be paid as soon as my estate is able in the judgement of my Executrix.

SECOND:   A.   I give, devise and bequeath the proprietary lease and stock certificate relating to apartment 34D located at 190 East 72nd Street, New York, New York 10021, as well as the contents therein to the extent I own the same at my death, to my daughter WAVERLY SCOTT KAFFAGA.  The bequest of this proprietary lease and stock certificate and the bequest of its contents shall be free of any estate tax whatsoever, and notwithstanding the fact that other bequests under this last Will may be reduced in the event my residuary estate does not contain sufficient assets to pay estate taxes and administration expenses.  The reasonable costs of appraising, packing, storing, shipping and insuring all articles disposed of in this Article shall be paid as an expense of administering my estate.

B. If my daughter, WAVERLY SCOTT KAFFAGA, predeceases me then I give and bequeath the proprietary lease and stock certificate relating to apartment 34D located at 190 East 72nd Street, New York, New York 10021, as well as the contents therein to the extent I own the same at my death to a group consisting of

1

my grandchildren DAVID SCOTT FARBER, ANDERSON FARBER RUNKLE, ROLAND ZACHARY KAFFAGA, JEBEL KAFFAGA, and BAHAR KAFFAGA to be divided among them as they may reasonably determine.  The bequest of this proprietary lease and stock certificate and the bequest of its contents shall be free of any estate tax whatsoever, and notwithstanding the fact that other bequests under this last Will may be reduced in the event my residuary estate does not contain sufficient assets to pay estate taxes and administration expenses. My Executors, in their sole and absolute discretion, may divide these assets as they may deem appropriate if my beneficiaries shall not agree.  The decision of my Executors as to the composition and equality of such shares shall be final and binding upon my beneficiaries, and any articles which my Executors consider inappropriate for my beneficiaries shall be sold and the proceeds thereof added to my residuary estate.  The reasonable costs of appraising, packing, storing, shipping and insuring all articles disposed of in this Article shall be paid as an expense of administering my estate.

C. I give, devise and bequeath all my real property located in the Village of Sag Harbor, Town of Southampton, Suffolk County, New York, including all building, fixtures and improvements thereon, and contents therein to the extent I own the same at my death, to a Trust dated October 29, 1999 between ELAINE ANDERSON STEINBECK as Grantor and EUGENE H. WINICK AND STEVEN FRUSHTICK as Trustees. The devise of my Sag Harbor real property and the bequest of its contents shall be free of any estate tax whatsoever, and

2

notwithstanding the fact that other bequests under this last Will may be reduced in the event my residuary estate does not contain sufficient assets to pay estate taxes and administration expenses.

THIRD:    A.   I give and bequeath to Stanford University my late husband's Nobel Prize Certificate and Medal, to be held by it together with its collection of my late husband's literary works and materials.

B. I give and bequeath any interest that I may own in R. W. Downey Inc., a New York corporation, to my sister, JEAN ANDERSON BOONE and RAE W. DOWNEY, her companion, jointly and severally, or their survivor.  The devise of any interest that I may own in R. W. Downey Inc. shall be free of any estate tax whatsoever, notwithstanding the fact that other bequests under this last Will may be reduced in the event my residuary estate does not contain sufficient assets to pay estate taxes and administration expenses.

C. I make the following specific bequests to my daughter, WAVERLY SCOTT KAFFAGA:

1. An antique diamond ring with a large diamond in the center surrounded by twelve smaller diamonds;

2. A gold necklace with small, round, gold beads;

3. A large gold link bracelet; and

4. A small olive wood cross with a gold disc in the center.

If my daughter, WAVERLY SCOTT KAFFAGA, shall predecease me, then these bequests shall lapse and these items shall be considered part

3

of my residuary estate.

FOURTH:   I give and bequeath the portrait of John Steinbeck by the artist Bo Beskow to THE STEINBECK CENTER AT THE UNIVERSITY OF CALIFORNIA AT SAN JOSE located in San Jose, California.

FIFTH:   A. I give and bequeath the sum of FIFTY THOUSAND DOLLARS ($50,000.00) to each of my five grandchildren, DAVID SCOTT FARBER (subject to Article NINTH B.), ANDERSON FARBER RUNKLE, ROLAND ZACHARY KAFFAGA, JEBEL KAFFAGA, and BAHAR KAFFAGA.  If any of my grandchildren shall predecease me, then I give his or her share to his or her lineal decedents, if any, per stirpes.  If any of my grandchildren shall predecease me without living decedents then the specific bequest given to him or her in this paragraph shall lapse.

SIXTH:  I have specifically made no provision in this my Last Will for my stepson, THOMAS STEINBECK, or NANCY STEINBECK, who has asserted succession rights to the interest of my deceased stepson JOHN STEINBECK IV.

SEVENTH: All copyrights and proceeds from the exploitation of copyrights whether owned or controlled by me, including but not limited to those relating to the works of my late husband, JOHN STEINBECK, and my own, I give and bequeath as follows:

A. To my sister JEAN ANDERSON BOONE, one-quarter thereof during her lifetime, and upon her death or if she shall not survive me, I give and bequeath her share to her friend, RAE W. DOWNEY during his lifetime if he is surviving, and upon his death or if he shall not be surviving, then I give and bequeath this bequest to my

4

EAS

five grandchildren, DAVID SCOTT FARBER (subject to Article NINTH B.), ANDERSON FARBER RUNKLE, ROLAND ZACHARY KAFFAGA, JEBEL KAFFAGA, and BAHAR KAFFAGA, in equal shares pursuant to the provisions of Paragraph SEVENTH D. of this Will.

B.   To my sister, FRANCES ANDERSON ATKINSON, one-quarter thereof during her lifetime, and upon her death or if she shall not survive me, I give and bequeath her share to her husband, JOHN ATKINSON during his lifetime if he is surviving, and upon his death or if he shall not be surviving, then I give and bequeath this bequest to my five grandchildren DAVID SCOTT FARBER (subject to Article NINTH B.), ANDERSON FARBER RUNKLE, ROLAND ZACHARY KAFFAGA, JEBEL KAFFAGA, and BAHAR KAFFAGA in equal shares pursuant to the provisions of Paragraph SEVENTH D. of this Will.

C.   To my daughter, WAVERLY SCOTT KAFFAGA, one-half thereof during her lifetime, and upon her death or if she shall not survive me, I give and bequeath the same to my five grandchildren, DAVID SCOTT FARBER (subject to Article NINTH B.), ANDERSON FARBER RUNKLE, ROLAND ZACHARY KAFFAGA, JEBEL KAFFAGA, and BAHAR KAFFAGA, pursuant to the provisions of Paragraph SEVENTH D. of this Will.

D.   All copyrights and proceeds from the exploitation of copyrights owned or controlled by me which shall be distributed to my five named grandchildren shall be administered and distributed pursuant to this provision.  The property shall be divided into a sufficient number of equal shares to create one share for each of my five named grandchildren, and if any shall not survive, such deceased grandchild's share shall be allocated to his or her issue

5

EAS

in equal shares, per stirpes, and if there be no issue surviving, such deceased grandchild's share shall be added in equal portions to the shares allocated to my other grandchildren, or, if any are not surviving, to their surviving issue, per stirpes.

E. As a condition precedent to any beneficiary receiving an interest in the assets set forth in this paragraph SEVENTH, a beneficiary must agree to be bound by the terms of a Special Power of Attorney between ELAINE ANDERSON STEINBECK and EUGENE H. WINICK or his successor as Attorney-in-Fact in effect at the time of my death, relating to certain copyrights and other matters. The beneficiary will signify his or her agreement to be bound by that Special Power of Attorney by signing any document including a Power of Attorney reasonably required by the holder of the power, provided that the beneficiary shall execute said document within one month of his or her receipt of it. Said Power of Attorney or other document shall include a provision whereby the beneficiary shall renounce and revoke in favor of the Attorney-in-Fact and successor Attorneys-in-Fact all right of the beneficiary himself or herself to perform any of the acts or exercise any of the rights enumerated in the Power of Attorney or other document insofar as they relate to the copyrights created by, John Steinbeck; his literary works and their subsidiary and derivative rights and renouncing all right to unilaterally revoke such Power of Attorney.

EIGHTH: All the rest, residue and remainder of my estate, both real and personal and wheresoever situate, of which I may die seized or possessed, including without limitation all property

EAS

acquired by me or to which I may become entitled after the execution of this Will, and all property herein attempted to be disposed of, the disposition whereof by reason of lapse or other cause shall fail to take effect, I give, devise and bequeath as follows:

A. One-Half (½) to my daughter, WAVERLY SCOTT KAFFAGA. If my daughter, WAVERLY SCOTT KAFFAGA, shall predecease me, then this bequest shall not lapse, but shall be distributed to her issue in equal shares, per stirpes.

B. One-Fourth (¼) to my sister, JEAN ANDERSON BOONE. If my sister, JEAN ANDERSON BOONE, shall predecease me, then this bequest shall lapse.

C. One-Fourth (¼) to my sister FRANCES ANDERSON ATKINSON. If my sister, FRANCES ANDERSON ATKINSON, shall predecease me, then this bequest shall lapse.

NINTH:   A. If, pursuant to this Will, all or any part of my estate shall vest in absolute ownership in a minor or minors, for which other provisions have not specifically been created by this Will, I authorize and empower my Trustees, in their discretion, to hold the property so vested in any such minor, or any part thereof, in a separate trust fund for the benefit of such minor, and to invest and reinvest the same, collect the interest therefrom and, during the minority of such minor, to pay or apply so much of the principal thereof and so much of the net income therefrom and any accumulated income to the proper support, education or maintenance of such minor as my Trustees shall see fit and to accumulate,

7

EAS

invest and reinvest the balance of said income until such minor shall attain the age of twenty-one (21) years and thereupon to pay the then principal, together with any accumulated income, to such minor. If such minor shall die before attaining the age of twenty-one (21) years, the then principal together with any accumulated income, shall be paid over to the estate of such minor. The authority conferred upon my Trustees by this Paragraph NINTH A. shall be construed as a power only, and shall not operate to suspend the absolute ownership of such property by such minor or to prevent the absolute vesting thereof in such minor. With respect to any property held under this Paragraph NINTH A., my Trustees shall have all the powers, privileges, discretions and immunities conferred upon them elsewhere in this Will and shall be entitled to commissions at the rates and in the manner payable to testamentary trustees, and shall not be required to give any bond or other security for the faithful performance of their duties hereunder in any jurisdiction whatsoever. Any payment hereinabove authorized shall be in full discharge to my Trustees with respect thereto.

B.    Anything in this will to the contrary notwithstanding, any bequest or devise to my grandson, DAVID SCOTT FARBER, except as described in Article THIRD B., shall not be given to him, but instead shall be set apart and shall be held, IN TRUST, for the benefit of my grandson, DAVID SCOTT FARBER; and the Trustees shall pay to my grandson, DAVID SCOTT FARBER, or apply for his benefit so much or all of the net income of such share, at such time or times and in such amounts, as the Trustees, in their sole

8

and absolute discretion, may deem advisable. The net income which shall not be paid to or applied for the benefit of my grandson, DAVID SCOTT FARBER, in any year shall be added to the principal of such share at the end of such year and shall be held, administered and disposed of as a part thereof.

(1) The Trustees shall pay to or apply for the benefit of my grandson, DAVID SCOTT FARBER, so much or all of the principal of such share, at such time or times and in such amounts, as the Trustees, in their sole and absolute discretion, may deem advisable.

(2) Upon the death of my grandson, DAVID SCOTT FARBER, the Trustees shall distribute the remaining principal and undistributed income of such share to his then living issue, per stirpes, or, in default of such issue, to my then living issue, per stirpes. If any portion of such share shall become payable to any issue of mine for whom a share shall then be held in trust hereunder, then anything herein to the contrary notwithstanding, such portion shall not be paid over to such issue but in lieu thereof shall be added to his or her share to follow the disposition thereof in all respects as to both income and principal.

C. Anything in this will to the contrary notwithstanding, any bequest or devise to my sister, FRANCES ANDERSON ATKINSON, shall not be given to her, but instead shall be set apart and shall be held, IN TRUST, for the benefit of my sister, FRANCES ANDERSON ATKINSON; and the Trustees shall pay to my sister, FRANCES ANDERSON

ATKINSON, or apply for her benefit so much or all of the net income of such share, at such time or times and in such amounts, as the Trustees, in their sole and absolute discretion, may deem advisable. The net income which shall not be paid to or applied for the benefit of my sister, FRANCES ANDERSON ATKINSON, in any year shall be added to the principal of such share at the end of such year and shall be held, administered and disposed of as a part thereof.

(1) The Trustees shall pay to or apply for the benefit of my sister, FRANCES ANDERSON ATKINSON, so much or all of the principal of such share, at such time or times and in such amounts, as the Trustees, in their sole and absolute discretion, may deem advisable.

(2) Except with regard to paragraph SEVENTH B., upon the death of my sister, FRANCES ANDERSON ATKINSON, or if she shall not survive me, I give and bequeath her share to her husband, JOHN ATKINSON during his lifetime if he is surviving, and upon his death or if he shall not be surviving, then the Trustees shall distribute the remaining principal and undistributed income of such share to her then living issue, per stirpes, or, in default of such issue, to my then living issue, per stirpes. If any portion of such share shall become payable to any issue of mine for whom a share shall then be held in trust hereunder, then anything herein to the contrary notwithstanding, such portion shall not be paid over to such issue but in lieu thereof shall be added to his or her share to follow the disposition thereof in all respects as to both income

10

and principal.

TENTH:  Whenever in this Will my Trustees are authorized or directed to apply any income or principal to the support, education and maintenance of any minor, my Trustees in determining the amount to be so applied is authorized, in  their discretion, to disregard and not to take into consideration the amount of income receivable by such minor from other sources or the amount of such minor's independent property or the extent to which such minor may be entitled to support by a parent or any other person.

Whenever in this Will my Trustees are authorized or directed to apply any income or principal to the support, education and maintenance of any minor, my Trustees are authorized, among other methods, to pay all or any part of such income or principal, at any time and from time to time, to such minor, or the person with whom such minor may reside, without bond or security, and my Trustees shall not be bound to see to the application or use of any payment so made.

ELEVENTH: A. I hereby nominate, constitute and appoint my daughter, WAVERLY SCOTT KAFFAGA, as Executrix of this Will. If my daughter, WAVERLY SCOTT KAFFAGA, shall fail or cease to act for any reason, to act as Executrix of this will, I appoint my sister, JEAN ANDERSON BOONE, my grandson, ROLAND ZACHARY KAFFAGA and STEVEN FRUSHTICK to act as substitute Executors.  If one of these Executors shall fail or cease to act for any reason, to act as Co-Executors of this will, I appoint EUGENE WINICK to act as substitute Co-Executor of this will.  The survivor of the named

parties shall act as sole Executor and Trustee.

B. I hereby nominate, constitute and appoint my daughter, WAVERLY SCOTT KAFFAGA, as Trustee of any trust created by this will except for any trust created for my grandson, DAVID SCOTT FARBER. If my daughter, WAVERLY SCOTT KAFFAGA, shall fail or cease to act for any reason, to act as Trustee of a trust created by this will, I appoint my sister, JEAN ANDERSON BOONE, and STEVEN FRUSHTICK to act as substitute Co-Trustees. If my sister, JEAN ANDERSON BOONE, or STEVEN FRUSHTICK shall fail or cease to act for any reason, to act as Co-Trustee, I appoint EUGENE WINICK to act as substitute Co-Trustee. The survivor of the four named parties shall act as sole Executrix and Trustee.

C. I hereby nominate, constitute and appoint my brother in law, JOHN ATKINSON, as Trustee of any trust created by this will created for my sister, FRANCES ANDERSON ATKINSON. If my brother in law, JOHN ATKINSON, shall fail or cease to act for any reason, to act as Trustee of a trust created by this will, I appoint my nephew, JON ATKINSON, to act as substitute Trustee. If my nephew, JON ATKINSON, shall fail or cease to act for any reason, to act as Trustee, I appoint my sister, JEAN ANDERSON BOONE to act as substitute Trustee.

D. I hereby direct that no bond or other security shall be required of my Executrix and Trustees or their successors for the faithful performance of their duties as such, whether because of nonresidence or otherwise.

TWELFTH: I give my Executors and Trustees and substitute

12

*EAS*

Executors and Trustees the fullest power and authority in all matters and questions and to do all acts which I might or could do if living, including, without limitation, complete power and authority to invest (without restriction to investments permitted by law), sell (at public or private sale, for cash or credit, with or without security), mortgage, lease and dispose of and distribute in kind, all property, real and personal, at such times and upon such terms and conditions as they may deem advisable, and the power and authority to negotiate, arrange, execute, acknowledge, contract and deliver in the United States and in all countries throughout the world, any and all contracts for the sale, leasing, licensing, sub-licensing or other disposition of any literary or other works owned or controlled by me, and of any subsidiary rights therein, on such terms and conditions as they shall deem proper with respect to any one or more of such works and for any period hereby directing that the consent of both Executors and Trustees, when two are acting jointly, shall be required in all matters relating to the disposition of any literary or other works owned or controlled by me, and of any subsidiary rights therein, and any copyrights owned or controlled by me or interests in the same.

THIRTEENTH: Should any person entitled to share in my estate either as an heir at law or as a legatee or devisee under this will, or any trust related thereto, contest or oppose or seek to set aside this will, or any trust related thereto, or establish any legal right to share in my estate, or any trust related thereto, other than as approved and provided in this will, I give and

13

EAS

bequeath to each such person the sum of One ($1.00) Dollar and I do expressly direct that he or she shall receive no other or further share in my estate and the share to which any such person might otherwise have been entitled had he or she not participated in the contest or opposition or to which he or she might have been entitled had I died intestate, I give, devise, and bequeath, equally, share and share alike, to the other legatees and devisees mentioned in this will, other than the issue of the contesting person, who may not have joined in the contest or opposition and should all such devisees and legatees join in opposition of this will, then the shares of each such one which would otherwise have gone to him or her under this will, I give, devise and bequeath to my heirs at law according to the law of succession of the State of New York then in force, excluding each and all of such contesting heirs, devisees and legatees and their issue.

FOURTEENTH:  A.  I direct that all estate, inheritance or other death taxes (including any interest and penalties thereon) payable by reason of my death in respect to any property included in my Estate for the purpose of computing such taxes, whether or not such property shall pass under this Will, except for any generation-skipping transfer tax which may be payable under Chapter 13 of the Code, be paid in the first instance by my Executors. However, I further direct that the ultimate burden of the balance of such taxes and charges shall be apportioned among and collected from the respective distributees and beneficiaries sharing in my gross taxable estate, including distributees for all manner of

14

EAS

devisees under my Will and beneficiaries of property passing in any manner outside my Will, excluding only the distributees as specifically noted in Articles SECOND and THIRD, and the distributees of personal property in Articles SECOND and THIRD. I further authorize my Executors to take such action as may be necessary to collect these taxes and charges from the distributees and beneficiaries responsible therefor, and to withhold such amounts from any property otherwise distributable to any distributee or beneficiary hereby made responsible for their payment.

B.  With respect to any disposition of property made by me which may become subject to a generation-skipping transfer tax upon or after my death, the Executors and Trustees shall have the following duties and powers:

(1)  With respect to any disposition of property under this Will which shall be a direct skip (from a trust or otherwise), any generation-skipping transfer tax shall be paid by my Executors or the Trustees, as the case may be, from the property which is the subject of the direct skip.

(2)  The unused portion of my generation-skipping transfer tax exemption shall be allocated by my Executors as my Executors, in their sole and absolute discretion, may determine; and any allocation made by the Executors shall be binding and conclusive on all persons interested in any such transfer.

FIFTEENTH:  All genders referred to in my Last Will and Testament and any Codicils thereto shall be interchangeable so that

15

*SPS*

wherever references are made in this Will in the masculine they shall also be intended to include the feminine.

IN WITNESS WHEREOF, I have hereunto set my hand and seal to this my Last Will and Testament this 29 day of October, 1999.

*Elaine A. Steinbeck*

ELAINE ANDERSON STEINBECK

On this 29 day of October, 1999, this foregoing instrument was signed and sealed at the end thereof, and at the same time published and declared by ELAINE ANDERSON STEINBECK, the above named Testatrix, as and for her Last Will and Testament, in the presence of each of us, and we thereupon did, at the request of the said Testatrix, in her presence, and in the presence of each other, sign our names as witness thereto.

*signature* ————— residing at 23 Victorian Lane Brookville, NY 11545

*signature* ————— residing at 1841 Central Pk. Ave Yonkers NY 10710

*Marcia Light* ————— residing at 118 Clarke Ave, 2nd Fl. Jersey City, N.J. 07304

16

STATE OF NEW YORK    )
                     )  ss.:
COUNTY OF NEW YORK   )

     Lawrence B. Copperman, Lloyd Mittenthal and Marcia Light, jointly and severally, depose and say:

     I am acquainted with ELAINE ANDERSON STEINBECK. Said ELAINE ANDERSON STEINBECK signed her name at the end of the annexed instrument, bearing the date of October 29, 1999, at 475 Park Avenue South, 23rd Floor, New York, N.Y., on said date, in the presence of myself and other subscribing witness. At the time of signing the same, said ELAINE ANDERSON STEINBECK declared said instrument so signed by her to be her Last Will and Testament, and I thereupon signed my name as witness at the end of said instrument at the request of said ELAINE ANDERSON STEINBECK, and in her presence. Said ELAINE ANDERSON STEINBECK was then over the age of twenty-one years, and in my opinion, of sound mind, memory and understanding, and not under any restraint, or in any respect incompetent to make a Will. I also saw the said other subscribing witness sign his or her name as witness at the end of said instrument and know that he or she did so at the request and in the presence of said ELAINE ANDERSON STEINBECK.

     The signing of the Last Will and Testament by ELAINE ANDERSON STEINBECK was supervised by STEVEN K. ARONOFF, an attorney at law of the State of New York who maintains offices at 475 Park Avenue South, New York, N.Y., 10016-6901, and I signed my name as witness under his supervision.

SWORN TO BEFORE ME THIS
29th DAY OF OCTOBER, 1999.

STEVEN K. ARONOFF
Notary Public, State of New York
No. 31-4610726
Qualified in New York County
Commission Expires March 30, 19
Oct. 31, 2001

17

# EXHIBIT 4

I, JOHN ERNEST STEINBECK, now residing in the State of
New York, do hereby make, publish and declare this instrument to
be my Last Will and Testament, hereby revoking every Will and
Codicil heretofore made by me.

FIRST:  I direct my Executors to pay my just debts and
funeral expenses out of my estate as soon after my decease as may
be practicable.

SECOND:  I give and bequeath to my sister, ELIZABETH
STEINBECK AINSWORTH, now of Pacific Grove, California, if she sur-
vives me, the sum of Twenty Five Thousand Dollars ($25,000.00).

THIRD:  (a)  If I shall die prior to December 31, 1974

(i) and my son, THOM STEINBECK, survive me, I give
and bequeath the sum of Fifty Thousand Dollars ($50,000.) to my
Trustees hereinafter named, in trust nevertheless, for the follow-
ing uses and purposes:  To collect and receive the income thereof
and to pay over the net income to my said son THOM in as near
quarterly payments as may be practicable during his life but no
later than December 31, 1974; if my son Thom be living on that
date, the Trustees shall transfer and convey the principal of the
trust to him; if my son Thom shall die before December 31, 1974,
leaving him a child or children him surviving, then upon his death
I direct my Trustees to transfer and convey the principal of said
trust, together with any undistributed income therefrom, to his
child or children him surviving, in equal shares, but in the event
there shall be no child or children of his then living, then I di-
rect my Trustees to transfer and convey the same to my son, JOHN
STEINBECK IV, if he be then living, and if he be not then living,

then to my wife, ELAINE;

(ii) and if my son Thom shall have predeceased me, then I give and bequeath the said sum of $50,000. to his child or children me surviving, in equal shares, and if there be no child or children of his then living, then to my said son John, if he shall then be living, and if he be not then living, then to my wife, Elaine.

(b) If I shall die after December 31, 1974,

(i) and my son Thom survive me, then I give and bequeath the said sum of $50,000. to my said son Thom;

(ii) and if he shall have predeceased me, then I give and bequeath the said sum of $50,000. to his child or children me sur-viving, in equal shares, and if there be no child or children of his then living, then to my said son JOHN if he shall then be living, and if he be not then living, then to my wife, ELAINE.

FOURTH: (a)  If I shall die prior to December 31, 1974

(i) and my son, JOHN STEINBECK IV, survive me, I give and bequeath the sum of Fifty Thousand Dollars ($50,000.) to my Trustees hereinafter named, in trust nevertheless, for the follow-ing uses and purposes:  To collect and receive the income thereof and to pay over the net income to my said son JOHN in as near quarterly payments as may be practicable during his life but no later than December 31, 1974; if my son John be living on that date, the Trustees shall transfer and convey the principal of the trust to him; if my son John shall die before December 31, 1974, leaving him a child or children him surviving, then upon his death I direct my Trustees to transfer and convey the principal of said trust, together with any undistributed income therefrom, to his child or children him surviving, in equal shares, but in the event there shall be no child or children of his then living, then I direct my Trustees to transfer

-2-

and convey the same to my son, THOM STEINBECK, if he be then living, and if he be not then living, then to my wife, ELAINE;

(ii) and if my son John shall have predeceased me, then I give and bequeath the said sum of $50,000. to his child or children me surviving, in equal shares, and if there be no child or children of his then living, then to my said son Thom, if he shall then be living, and if he be not then living, then to my wife, Elaine.

(b) If I shall die after December 31, 1974,

(i) and my son John survive me, then I give and bequeath the said sum of $50,000. to my said son John;

(ii) and if he shall have predeceased me, then I give and bequeath the said sum of $50,000. to his child or children me surviving, in equal shares, and if there be no child or children of his then living, then to my said son THOM if he shall then be living, and if he be not then living, then to my wife, ELAINE.

FIFTH:  I give and bequeath to RUTH FLETCHER (now employed by me in my home) the sum of Five Thousand Dollars ($5,000.).

SIXTH:  All the rest, residue and remainder of my property and estate, be the same real or personal, of whatsoever kind or nature, and wherever the same may be situate, I give and bequeath to my wife, ELAINE, if she shall survive me; if she shall not survive me, I give the said rest, residue and remainder of my property and estate, in equal shares, (a) to my Trustees, or (b) to my sons Thom and John or their respective children, as the case may be, to be held, invested and distributed in manner identical to that which I directed in the bequests set out in paragraphs THIRD and FOURTH hereof, respectively.

SEVENTH:  In the event my wife and I shall die simultaneously or under such circumstances as to render it impossible to determine who predeceased the other, I hereby declare it to be my will and I direct that I shall be deemed to have predeceased my wife and that

-3-

my Will and any and all of its provisions shall be construed on that assumption.

EIGHTH:  In connection with the trusts hereinbefore set out, during the term thereof my Trustees may pay or apply any part or all of the principal thereof for such respective child's care, support, maintenance, education or welfare to such extent and at such times and in such manner as my Trustees in their absolute discretion shall deem advisable without court order and payment of any part of the trust res to one child of mine shall not be related to any payment to the other child of mine.

NINTH:  To carry out the bequests recited in paragraphs SECOND to and including FIFTH and to pay my debts, funeral expenses, administration expenses and estate taxes set out in the following paragraph TENTH, I direct that my Executors shall not sell any property of mine which I may own either in fee or represented by shares in a cooperative corporation in which I maintain my homes, unless the same be absolutely essential to permit the funding of the said bequests and other items in this paragraph mentioned, it being my intention so far as possible that such property used by me as homes of mine constitute part of the residuary estate to which my wife Elaine may be entitled hereunder.

TENTH:  I direct my Executors to pay out of my residuary estate and as an expense of administration, all estate, transfer and inheritance taxes and other taxes of a similar nature, which may be substituted for or added to the foregoing, levied or imposed upon my estate or upon the transfer of property or rights or interests as a result of my death, whether arising out of any federal, state or other political subdivision thereof.  No beneficiary of mine shall be called upon to reimburse my Executors for payment of the foregoing.

ELEVENTH:  In the event a legacy shall be payable or deliverable hereunder to an infant and such legacy shall be in property

-4-

or in money, then my Executors and Trustees are empowered to de-
liver the same in their discretion to a parent of such infant or
the person with whom such infant shall reside, or a general guardian
of the property of such infant, and upon receiving a written acknow-
ledgment from such person to whom the same shall have been delivered
that such person agrees to hold the same for the benefit of such
infant, my Executors and Trustees shall be acquitted of any further
responsibility with respect to the payment of such legacy.

TWELFTH:  In addition to such powers conferred upon them
by law, I authorize my Executors and Trustees:

(a)  To compromise any claim in favor of or which may be
asserted against my estate or trusts hereunder;

(b)  To sell, exchange, pledge, mortgage or otherwise dis-
pose of or encumber any property held by them at public or private
sale, at such price, for cash or partly or wholly upon credit, and
generally, upon such terms as my Executors and Trustees may deem
proper; to extend any bonds and mortgages which may be or become
part of my estate or which may encumber any property constituting
an asset of my estate; to reduce the principal and the rate of in-
terest therein provided and to modify the time of payment of prin-
cipal and interest, as well as other terms thereof;

(c)  To retain property and investments made by me; and
to acquire in exchange for assets of my estate, and to purchase,
lease or license for purposes of investment, property of every.
kind and nature, real, personal and mixed, tangible and intangible,
whether or not the same be of a kind authorized by the laws of the
State of New York;

(d)  To make distributions hereunder in their discretion in
kind or partly in kind with securities or other property of my estate
and trusts.

-5-

(e) To deal in and with the literary properties which may constitute a part of my estate, either directly or through literary agents, and to acquire and dispose of other interests in literary properties in connection with the exploitation of rights in literary properties constituting a part of my estate, in all respects as fully as I could do if living; and in all such transactions, to conclude the same upon such terms as my Executors and Trustees, in their sole and unfettered judgment, may believe to be advantageous to my estate. It is my purpose to invest my Executors and Trustees with the fullest power and authority to deal in and with rights in literary properties, realizing the complexity and difficulty of exploiting the same advantageously and desiring that they shall be unhampered in any respect in turning to account the rights therein and making or amending contracts with respect thereto. I specifically empower my Executors and Trustees until the expiration of the last of the United States statutory copyrights and renewals owned by me or in which I may have any interest at the time of my death, and renewals to which my Executors may be entitled and which may be secured by them for the benefit of my estate, to hold, manage and exploit said copyrights, and all common law and foreign copyrights in my works, and the rights and interests therein, as in this subdivision (e) set forth. My Executors and Trustees shall not, however, be limited as to the periods of any assignments, licenses or other contracts relating thereto, made by them, it being my intention that although title in such copyrights, rights and interests shall vest in accordance with the provisions of this Will, they shall be held, managed and exploited by my Executors and Trustees. If my Executors or

-6-

Trustees shall deem it convenient to organize a corporation to hold title to my copyrights, I authorize and empower them to do so and make such assignments thereto as are appropriate and to provide for control of the corporation as they see fit.

(f)  To vote by proxy all shares of stock which may be or become part of my estate; to deposit any securities (including in said term "securities" wherever used in this Will, all evidences of indebtedness, instruments securing same, stocks and rights and interests therein) which may be or become part of my estate, in their uncontrolled discretion, with any protective or reorganization committee or group, or with a trustee or trustees under a protective or reorganization agreement for the safeguarding of holders of such class of security, or with a trustee or trustees appointed by any court or judge thereof for a similar purpose, and to make payments out of my estate necessary for the expenses of such committee, group or trustee, or to enable my Executors to exchange the security so deposited for new or substituted securities.

(g)  To place and leave all or any part of the funds or securities at any time held in my general estate or in any trust estate in the care and custody of any bank or trust company; to have all stocks and registered securities put in the name of such bank or trust company or in the name of its nominee; to appoint such bank or trust company the agent and attorney of the Executors or of the Trustees, as the case may be, to collect, receive, receipt for and disburse any income, and, generally, to perform all and every the duties and services incident to a so-

-7-

called "custodian account". I direct that the charges and expenses of such bank or trust company as such attorney, agent, or custodian shall be a proper charge against income. While said funds and securities are in the care and custody of any such bank or trust company, as aforesaid, the Executors and also the Trustees shall be under no obligation to inspect or to verify the same, nor shall they in any event be responsible for the loss or misapplication of any securities or funds so left by them in the custody of such bank or trust company.

(h)  To hold any property in bearer form or to register any securities held by them hereunder in the name of a nominee.

(i)  To sign, seal, acknowledge and deliver any and all instruments in writing which they in their sole and absolute discretion may deem appropriate or advisable to carry out any of the foregoing powers, and, generally, to deal with my general estate or any trust estate as in their judgment the best business interests of my general estate or of such trust estate may require. Any obligations incurred by any such instrument in writing signed by the Executors shall be discharged only out of the assets of my general estate in their hands and shall not create any personal liability on the part of the Executors. Any obligations incurred by any such instrument in writing signed by the Trustees of any of the trusts hereinbefore created shall be discharged only out of the assets of such trust in their hands and shall not create any personal liability on the part of the Trustees. No party to any such instrument in writing signed by the Executors or by the Trustees shall be obliged to inquire into the validity, expediency or propriety of any obligation incurred by such instrument on

-8-

behalf of my general estate or of any trust estate, nor shall any
such party be bound to see to the application by the Executors or
by the Trustees of any money or other property paid or delivered
to them by such party pursuant to the terms of any such instrument.

(j)  In connection with any trust hereinbefore created,
I authorize and empower my Trustees to commingle the funds of the
two trusts if in their discretion it is more convenient for the
purpose of investment and reinvestment and distribution thereof.

THIRTEENTH: I appoint my wife, ELAINE ANDERSON STEINBECK,
and my friend and attorney, HARRY BUCHMAN, to be the Executors and
Trustees hereunder.  In the event either or both of them shall fail
to qualify, or having qualified either or both of them shall for
any reason cease to act as Executor or as Trustee before completing
her or his duties hereunder, then I appoint SOL LEIZNER and THE
CHASE MANHATTAN BANK (National Association) in the order named, as
substitute Executors or Trustees, as the case may be.  It is my in-
tention that at all times there be two Executors and Trustees of
my estate.  In the event the said The Chase Manhattan Bank (National
Association) shall fail to qualify or having qualified shall cease
to act as Executor and Trustee, then the person then acting as
Executor shall select another bank or trust company to be his co-
Executor or co-Trustee hereunder, as the case may be.  If one in-
dividual shall be acting hereunder as Executor or as Trustee and
such Executor or Trustee shall not be able to find a bank or trust
company willing to qualify as co-Executor or as co-Trustee, then
I direct the court in which this Will shall be probated to select
such co-Executor or co-Trustee.  If a bank or trust company is

-9-

acting alone as Executor or as Trustee, no co-Executor or co-Trustee in that circumstance is to be required.

No bond or other security shall be required of any of the persons named as Executor, substitute Executor, Trustee or substitute Trustee or of any bank or trust company acting as Executor or Trustee.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal, this 5ᵗʰ day of August , 1968.

*John Ernest Steinbeck* L.S.
————————————————————
John Ernest Steinbeck

On this 5ᵗʰ day of August 1968, the foregoing instrument consisting of ten (10) typewritten pages, including this page, was signed, sealed, published and declared by JOHN ERNEST STEINBECK, the Testator, as and for his Last Will and Testament, in the presence of us, and we, in his presence, and in the presence of each other and at his request, have hereunto set our names as subscribing witnesses thereto.

*Earl Oliver* residing at 103-1- 16ᵗʰ Road
————————————— Forest Hills, NY 11375
*Sidney Hoskins* residing at 7-38 113 St
————————————— Forest Hills, NY 11375
————————————— residing at ———————————
—————————————

--10-

# EXHIBIT 5

STEINBECK v. McINTOSH & OTIS, INC.      **395**
Cite as 433 F.Supp.2d 395 (S.D.N.Y. 2006)

(quoting *In re Beatrice Foods Co.*, 57 C.C.P.A. 1302, 429 F.2d 466, 474 n. 13 (1970)).  In *Weiner King* the court fashioned a concurrent use arrangement between the parties only after two courts had determined that the parties' marks were confusingly similar and that "confusion in the marketplace if the marks [were] used side by side [was] not only likely but certain." *Id.* at 521.

No such finding of confusion has been made here.  Moreover, Defendant has not sought, through either formal or informal means, to enforce its trademark registration against Plaintiff or to expand into Plaintiff's market, as was the case in *Weiner King; see also Architemps, Inc. v. Architemps, Ltd.*, No. 88 Civ. 5152(RO), 1989 WL 80300 (S.D.N.Y. Apr.16, 1989) (holding that junior user/senior registrant of mark, an architecture firm, had superior right to expand into area into which neither it nor defendant, also an architecture firm, had expanded).  Plaintiff has not evidenced any intent to seek registration of the "Omicron Capital" mark.  Because there is no likelihood that Defendant's use of "Omicron Capital" will result in confusion among relevant consumers and because Defendant has no intention to expand its services to include any similar to Plaintiff's, no concurrent use registration is appropriate at this time.

### *The Unfair Competition Claim Is Dismissed*

**[8, 9]**  To prevail on a claim for unfair competition under New York common law, "a plaintiff must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating the defendant's bad faith." *Info. Superhighway*, at 56 (quoting *Philip Morris USA Inc. v. Felizardo*, No. 03 Civ. 5891(HB), 2004 WL 1375277 (S.D.N.Y. June 18, 2004)) (dismissing plaintiff's common-law unfair competition claim on summary judgment because Lanham Act claim had been dismissed and plaintiff was unable to show bad faith on part of defendants); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) (dismissing Lanham Act claims and state law unfair competition claims on summary judgment, noting that "[t]he essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another. Central to this notion is some element of bad faith.").  No evidence has been presented to establish that Defendant acted in bad faith in adopting and registering the mark "Omicron Capital."  As a consequence, the claim for unfair competition is dismissed.

### *Conclusion*

For the reasons set forth above, the motion by Defendant for summary judgment is granted, and the cross-motion of Plaintiff is denied.  Submit judgment on notice.

It is so ordered.



Thomas **STEINBECK**, an individual; and Blake Smyle, an individual, Plaintiffs and Counterclaim Defendants,

Nancy Steinbeck, an individual, Intervenor–Plaintiff,

v.

**McINTOSH & OTIS, INC.**, a New York corporation; the Steinbeck Heritage Foundation, a non-profit New York corporation; Eugene H. Winick, an individual; Samuel Pinkus, an individual; Jean Anderson Boone, an indi-

vidual; Francis Anderson Atkinson, an individual; Waverly Scott Kaffaga, an individual and Executor of the Estate of Elaine Anderson Steinbeck; David Scott Farber, an individual; Anderson Farber Runkle, an individual; Jebel Kaffaga, an individual; Bahar Kaffaga, an individual; and Steven Frushtick, an individual; and Does 1–10, Defendants and Counterclaim Plaintiffs.

**Penguin Group (USA) Inc. Plaintiff,**

v.

**Thomas Steinbeck and Blake Smyle, Defendants.**

Nos. 04–CV–5497 (RO), 04–CV–6795 (RO).

United States District Court, S.D. New York.

June 8, 2006.

As Amended July 18, 2006.

**Background:** Holders of right to recapture copyrights, provided by Copyright Act amendments extending period of available copyright protection, served notice of termination of pre-1978 copyright grants. Holders and grantees moved and cross moved for summary judgment.

**Holdings:** The District Court, Owen, J., held that:

(1) recapture rights were not lost as result of post-1978 copyright agreement expressly continuing prior publication rights, and

(2) there were no recapture rights with respect to copyrights transferred by author during original copyright term, when author died before commencement of renewal term.

Ordered accordingly.

**1. Copyrights and Intellectual Property**
    ⚖47.5

Statutory right to recapture interests in pre-1978 copyright were not lost when widow who was statutory heir of author entered into agreement with publisher in 1994, continuing prior publication rights with additional publication costs to publisher, despite claim that 1994 agreement was new copyright grant not subject to recapture; agreement expressly reserved widow's copyright interests. 17 U.S.C.A. § 304(c)(5), (d).

**2. Copyrights and Intellectual Property**
    ⚖47.5

A son and granddaughter of author had no rights to recapture copyrights in works obtained prior to 1978, when author who had granted to third parties rights to those works died before renewal term of original copyrights began; recapture rights did not arise until expiration of renewal term, and author could grant those copyrights only through end of original term, after which rights reverted to author's widow, who had not made any copyright grants. 17 U.S.C.A. § 304(c)(5), (d).

———

Mark S. Lee, Manatt, Phelps & Phillips LLP, New York City, for Plaintiffs/Defendants Thomas Steinbeck and Blake Smyle.

Sanford J. Hausler, Cox Padmore Skolnik & Shakarchy LLP, New York City, for Intervenor–Plaintiff Nancy Steinbeck.

Susan J. Kohlmann, Carolina A. Fornos, Nancy V. Thornton, Pillsbury Winthrop Shaw Pittman LLP, New York City, for Defendants and Counterclaim Plaintiffs Waverly Scott Kaffaga (as individual and executor of the Estate of Elaine Anderson Steinbeck), David Scott Farber, Anderson Farber Runkle, Jebel Kaffaga, Bahar Kaffaga, and Jean Anderson Boone.

Elizabeth McNamara, Davis Wright Tremaine LLP, for Defendants and Counterclaim Plaintiffs McIntosh & Otis, Inc., Eugene Winick, and Samuel Pinkus.

Richard Dannay, Thomas Kjellberg, Cowan, Liebowitz & Latman, P.C., New York City, for Plaintiff Penguin Group.

*OPINION & ORDER*

OWEN, District Judge.

Prior to the copyright law amendments taking effect in 1978, there were but two periods of copyright protection—the original period of 28 years, and a 28-year renewal, for a possible total of 56 years. In 1978, the copyright term was increased by 19 years, to a total of 75 years, and in 1998, 20 more years was added to that, for today a total of 95 years.

Given the said length of copyright protection, early in which young creators often less than advantageously contract for long terms with publishers, etc., and it also being the way of the world that a number of such young composers, artists and authors, from time to time, such as John Steinbeck writing his first book in 1929, cannot predict the high stature they would attain,[1] and the popular prominence of their works in musical and literary consciousness—not to mention the eventual high financial rewards to them and their families their work can command, our copyright laws have come to recognize this, and accordingly, in the statute, provide opportunities for such a creator and/or his or her family to terminate—and recapture—rights previously granted others, allowing creators or their heirs appropriate reward for the artistic gifts to our culture.

There are two such "recapture" opportunities during a copyright's lifetime.[2] The first, Section 304(c) of the Copyright Act, grants creators of pre–1978 works or their statutory heirs,[3] an inchoate but inalienable[4] property right[5] to "terminate" earlier grants of copyrights made before Janu-

---

1. Steinbeck was awarded a Pulitzer Prize and the Nobel Prize for Literature.

2. A third possible mandatory event of return of the grant—if it can be so phrased—is if the creator dies while the copyright is in its first term. Under that circumstance, the right to future renewal does not follow his contractual or testamentary grant. Instead, the expectancy of the renewal rights automatically vests in statutorily enumerated categories of persons—who are *not* bound by the original disposition—according to the following hierarchy: "[1] the widow, widower, or children of the author, ... [2] the author's executors, if such author, widow, widower, or children are not living, or [3] the author's next of kin, in the absence of a will of the author." 17 U.S.C. § 304(a)(1)(C). *See also Stewart v. Abend,* 495 U.S. 207, 219–20, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). Thus, the additional years of protection provided by Section 304(a) represent a completely "new family property right" in pre–1978 works. *Larry Spier, Inc. v. Bourne Co.,* 953 F.2d 774, 779 (2d Cir.1992).

3. *See* 17 U.S.C. § 304(a)(1)(C), discussed *supra,* and 17 U.S.C. §§ 304(c)(1), (c)(2), discussed *infra,* for the statute's categorical hierarchy of entitlement. *See also, Larry Spier,* 953 F.2d at 778; *Abend,* 495 U.S. at 218, 110 S.Ct. 1750.

4. The inalienability of the Section 304(c) right has been recognized by the Supreme Court, the Second Circuit, and this Court on myriad occasions. *See Abend,* 495 U.S. at 230, 110 S.Ct. 1750 ("The 1976 Copyright Act ... provides an inalienable termination right."); *Larry Spier,* 953 F.2d at 779–80 (Section 304(c) "was drafted so as to leave no doubt about the family's power to recapture the copyright."); *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.,* 155 F.3d 17, 24 (2d Cir.1998) (inalienability is "consistent with the general thrust of § 304, which is designed to protect the interests of authors and their heirs and to maximize their ability to exploit the value of their [works] during the extended renewal term."); *Morris,* 73 F.Supp.2d at 372 ("unlike the renewal rights, the termination right is inalienable ... Congress resorted to the extraordinary measure of creating an inalienable right in order to ensure that the author's heirs would be able to terminate any contingent grants of renewal rights during the author's lifetime."). Termination rights remain inalienable until they are exercised by service of a notice of termination. 17 U.S.C. § 304(c)(6)(B); *see also,* 17 U.S.C. § 304(c)(6)(D) (providing that "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date

**398**          **433 FEDERAL SUPPLEMENT, 2d SERIES**

ary 1, 1978 and to do so beginning 56 years after the copyright was first secured (i.e., upon expiration of both the original 28–year copyright term and the pre–1978 28–year renewal term).  17 U.S.C. § 304(c). Such termination right is optional—not mandatory or automatic—and can be exercised at any time during a five-year period beginning at the end of the said 56 year period, or on January 1, 1978 (the date of enactment of the statute extending the copyright protection term), whichever is later.  17 U.S.C. § 304(c)(3).[6]  *See Music Sales Corp. v. Morris*, 73 F.Supp.2d 364, 372 (S.D.N.Y.1999).  Should the creator die, the statute transfers the termination to specific successor(s),[7] who, upon recapture thereupon possesses and may regrant those rights.  17 U.S.C. § 304(c)(1), (c)(6).  Termination rights vest on the date a notice of termination is served.  17 U.S.C. § 304(c)(6)(B), (C).[8]  Once a prior grant of copyright is terminated, statutory

heirs are free to grant these rights to whomever they desire, as such new grants fulfill the purpose of the termination right, which is to provide successors in interest with an opportunity to obtain the fair value of the work by negotiating new terms for previously granted rights once the work's true value has appeared.  3–11 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 11.01[A].

The second such termination right was created in 1998 as part of the Sonny Bono Copyright Term Extension Act (CTEA), which extended the copyright term by an additional twenty years, *see* 17 U.S.C. §§ 304(a), (b), and also gives creators or their survivors who did not exercise their termination rights the first time (i.e., 56 years after the copyright was first secured, *see supra*) a second opportunity to terminate during the five-year period beginning 75 years after the copyright came into existence.  17 U.S.C. § 304(d).[9]

of the termination ... [or] after the notice of termination has been served ...'').

**5.** Because Section 304(a) established a completely new family property right in pre–1978 works, *see supra*, ''[t]here are strong reasons for giving the author [and/or his statutory heirs] ... an opportunity to share in'' the benefits of continued exploitation of such works by permitted the author or his family to terminate third party grants.  *See House Report on the Copyright Act of 1976*, House Report No. 94–1476, p. 140 (1976).

**6.** A notice of such termination must be served no more than ten or less than two years before termination is to be exercised.  17 U.S.C. § 304(c)(4)(A).  Thus, under Section 304(c), a notice of termination may be served between 46 years and 59 years after the copyright was originally secured—a 13–year ''window of opportunity''—with the rights that are to revert vesting in the owners of the termination interest on the date the notice is served.  17 U.S.C. § 304(c)(6)(B).

**7.** The deceased author's termination interest is owned, and may be exercised, by the fol-

lowing: (i) the author's widow or widower owns the author's *entire* termination interest; (ii) if the author leaves both a widow or widower *and* children or grandchildren, the widow or widower owns *one-half* of the author's interest, and the remaining half is divided per stirpes among the author's progeny; (iii) in the absence of a surviving widow or widower, the author's surviving children, and surviving children of any dead child of the author, own the author's *entire* termination interest, which is divided among them and exercised on a per stirpes basis; or (iv) in the event that none of the aforementioned heirs are living, the author's executor, administrator, personal representative, or trustee shall own the author's *entire* termination interest.  17 U.S.C. § 304(c)(2).

**8.** *See Range Road Music, Inc. v. Music Sales Corp.*, 76 F.Supp.2d 375, 377 (S.D.N.Y.1999); *see also* 3–11 NIMMER ON COPYRIGHT § 11.03[A][3] (stating that the class of recipients of the terminated rights is determined as of the date the termination notice is served).

**9.** Section 304(d) applies to copyrights in their renewal term on the effective date of the

To protect this right and prevent creators or statutory heirs from contracting away, for whatever reason, this absolute right to "recapture" for the years of extended protection any pre–1978 copyright grant, the statute declares void any contract the effect of which is in contravention of or which negates either of these termination rights. 17 U.S.C. § 304(c)(5).[10] *See, e.g., Morris,* 73 F.Supp.2d at 372; *Larry Spier, Inc. v. Bourne Co.,* 953 F.2d 774, 778 (2d Cir.1992).

Pursuant to these provisions in the Copyright Act, in May and June 2004, the then-statutory heirs of John Steinbeck—son Thom and granddaughter Blake—served five "Notices of Termination" on various third parties which purported to terminate pre–1978 grants of copyrights

---

CTEA—October 27, 1998—for which the termination right under Section 304(c) had expired by that date, and as to which the author or the owner of the Section 304(c) termination right has not previously exercised the right. A notice of termination under Section 304(d) must be served no more than ten and not less than two years before termination is to be exercised—i.e., no earlier than 65 years, and no later than 78 years, after copyright was originally secured.

**10.** This statutory prohibition is intended to be broadly applied to invalidate such unlawful contracts and liberally protect termination rights. *See Marvel Characters, Inc. v. Simon,* 310 F.3d 280 (2d Cir.2002); *Larry Spier, supra; Morris, supra.* Indeed, copyright termination abrogates freedom of contract in two ways: it allows for the invalidation of the original contractual transfer, and it abrogates subsequent attempts to contract around the termination right it creates. 17 U.S.C. § 304(c), (c)(5)

**11.** Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To satisfy its burden under Rule 56(c), the movant must show that the record raises no genuine issue of material fact for trial. *Brink v.*

---

John Steinbeck made to those third parties in accordance with 17 U.S.C. § 304(c) and (d). The parties have filed cross motions for summary judgment as to the validity of these notices, and the above-captioned actions are joined for this purpose only.[11]

Turning to the facts here, when John Steinbeck died in 1968, his third wife, widow Elaine, inherited his copyrights in his early works[12] under the residuary clause in Steinbeck's will. However, with respect to these works, as well as those that entered their renewal period after Steinbeck's death,[13] his two sons from his second marriage—Thomas Steinbeck and John Steinbeck IV—though inheriting no interest in the copyrights under their father's will, nevertheless became possessed of a 50% share of the copyright termi-

---

*Union Carbide Corp.,* 41 F.Supp.2d 406, 413–14 (S.D.N.Y.1999); *see also Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**12.** Steinbeck's "early works" are those whose renewal term of copyright (i.e., after the first 28 years of copyright) became due in the course of his lifetime, and for which he filed renewal registrations. Specifically, Steinbeck renewed: *Cup of Gold* (©1929), *The Pastures of Heaven* (©1932), *To a God Unknown* (©1933), *The Red Pony* (©1937), *Tortilla Flat* (©1935), *In Dubious Battle* (©1936), *Of Mice and Men* (©1937), *Of Mice and Men* (play) (©1937), *Murder at Full Moon* (©1938), *The Long Valley* (©1938), *The Grapes of Wrath* (©1939), *Forgotten Village* (©1941), and *The Sea of Cortez* (©1941) (collectively, the "Early Works").

**13.** These "late works" are: *The Moon is Down* (©1942), *The Moon is Down* (play) (©1942), *Bombs Away* (©1942), *Cannery Row* (©1945), *The Pearl* (©1945), *The Wayward Bus* (©1947), *A Russian Journal* (©1948), *Burning Bright* (©1950), *Log From the Sea of Cortez* (©1951), *East of Eden* (©1952), *Sweet Thursday* (©1954), *The Short Reign of Pippin IV* (©1957), *Once There Was a War* (©1958),

nation interest in each work pursuant to Section 304(c)(2)(B), quoted *supra,* which states that a deceased author's entire termination interest is to be divided, 50% to his widow and 50% to his children [and grandchildren]. 17 U.S.C. § 304(c)(2)(B). Since, however, to exercise a termination right requires a simple majority of the possessors, this meant here that, Elaine and the children being in disagreement, no termination right could be exercised, as neither side had 51%.[14] John IV died in 1991, leaving only one child, Blake Smyle, who now asserts her statutory right in his stead, as Steinbeck's granddaughter.[15] Elaine died in April 2003, leaving all copyrights to her heirs from a previous marriage—all unrelated to Steinbeck.

But upon Elaine's death in April 2003, Thom and Blake, being in agreement, for the first time together possessed the majority (indeed, the totality) of termination interests needed to exercise their termination right. *See* 17 U.S.C. § 304(c)(1). In May and June 2004, they served five "Notices of Termination" on various third parties which purported to terminate pre-1978 grants of copyrights John Steinbeck made to those third parties in accordance

with 17 U.S.C. § 304(c) and (d). Specifically, the Notices terminated: (1) a 1938 grant of book publishing rights made to the predecessor of Penguin Group (USA) Inc. (hereinafter the "Penguin Notice");[16] (2) grants of motion picture rights in Steinbeck's *The Red Pony* made to Paramount Pictures, Inc. in 1946, 1947 and 1949; (3) grants of motion picture rights to Steinbeck's *The Long Valley* given to Paramount Pictures, Inc. in 1946, 1947 and 1949; (4) a 1956 grant of theatrical rights to Steinbeck's *Cannery Row* given to Rogers & Hammerstein and MGM; and (5) a 1949 grant of motion picture rights in Steinbeck's *The Wayward Bus* made to Twentieth Century Fox Film Corporation. Each notice is now addressed in turn.

*The Penguin Termination Notice*

[1] In a 1938 agreement, author John Steinbeck granted to Penguin's predecessor, The Viking Press, Inc., sole, exclusive, and open-ended publication rights in the collection of stories *The Long Valley,* including all thirteen short stories contained therein. By its terms, the 1938 Agreement "supersede[d] all previous agreements made between The Viking Press, Inc. and John Steinbeck," and also applied

---

*The Winter of Our Discontent* (©1961), and *Travels With Charley* (©1962).

**14.** The statute provide that if the author himself has made the assignment, and said author is now dead, termination of the assignment may be effected by the person or persons who own and are entitled to exercise a total of more than one-half of the author's termination interest. 17 U.S.C. § 304(c)(1).

**15.** Defendants dispute the assertion that Blake is the granddaughter of John Steinbeck, claiming that there has been no conclusive evidence produced to this effect, and there is no mention of her in John IV's will or in his pleadings in the 1981 action. It is undisputed, however, that John IV's heirs continued to receive his royalties, although the identity of those heirs and the distribution arrangement among them are the subject of a confidential

settlement agreement or agreements entered into by Blake, Thom, and John IV's former wife Nancy Steinbeck, the intervenor-plaintiff in this action and the purported residuary beneficiary of John IV's Estate under his will. Nancy apparently seeks to ride on the "coat tails" of Thom and Blake's action against the defendants, claiming that neither Thom nor Blake are likely to protect her interests. As this motion is limited to the validity of the termination notices issued by Thom and Blake, the allegations brought by Nancy are not addressed at this time, and the parties have reserved their rights to do so.

**16.** Widow Elaine entered into a new agreement with Penguin in 1994, Penguin's right of publication remaining the same as in the 1938 grant, but at a higher consideration, and statutory termination rights explicitly contin-

STEINBECK v. McINTOSH & OTIS, INC.     **401**
Cite as 433 F.Supp.2d 395 (S.D.N.Y. 2006)

to "all the previously published books of John Steinbeck," namely: *Cup of Gold; The Pastures of Heaven; To A God Unknown; Tortilla Flat; In Dubious Battle; Of Mice and Men; Of Mice and Men* (Play); *The Red Pony,* and the three stories included therein.[17] Four additional works by Steinbeck were added to the 1938 Agreement by way of its option clause, including *The Grapes of Wrath,* the latest of the works at issue here, in 1939. This agreement provided for ongoing royalties based on net sales, and was periodically amended. Author Steinbeck renewed the copyrights in each of the ten works in question during his lifetime, and when he died in 1968, he bequeathed the copyrights in these early works to his widow Elaine. In 1994, Elaine entered into a "new agreement for continued publication" with Penguin as "Publisher" for these early works, which granted Penguin no more nor less rights than Penguin already had and was exercising under the original 1938 Agreement, although at increased cost to Penguin.[18]

On or about June 13, 2004, Thom and Blake served on Penguin a Notice of Termination, purporting to terminate Steinbeck's grants under the 1938 Agreement pursuant to Section 304(d). Penguin and the defendants in the *Steinbeck* action contend that said notice is invalid as a matter of law, because widow Elaine's 1994 Agreement, by its express terms, "cancel[s] and supercede[s] the previous agreements, as amended, for the Works,"[19] which effectively transforms Steinbeck's pre–1978 grant into a "new" grant of copyright, executed *on or after January 1, 1978,* and as such, is not subject to termination under Section 304. 17 U.S.C. § 304(c), (d).

I conclude that this argument fails. The 1938 Agreement was author Steinbeck's exclusive grant of publication rights to Penguin's predecessor of certain of his early works, so they unquestionably were within the terms of the subsequently-enacted termination statute.[20] Elaine's 1994 identical grant to Penguin explicitly carries forward possible future termination under the statute, reading: "If Elaine Steinbeck exercises her right to terminate grants made to Publisher in this agreement (in accordance with Section 304(c) of Title 17 of the U.S.Code) ..." *See* Penguin USA, Contract For Steinbeck titles, p. 13, ¶ 9A, *Termination Under U.S. Law* (Oct. 24, 1994).[21] The contention that the 1994 Agreement extinguished the very termination right that it expressly acknowledges both exists and flows from the 1930s copyrights necessarily fails. At no point did Penguin lose or gain any rights other than those originally granted to it under the

ued, as per the agreement. *See* discussion *infra.*

**17.** The Viking Press, Inc. Agreement, ¶ 13A (Sept. 12, 1938).

**18.** Elaine simultaneously entered into a similar agreement with Penguin for the late works on behalf of herself and Thom (who subsequently ratified the agreement on December 22, 1994), but this second 1994 Agreement is not relevant here, although it raises questions of motive.

**19.** Penguin USA, Contract For Steinbeck titles, p. 10, ¶ 19, *Termination of Previous Agreements* (Oct. 24, 1994).

**20.** Indeed, this grant of publication rights is terminable because it is a "copyright subsisting in either its first or renewal term on January 1, 1978, ... [and is] the exclusive ... grant of a transfer or license of the renewal copyright *or any right under it,* executed before January 1, 1978, by [the living author of such work], otherwise than by will [here, by contract] ..." 17 U.S.C. § 304(c) (emphasis added).

**21.** Section 304(d) was enacted four years after the contract was entered into, but remains no less applicable, as it simply expanded the opportunity for authors or their statutory heirs to execute their termination rights.

1938 Agreement.[22]  Furthermore, to the extent that the 1994 Agreement would strip Thom and Blake—at the time, owners of one-half of the future termination interest, but on Elaine's death, full owners—of their inalienable termination rights in the pre–1978 grants, it is void as an "agreement to the contrary" pursuant to 17 U.S.C. § 304(c)(5).[23]

Accordingly, I consider the Penguin termination notice both valid and effective.

### *The Wayward Bus Termination Notice*

[2]  In 2004, Thom and Blake, now having between them 100% of the termination rights, sought to terminate author Steinbeck's 1949 grants of *The Wayward Bus* for "all motion picture rights, limited publication rights, radio rights, film, television, and commercial tie-up rights" that had been transferred to Twentieth Century Fox or its predecessors by John Steinbeck pursuant to agreements in 1949.  Defendants argue that this termination notice is of no effect because author Steinbeck died before the copyright in this work entered its renewal term, and thus, the renewal copyright automatically went to his next of kin pursuant to Section 304(a).[24]

As observed earlier, in *Stewart v. Abend*, 495 U.S. 207, 219–20, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990), the United States Supreme Court recognized that a renewal copyright represents a new estate free and clear of all rights, interests or licenses granted under the original copyright.  *Id.* at 219, 110 S.Ct. 1750.  Accordingly, the Court stated that "[i]f the author dies before [the renewal right vests], the next of kin obtain the renewal copyright free of any claim founded upon an assignment made by the author in his lifetime.

---

**22.**  By its terms, absent a default, the agreement was to continue for as long as the publishers keep the works "in print and for sale." The Viking Press, Inc. Agreement, ¶ 12A, *Termination of this agreement* (Sept. 12, 1938). Elaine did not inherit any interest in the book publishing rights Steinbeck granted to Penguin in 1938, because Steinbeck did not own those rights when he died.  Rather, Penguin was the owner of said rights pursuant to the 1938 Agreement, and Steinbeck had only a contractual right to receive monies pursuant to that agreement.  Elaine inherited only that contractual revenue scheme—she had no "copyright" interest to convey to Penguin by the 1994 Agreement, and Penguin had no need to enter into an agreement with Elaine to maintain its book publishing right (except, of course, to possibly avoid the exercise of federal termination rights—or a lawsuit).

**23.**  The 1994 Agreement does not purport to transfer Elaine's or anyone else's termination rights under Section 304, nor does it require Elaine or anyone else to refrain from exercising such rights, as any such contractual language that purports to affect inalienable termination interest would run afoul of black-letter copyright law.  Rather, the copyright interests purportedly granted by the document were granted *subject to* those very same rights.  The whole of ¶ 9A *expressly preserves*

Section 304 termination rights (at least with respect to Elaine, who, at the time, owned one-half), acknowledges that such rights (which had not yet been exercised) *could* be exercised in the future, and accordingly, contains detailed provisions about what would happen if (i) such termination rights were indeed exercised; and (ii) the copyright interests in Steinbeck Works were not subsequently re-granted to Penguin.  Neither Thom nor Blake was a party to the 1994 Agreement, and they have never contractually transferred their termination rights to Penguin nor agreed to forego their termination rights. Any interpretation of the 1994 Agreement having the effect of disinheriting the statutory heirs to the termination interest—Thom and Blake—in favor of Elaine's heirs must be set aside as contrary to the very purpose of the termination statute, which protects children and grandchildren, and not just widows.  *See, e.g.*, 3–11 NIMMER ON COPYRIGHT § 11.07, n. 29.

**24.**  17 U.S.C.A. § 304(a)(1)(C), in relevant part, states that "the widow . . . or children of the author, if the author is not living . . . shall be entitled to a renewal and extension of the copyright in such work for a further term . . ."

These results follow not because the author's assignment is invalid but because he had only an expectancy to assign [in the renewal copyright]; and his death, prior to the renewal period, terminates his interest in the renewal [term] . . ."—which then vests in the statutorily named classes. *Id.* (internal citations omitted).

The renewal copyright for *The Wayward Bus* came into effect in 1975. Because John Steinbeck died in 1968—seven years *before* the renewal period would commence for this work—the renewal copyright never vested in the grantee (Twentieth Century Fox) and, therefore, the author's then-living statutory heir, Elaine, inherited those rights free of the previous assignment by the author pursuant to Section 304(a)(1)(C). *See Abend,* 495 U.S. at 219, 110 S.Ct. 1750; *Morris,* 73 F.Supp.2d at 371–72. Consequently, Twentieth Century Fox had in 2004 no interest in the renewal copyright today, and accordingly, there was nothing there for Thom and Blake to terminate in 2004 and the notice was a nullity.

### The Cannery Row Termination Notice

On or about May 17, 2004,[25] Thom and Blake served a notice of termination of the grant for Steinbeck's *Cannery Row* pursuant to Section 304(c) for "all motion picture, radio, and television rights" to Rogers & Hammerstein and MGM in or before 1956 by author Steinbeck. Defendants assert a number of reasons this notice is invalid. I need address only the fact that

this identical to *The Wayward Bus* termination, immediately above.[26]

Author Steinbeck registered *Cannery Row* for copyright protection in 1945, and so, the original term of copyright ended in 1973. As John Steinbeck died five years prior to the copyright entering its renewal term, his statutory heir, Elaine, automatically received the renewal copyright. *See Wayward Bus* Termination Notice discussion, *supra.* Thus, neither Rogers & Hammerstein nor MGM possessed any interest in the renewal copyright for Thom and Blake to terminate, so this notice was a nullity.

### The Long Valley and The Red Pony Termination Notices

In 2004, Thom and Blake, served a notice of termination on Paramount Pictures Corporation, pertaining to a grant of motion picture, radio, and limited publication rights, in Steinbeck's *The Long Valley* and the collection of stories included therein that Paramount's predecessor had received from author Steinbeck pursuant to three agreements in 1946, 1947, and 1949. Simultaneously, Thom and Blake issued a separate but virtually identical termination notice for *The Red Pony* and all stories contained therein, granted to Paramount pursuant to the same contracts.[27] The defendants contest the validity of these two nearly identical notices of termination on the grounds that, under a 1983 Settlement Agreement between Elaine, Thom and Blake's father John IV, Thom and

---

**25.** An amended notice was issued on or about June 13, 2004.

**26.** Rogers & Hammerstein had transferred the rights it received in or before 1956 to Cannery Row Productions, Inc. by short form option agreement after 1978, and Thom and Blake also served the successor to that transfer with this termination notice. The fact that a copyright grantee made a subsequent post-

1978 transfer of rights it acquired pre–1978 does not insulate such from termination. *See Morris, supra.*

**27.** John Steinbeck had renewed the copyrights in each of these works during his lifetime, *see supra* n. 12, and the grants he made to Paramount appear to meet the termination requirements of the statute.

**404**                    **433 FEDERAL SUPPLEMENT, 2d SERIES**

Blake have no existing grants which they can address to terminate.[28]  Defendants early asserted that discovery was needed on the agreements which Thom and Blake purport to terminate, and until that time, they wish to reserve their right to contest the validity of these notices, but the troublesome question is why discovery was not timely sought *here.*

So the record remains that, other than this bland conclusory assertion (without sufficient justification)[29] that discovery is needed, defendants are silent on their principal argument that the said 1983 Settlement Agreement invalidated all of the notices of termination which are the subject of the present motion,[30] which I therefore deem to be an abandonment of defendants' counterclaims regarding these two notices.  *See Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 515 n. 21 (S.D.N.Y.2003).  Summary judgment on

the validity of these notices as a matter of law is granted.

So Ordered.



Samantha **RICHARDS**, and Samantha Richards as parent and next friend of Wydeia and Shanealya Richards, Plaintiff,

v.

THE CITY OF NEW YORK et al.; New York City Detectives Kevin McCann, Daniel Carmosin and Mike Paul; New York City Police Officer Mark Preiffer; Detectives/Police Officers John and Jane Doe; Assistant District At-

---

**28.**  After a scuffle in court, *Steinbeck v. Steinbeck,* No. 81 Civ. 6105 (S.D.N.Y. Dec. 8, 1982), Thom, John IV and Elaine entered into a settlement agreement in 1983, pursuant to which Thom, John IV, and Elaine would share equally in the royalties from author Steinbeck's late works—one-third, one-third, one-third—in return for which Elaine was granted exclusive control over the copyrighted works, including the power and authority to execute contracts in their name.  Disturbingly, the settlement agreement also purported to grant Elaine the exclusive right to exercise Thom and John IV's termination rights over the Steinbeck works.  Paragraph 5 of the settlement agreement, in particular, is statutorily prohibited, stating:  "Elaine Steinbeck and/or her agent shall have the complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck which John Steinbeck IV and Thom Steinbeck have or will have renewal or termination rights."

**29.**  At the hearing before me on May 11, 2005, counsel for the defendants stated, for the first time, that the two notices at issue "relate to motion picture rights with respect to a licensee who the, during John Steinbeck's lifetime

in a foreclosure action, had those rights transferred . . . So it is not at all clear to us, first of all, whether there is anything to terminate, because after a bankruptcy during the course of John Steinbeck's lifetime it's not at all clear whether anything still exists.  It would appear that it may be the motion picture rights at issue are actually derivative works, which would essentially take them out of and have different meanings with respect to the termination provisions."  Hr'g Tr. 17 (May 11, 2005).  The record before me does not support this contention.

**30.**  If this theory is meant to suggest that the terms of the 1983 Settlement Agreement void all of Thom's and Blake's termination rights— that Elaine successfully contracted away the rights of these statutory heirs when she settled litigation with them—it is barred by the plain language of 17 U.S.C. § 304(c)(5) and (d)(1).  Any portion of the settlement agreement which limits or extinguishes Thom's and Blake's statutory termination rights is invalidated as a statutorily-prohibited "agreement to the contrary."  *See, e.g., Marvel,* 310 F.3d at 290–91; *Morris,* 73 F.Supp.2d at 373–77.

# EXHIBIT 6

For these reasons, we vacate the District Court's October 24 Order insofar as it held plaintiff to a pleading standard inconsistent with that applicable to *pro se* litigants.[5] Likewise, we vacate the District Court's Order dated March 9, 2006 and the judgment entered on March 10, 2006, dismissing plaintiff's complaint for failure to comply with the October 24 Order.

## CONCLUSION

Because the District Court, lacking the benefit of the guidance set forth herein, (1) denied plaintiff's request to litigate this action under a pseudonym without first balancing plaintiff's interest in anonymity against the public interest in disclosure and prejudice to defendants, and (2) subjected plaintiff's pleadings to a standard far stricter than that applicable to *pro se* litigants, we VACATE the District Court's Order of October 24, 2005. We also VACATE the District Court's Order of March 9, 2006 and the judgment entered on March 10, 2006, dismissing plaintiff's complaint *sua sponte* for failure to comply with the October 24, 2005 Order. We REMAND the cause for further proceedings consistent with this opinion. In light of the serious nature of the claims pressed in this action, we encourage the district court to consider whether the appointment of *pro bono* counsel pursuant to 28 U.S.C. § 1915(e)(1) is warranted. The mandate shall issue forthwith, and jurisdiction shall be returned to this Court, pursuant to *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir.1994), upon a letter request from any party. Upon such a restoration of jurisdiction, the matter is to be referred to this panel.



---

**5.** In light of the vacatur of that portion of the Order denying plaintiff's application to file

**PENGUIN GROUP (USA) INC.,**
**Plaintiff–Appellant,**

**Waverly Scott Kaffaga, individually as Executor of the Estate of Elaine Anderson Steinbeck, David Scott Farber, Anderson Farber Runkle, Jebel Kaffaga, Bahar Kaffaga and Jean Anderson Boone, Defendants–Counterclaim–Plaintiffs–Appellants,**

v.

**Thomas STEINBECK and Blake Smyle, Plaintiffs–Counterclaim–Defendants–Appellees,**

**Nancy Steinbeck, Intervenor–Plaintiff,**

**McIntosh & Otis, Inc., The Steinbeck Heritage Foundation, Eugene H. Winick, Samuel Pinkus and Steven Frushtick, Defendants–Counterclaim–Plaintiffs,**

**Francis Anderson Atkinson and Does 1–10, Defendants.**

Docket Nos. 06–3226–cv, 06–3696–cv.

United States Court of Appeals, Second Circuit.

Argued: Jan. 23, 2008.

Decided: Aug. 13, 2008.

**Background:** Holders of right to recapture copyrights, provided by Copyright Act amendments extending period of available copyright protection, served notice of termination of pre-1978 copyright grants. Publisher filed complaint seeking declaratory judgment against holders that notice was invalid. The United States District

under a pseudonym (see Part I), the Order of October 24, 2005 is vacated in its entirety.

**194**                 **537 FEDERAL REPORTER, 3d SERIES**

Court for the Southern District of New York, Richard Owen, J., 433 F.Supp.2d 395, granted summary judgment for defendants. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Sack, Circuit Judge, held that:

(1) post–1978 agreement terminated and superseded all pre–1978 grants of transfer or license in subject copyrights;

(2) original grantee could execute new grant of licenses for publication of copyrighted works any time after notice of termination had been served;

(3) subsequent agreement regarding licenses for publication of copyrighted works that terminated and superseded pre–1978 agreement also eliminated right to terminate grants contained in pre–1978 agreement;

(4) phrase, "agreement to the contrary," in statute governing termination rights did not include any agreement that had effect of eliminating termination rights;

(5) subsequent agreement that terminated and superseded pre–1978 agreement was not "agreement to the contrary" solely because it had effect of eliminating termination rights that did not yet exist; and

(6) author or author's statutory heirs were not entitled to more than one opportunity, between them, to use termination rights.

Reversed and remanded.

**1. Copyrights and Intellectual Property**
&#8669;**47, 48**

Post–1978 agreement, stating that "[t]his agreement, when signed by Author and Publisher, will cancel and supercede the previous agreements," terminated and superseded all pre–1978 grants of transfer or license in subject copyrights under New

York law; although subsequent agreement might have intended that earlier-created termination rights survived it, availability of termination rights under Copyright Act was not dependent on intent of parties but on, among other things, date that grant of rights was executed and relationship to author of those seeking to exercise termination right. 17 U.S.C.A. § 304(d).

**2. Contracts** &#8669;**252**
  **Novation** &#8669;**4**

Under New York law, parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter; once terminated and superseded, the new contract provides all of the parties' obligations and remedies for breach.

**3. Copyrights and Intellectual Property**
  &#8669;**107**

Under New York law, a contract that remains in force may still be terminated and renegotiated in exchange for, among other things, one party's forbearance of her legal right, such as a statutory right to terminate a previous grant of a copyright transfer or license.

**4. Copyrights and Intellectual Property**
  &#8669;**48**

Original grantee could execute new grant of licenses for publication of copyrighted works any time after notice of termination had been served, and thus no "moment of freedom" was required under Copyright Act. 17 U.S.C.A. § 304(c)(6)(D).

**5. Copyrights and Intellectual Property**
  &#8669;**47**

A prior grant may be renegotiated where a notice of termination of copyright has not been served. 17 U.S.C.A. § 304(c)(6)(D).

PENGUIN GROUP (USA) INC. v. STEINBECK **195**
Cite as 537 F.3d 193 (2nd Cir. 2008)

**6. Copyrights and Intellectual Property**
&#8986;48

Subsequent agreement regarding licenses for publication of copyrighted works, stating that "[t]his agreement, when signed by Author and Publisher, will cancel and supercede the previous agreements," that terminated and superseded pre–1978 agreement, also eliminated right to terminate grants contained in pre–1978 agreement under Copyright Act. 17 U.S.C.A. § 304(c, d).

**7. Copyrights and Intellectual Property**
&#8986;47

Phrase, "agreement to the contrary," in statute governing termination rights under Copyright Act did not include any agreement that had effect of eliminating termination rights, even if agreement had effect of eliminating termination right that Congress did not provide until after agreement, since other provisions of Copyright Act explicitly contemplated loss of termination rights. 17 U.S.C.A. §§ 304(c)(5), 304(d).

**8. Copyrights and Intellectual Property**
&#8986;33

The holders of a majority of an author's termination interest may agree that they will not exercise their termination rights, even though it has the effect of eliminating a termination right as to the minority termination interests. 17 U.S.C.A. §§ 304(c)(5), 304(d).

**9. Copyrights and Intellectual Property**
&#8986;33

Subsequent agreement regarding licenses for publication of copyrighted works, stating that "[t]his agreement, when signed by Author and Publisher, will cancel and supercede the previous agreements," that terminated and superseded pre–1978 agreement, was not "agreement to the contrary" solely because it had effect of eliminating termination rights that

did not yet exist. 17 U.S.C.A. §§ 304(c), 304(d).

**10. Copyrights and Intellectual Property**
&#8986;33

Backward-looking attempts to recharacterize existing grants of copyright so as to eliminate the right to terminate are forbidden under the Copyright Act. 17 U.S.C.A. § 304(c)(5).

**11. Copyrights and Intellectual Property**
&#8986;33, 47.5

Author or author's statutory heirs were not entitled to more than one opportunity, between them, to use termination rights under Copyright Act to enhance their bargaining power or to exercise them to execute renegotiated contract. 17 U.S.C.A. § 304(d).

———

Richard Dannay, Cowan, Liebowitz & Latman, P.C. (Thomas Kjellberg, of counsel), New York, NY, for Plaintiff–Appellant Penguin Group (USA) Inc.

Susan J. Kohlmann, Jenner & Block LLP (Carolina A. Fornos, of counsel), New York, NY, for Plaintiffs–Appellants Kaffaga et al.

Mark S. Lee, Manatt Phelps & Phillips, LLP (Benjamin G. Shatz and Alon G. Markowitz, of counsel), Los Angeles, CA, for Defendants–Appellees.

Before: SACK, KATZMANN, and RAGGI, Circuit Judges.

SACK, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York (Richard Owen, *Judge*) granting summary judgment to the appellees Thomas Steinbeck and Blake Smyle based on the court's conclusion that

**196**                    **537 FEDERAL REPORTER, 3d SERIES**

a "notice of termination" given in 2004 that purported to terminate, pursuant to the Copyright Act, 17 U.S.C. § 304(c) and (d), the 1938 grant of copyright licenses by the author John Steinbeck, was valid. We consider on appeal whether an agreement entered into in 1994 between Steinbeck's widow and the publisher terminated and superseded the 1938 agreement, and, if so, whether the termination notice is therefore ineffective. Because the termination right provided by section 304(d) pursuant to which the 2004 termination notice was issued applies only to pre–1978 grants of transfers or licenses of copyright, and because the 1994 agreement left intact no pre–1978 grant for the works in question, we conclude that the 2004 notice of termination is ineffective. The 1994 agreement remains in effect.

### BACKGROUND

*Grants of Licenses of Copyright*

On September 12, 1938, the author John Steinbeck executed an agreement with The Viking Press (the "1938 Agreement") that established the terms for the latter's publication of some of Steinbeck's best-known works, including *The Long Valley, Cup of Gold, The Pastures of Heaven, To A God Unknown, Tortilla Flat, In Dubious Battle,* and *Of Mice and Men,* in all of which Steinbeck held the copyright. In 1939, the agreement was extended to apply to four later works, including *The Grapes of Wrath,* through the operation of an option clause in the agreement. The rights granted by the 1938 Agreement were later assigned by Viking to plaintiff-appellant Penguin Group (USA) Inc. ("Penguin"), and the duties thereunder assumed by Penguin. The 1938 Agreement provided to the publisher, who agreed to take out

copyrights in the covered works in Steinbeck's name, the "sole and exclusive right" to publish the works in the United States and Canada, with Steinbeck receiving royalties based on net sales. The agreement would terminate if any of the covered works were not kept in print. The agreement was "binding upon [John Steinbeck's] heirs, executors, administrators or assigns."

During his lifetime, Steinbeck renewed the copyrights in the works covered by the 1938 Agreement so that they enjoyed protection under both of the consecutive 28–year copyright terms provided for by the version of the Copyright Act in effect at the time. When Steinbeck died in 1968, he bequeathed his interest in these copyrights to his widow, Elaine Steinbeck. His sons by a previous marriage, Thomas and John IV, each received a bequest of $50,000 in a trust arrangement.

On October 24, 1994, Elaine Steinbeck and Penguin entered into a "new agreement for continued publication" (the "1994 Agreement"). It addressed the publication by Penguin of all works that were covered by the 1938 Agreement. It added several other early Steinbeck works, some of his posthumous works, and some of Elaine Steinbeck's own works. It also changed the economic terms of the 1938 Agreement, mostly to Elaine Steinbeck's benefit, by requiring Penguin to provide a far larger annual guaranteed advance, and royalties of between ten and fifteen percent of retail (rather than wholesale) sales. The 1994 Agreement further stated that "when signed by Author and Publisher, [it] will cancel and supersede the previous agreements, as amended, for the [works] covered hereunder." [1]

---

1.  A separate agreement was executed on the same day by Penguin and by Elaine Steinbeck, acting on her own behalf and on behalf

of Thomas Steinbeck. Thomas Steinbeck ratified this agreement on December 22, 1994, on behalf of the other Steinbeck Descendants.

Elaine Steinbeck died in April 2003, bequeathing her copyright interests in the Steinbeck works at issue, as well as proceeds from the 1994 Agreement, to various testamentary heirs including her children and grandchildren from a previous marriage, but she specifically excluded Thomas Steinbeck, John Steinbeck IV, and their heirs. Her statutory termination rights expired upon her death.

On June 13, 2004, John Steinbeck's surviving son Thomas, and Blake Smyle, the sole surviving child of Steinbeck's other son, the deceased John IV, (collectively the "Steinbeck Descendants") served what purported to be a notice of termination (the "Notice of Termination") on Penguin terminating the "grants" made by the 1938 Agreement to Penguin's predecessor-in-interest (Viking).

### Statutory Background

The Copyright Act gives to authors and certain enumerated family members the power to terminate prior grants of transfers or licenses of copyright. This power is based on Congressional recognition that young authors frequently enter into long-term contracts with publishers when their bargaining power is weak and their prospects for success uncertain, and discover increased leverage only when they later achieve commercial success. Indeed, in an effort to balance the interests of publishers and authors, Congress enacted provisions in the Copyright Act that "attempted to give the author a second chance to control and benefit from his work" and to "secure to the author's family the opportunity to exploit the work if the author died." *Stewart v. Abend*, 495 U.S. 207, 218, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). Congress permitted a publisher the opportunity to

reap the initial rewards of an early investment in young talent, but it allowed authors to revisit the terms of earlier grants of rights once the long-term success of their works became apparent. *See id.*

When John Steinbeck entered into the 1938 Agreement with Viking Press, the Copyright Act of 1909 was in effect. Under that version of the Act, authors were entitled to a copyright in their works for an initial twenty-eight year period beginning on the date of a work's publication. After this period expired, the author had the right to renew the copyright for a second twenty-eight year term. The purpose of providing this renewal term was to permit "the author, originally in a poor bargaining position, to renegotiate the terms of the grant once the value of the work ha[d] been tested." *Stewart*, 495 U.S. at 218–19, 110 S.Ct. 1750; *accord Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 283 (2d Cir.2002) (quoting *Stewart*). Publishers could, and often did, thwart the purpose of this statutory scheme, however, by requiring authors to assign both their initial and renewal rights to the publisher at the same time and before the long-term value of an author's work could be ascertained. This practice received the legal imprimatur of the Supreme Court in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943), which held that renewal rights could be assigned by an author during a work's initial copyright term and before the vesting of the renewal right. *Id.* at 656–59, 63 S.Ct. 773; *see also Marvel*, 310 F.3d at 284.

The 1976 amendments to the Copyright Act, which took effect in 1978, abandoned this framework. In order to revitalize the ability of authors to revisit the terms of

This agreement, which itself is not at issue on this appeal and which governed works of John Steinbeck that are not at issue on this

appeal, obligated Penguin to pay higher royalties for these works to Elaine Steinbeck and the Steinbeck Descendants.

**198**        **537 FEDERAL REPORTER, 3d SERIES**

earlier grants of rights, the amended Act replaced the two consecutive twenty-eight year terms with a single copyright term of increased duration,[2] and it created for authors or their statutory heirs, with respect to transfers or licenses of copyright effected prior to 1978, an inalienable right to terminate the grant of a transfer or license. 17 U.S.C. § 304(c). The section provides, in pertinent part:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, ... the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by [the author or the author's heirs as specified at section 304(a)(1)(C)], otherwise than by will, is subject to termination under the following conditions:

> (1) ... In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected ... by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. (2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

>      . . .

> (B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.[3]

> (3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

>      . . .

> (5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

17 U.S.C. § 304(c).

This termination right provides authors or their statutory heirs with an opportunity to recapture some of the additional value produced by the lengthened copyright term. *See* H.R.Rep. No. 94–1476, at 140 (1976), U.S.Cong. Code & Admin.News 1976, pp. 5659,5756. It is worth noting that section 304(c), by its terms, does not apply to grants of a transfer or license of the renewal copyright made on or after January 1, 1978. Such grants are subject to the slightly different termination right provided at 17 U.S.C. § 203, which, among

<hr/>

**2.**  The consecutive-term renewal structure was retained for pre–1978 works, however, because a ''great many of the present expectancies in these cases are the subject of existing contracts, and it would [have been] unfair and immensely confusing to cut off or alter these interests.''  H.R.Rep. No. 94–1476, at 139 (1976), *reprinted in* 1976 U.S.C.A.N. 5659, 5755. For works still in their renewal term on January 1, 1978, which include the Steinbeck works governed by the 1938 Agreement, the amendments extended the expiration date of the then-governing renewal term until ''seventy-five years from the date the copy-

right was originally secured.''  17 U.S.C. § 304(b) (1997). When the Copyright Act was amended in 1998, for works still within this seventy-five year term, the length of the term was extended again to provide those works with a total of ninety-five years of copyright protection.  Pub.L. No. 105–298, 112 Stat. 2827, 2828–29 (1998).

**3.**  Prior to her death, Elaine Steinbeck held a one-half interest in the statutory termination rights under 17 U.S.C. § 304(c)(2)(A).

other distinctions, applies only to grants made by the author rather than to grants made by either the author or other parties.

Section 304(c) also provides only a limited five-year window of time "beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later," 17 U.S.C. § 304(c)(3), during which termination rights may be exercised. If the termination right is not exercised during this window, the original grant remains in effect. So, for *Cup of Gold*, the earliest work included in the 1938 Agreement, the termination right under section 304(c) expired on August 2, 1990, and for *The Grapes of Wrath*, the latest work, the right expired on April 14, 2000. It is undisputed, however, that no termination right under section 304(c) was ever exercised with respect to the copyrights covered by the 1938 Agreement.

When the length of the copyright term was extended in 1998, Congress provided an additional window of time corresponding to this extension, during which the same termination right could be, had it not already been, exercised. *See* 17 U.S.C. § 304(d). For pre–1978 grants whose section 304(c) termination right, as of October 26, 1998, had expired without being exercised, termination could "be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured." *Id.* Section 304(d) otherwise incorporated the conditions specified in section 304(c) including the statutory heirs of an author's termination right. *See* 17 U.S.C. § 304(d)(1). The Notice of Termination issued in 2004 by the Steinbeck Descendants purported to terminate the 1938 grants of copyright licenses within each work's section 304(d) termination period.

*District Court Proceedings*

Upon receiving the Termination Notice, Penguin filed a complaint in the United States District Court for the Southern District of New York seeking a declaratory judgment against Thomas Steinbeck and Blake Smyle that the notice is invalid. Penguin argued that the 1994 Agreement, to which Elaine Steinbeck was a party, superseded and itself terminated the 1938 Agreement, and that there was therefore no pre–1978 grant of a transfer or license of the renewal copyright to which section 304(d) could be applied.

In a related action, initiated by the Steinbeck Descendants, the estate and heirs of Elaine Steinbeck filed counterclaims seeking an equivalent declaration. The district court consolidated the two actions for the purposes of the summary judgment motions.

In an order issued June 8, 2006 and amended July 18, 2006, the district court disagreed, granting summary judgment against Penguin and Elaine Steinbeck's heirs and, among other things, upholding the validity of the Termination Notice served by the Steinbeck Descendants in 2004. *Steinbeck v. McIntosh & Otis, Inc.,* 433 F.Supp.2d 395, 401 (S.D.N.Y.2006). The court rejected Penguin's argument that the 1994 Agreement extinguished the section 304(d) termination right, observing that the agreement explicitly contemplated the future exercise of termination rights and that it did not grant Penguin rights that were any greater or lesser than those granted by the 1938 Agreement. *Id.* The court also concluded that "to the extent that the 1994 Agreement would strip [the Steinbeck Descendants] … of their inalienable termination rights in the pre–1978 grants, it is void as an 'agreement to the contrary' pursuant to 17 U.S.C. § 304(c)(5)." *Id.* at 402 (footnote omitted). In the district court's view, "[a]ny inter-

**200**          **537 FEDERAL REPORTER, 3d SERIES**

pretation of the 1994 Agreement having the effect of disinheriting the statutory heirs to the termination interest—[the Steinbeck Descendants]—in favor of Elaine's heirs must be set aside as contrary to the very purpose of the termination statute. . . ." *Id.* at 402 n. 23.

Penguin, and the estate and heirs of Elaine Steinbeck, appeal from the portion of the district court's judgment addressing the validity of the 2004 Termination Notice as to those works covered by the 1938 Agreement.

## DISCUSSION

### I.  Standard of Review

"We review *de novo* a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party." *White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 167 (2d Cir.2007).

### II.  Whether the 1994 Agreement Terminated and Superseded the 1938 Agreement

The Copyright Act provides a termination right for the grant of a transfer or license of copyright made by parties other than the author only if the grant was made prior to January 1, 1978.  17 U.S.C. § 304(d).  Our first inquiry, then, is whether the 1994 Agreement terminated and superseded the 1938 Agreement.  We conclude that it did, leaving in effect no pre–1978 grants to which the termination rights provided by section 304(d) could be applied.

[1, 2]  The language of the 1994 Agreement makes clear that the parties intended

---

4.  The parties do not dispute that New York state law governs both the 1938 and 1994

that the 1938 Agreement be terminated. Under New York law,[4] "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Jones v. Trice*, 202 A.D.2d 394, 395, 608 N.Y.S.2d 688, 688 (2d Dep't 1994).  Once terminated and superseded, the new contract provides all of the parties' obligations and remedies for breach. *See Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867, 474 N.Y.S.2d 122, 125 (2d Dep't 1984) ("[W]here the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." (internal quotation marks omitted)).  The 1994 Agreement states that "[t]his agreement, when signed by Author and Publisher, will cancel and supercede the previous agreements, as amended, for the Works # 1—# 19 [including those works governed by the 1938 Agreement] covered hereunder."  We see no valid reason to disregard this language and to regard the 1938 Agreement as surviving the 1994 Agreement.

Contrary to the district court's observation that "[a]t no point did Penguin lose or gain any rights other than those originally granted to it under the 1938 Agreement," *Steinbeck*, 433 F.Supp.2d at 401–02, the 1994 Agreement obligated Penguin to pay larger guaranteed advance payments and royalties calculated from the "invoiced retail price of every copy sold by the Publisher," rather than "the amount which the Publishers charge for all copies sold."

Agreements.

PENGUIN GROUP (USA) INC. v. STEINBECK **201**
Cite as 537 F.3d 193 (2nd Cir. 2008)

The 1994 Agreement also modifies the geographic limits of the publication rights as to the covered works and imposes a requirement on Penguin to keep a greater number of Steinbeck works in print.

[3]   The district court correctly observed that the 1938 Agreement, by its terms, "was to continue for as long as the publishers keep the works 'in print and for sale,'" *Steinbeck*, 433 F.Supp.2d at 402 n. 22, but this has little relevance to our analysis.   A contract that remains in force may still be terminated and renegotiated in exchange for, among other things, one party's forbearance of her legal right, such as a statutory right to terminate a previous grant of a copyright transfer or license.   *See, e.g., Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir.1991) ("[F]orbearance to assert a valid claim, if bargained for, is sufficient consideration to support a contract.").

It is of similarly little relevance that the 1994 Agreement might have intended that earlier created termination rights survive it, for our central inquiry is not the parties' intent to preserve these rights—which are granted by statute, not contract—but rather their intent to terminate the 1938 Agreement.   The availability of termination rights under the Copyright Act is not dependent on the intent of the parties but on, among other things, the date that a grant of rights was executed and the relationship to the author of those seeking to exercise the termination right.   So, even if we accept that the 1994 Agreement "explicitly carries forward possible future termination," *Steinbeck*, 433 F.Supp.2d at 401, it does not matter inasmuch as the pre–1978 grant of rights no longer existed.   To the extent that the 1994 Agreement might also have contemplated the potential preservation of termination rights, it does not abrogate the 1994 Agreement's clear expression of intent to terminate all prior grants of a transfer or license in the subject copyrights.

[4]   We also reject the suggestion that, notwithstanding the plain language of the 1994 Agreement, there was no effective termination of the 1938 Agreement because the 1994 Agreement provided no opportunity—no "moment of freedom"—for those holding the termination right to renegotiate the terms of the grant.   Appellees draw support for this theory primarily from *Nimmer on Copyright* § 11.07 (6th ed.1978), referring to 17 U.S.C. § 304(c)(6)(D).   That statutory provision reads:

A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid *only if it is made after the effective date of the termination.*   As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

*Id.* (emphasis added).   The appellees read the phrase "only if it is made after the effective date of the termination" to require a period of time during which holders of a termination right "know they will be free of extant agreements and can negotiate for the terminated rights."   Appellees' Br. at 80; *see also Nimmer on Copyright* § 11.07.   But the next sentence in the statute provides an exception for the original grantee, who may execute a new grant any time after the notice of termination has been served—no "moment of freedom" is required.

**[5]**  In any event, nothing in section 304(c)(6)(D) prevents renegotiation of a prior grant where a notice of termination has not been served.  Such a succeeding grant of rights would presumably take place with the parties' knowledge that the holder of a termination right *could* exercise that right if they failed to reach a new agreement.  It is undisputed that no termination right was exercised prior to the 1994 Agreement, but Elaine Steinbeck did renegotiate and cancel the 1938 Agreement while wielding the threat of termination.  Indeed, this kind of renegotiation appears to be exactly what was intended by Congress.  *See* Section III, *supra.*

**[6]**  Because we conclude that the 1994 Agreement terminated and superseded the 1938 Agreement, it also eliminated the right to terminate the grants contained in the 1938 Agreement under sections 304(c) and (d).

### III.  Whether the 1994 Agreement is an "Agreement to the Contrary" under 17 U.S.C. § 304(c)(5)

**[7]**  The Copyright Act provides that "[t]ermination of the grant [of transfer or license rights] may be effected notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5).  The 1994 Agreement is not invalid as an "agreement to the contrary"—and the Steinbeck Descendants' termination right under section 304(d) is therefore no longer effective—even if the agreement had the effect of eliminating a termination right that Congress did not provide until 1998.

**[8]**  We do not read the phrase "agreement to the contrary" so broadly that it would include any agreement that has the effect of eliminating a termination right.  To do so would negate the effect of other provisions of the Copyright Act that explicitly contemplate the loss of termination rights.  For example, sections 304(c) and

(d) require only the consent of a simple majority in interest for the exercise of a termination right.  Once the termination right is extinguished, it is extinguished with respect to all parties holding a termination interest, whether or not they agreed to its exercise.  *See* 17 U.S.C. § 304(d) (providing a new termination right but only "where the author or owner of the termination right has not previously exercised such termination right").  Similarly, if a termination right expires without being exercised, the original grant is no longer subject to termination, and the Copyright Act specifically provides that in such a case a grant would "continue[ ] in effect for the remainder of the extended renewal term."  17 U.S.C. § 304(c)(6)(F).  If the holders of a majority of an author's termination interest were to agree that they would not exercise their termination rights, this would have the effect of eliminating a termination right as to the minority termination interests.  Yet such an agreement could not be held ineffective as an "agreement to the contrary" inasmuch as section 304 itself contemplates elimination of termination rights in that manner.

**[9]**  Moreover, the 1994 Agreement did not divest the Steinbeck Descendants of any termination right under section 304(d) when the parties entered into that agreement.  In 1994, only 17 U.S.C. § 304(c) provided a termination right—section 304(d) would not become effective for another four years.  It is undisputed that the Steinbeck Descendants could not have exercised their termination rights in 1994 because they lacked more than one-half of the author's termination interest.  As of 1994, then, the agreement entered into by Elaine Steinbeck did not deprive the Steinbeck Descendants of any rights they could have realized at that time.  None of the parties could have contemplated that Congress would create a second termination