1  JENNER & BLOCK LLP
   Andrew J. Thomas (SBN 159533)
2  ajthomas@jenner.com
   633 West 5th Street, Suite 3600
3  Los Angeles, CA 90071
   Telephone:  (213) 239-5100
4  Facsimile:  (213) 239-5199

5  Susan J. Kohlmann (Pro Hac Vice)
   skohlmann@jenner.com
6  Alison I. Stein (Pro Hac Vice)
   astein@jenner.com
7  919 Third Avenue
   New York, NY 10022
8  Telephone:  212 891-1600
   Facsimile:  212 891-1699

9
   *Counsel for Plaintiff Waverly Scott Kaffaga, as Executor*
10 *of the Estate of Elaine Anderson Steinbeck*

11              **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13

14

15 WAVERLY SCOTT KAFFAGA, AS          Case No. 14-cv-08699-TJH (FFM)
   EXECUTOR OF THE ESTATE OF
16 ELAINE ANDERSON STEINBECK,         **PLAINTIFF'S STATEMENT OF**
                                      **UNCONTROVERTED FACTS AND**
17                      Plaintiff,    **CONCLUSIONS OF LAW IN**
                                      **SUPPORT OF MOTION FOR**
18         v.                         **SUMMARY JUDGMENT**

19 THOMAS STEINBECK, GAIL             Hearing Date:   May 16, 2016
   KNIGHT STEINBECK, and THE         Hearing Time:   UNDER SUBMISSION
20 PALLADIN GROUP, INC.,             Courtroom:      17 – Spring St.

21                      Defendants.   **[PUBLIC REDACTED VERSION]**

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Statement of Uncontroverted Facts ............................................................. 1

I.      Background ....................................................................................... 1

        A.      Ownership in the Steinbeck Works ...................................... 4

        B.      The 1983 Agreement ............................................................. 7

        C.      Elaine Anderson Steinbeck's Death ..................................... 9

        D.      The 2004 Litigation .............................................................. 10

        E.      The 2014 Litigation .............................................................. 12

II.     Defendants' Pattern of Improper Conduct ...................................... 13

        A.      Defendants' Interference with the Estate's Negotiations ..... 13

                1.      *East of Eden* ............................................................. 13

                2.      *The Grapes of Wrath* ................................................ 20

        B.      Defendants' Unauthorized Exploitation of the Steinbeck
                Works ................................................................................... 28

                1.      Thom's Screenplays .................................................. 28

                2.      *The Long Valley* Audio Book .................................. 31

                3.      *The Moon Is Down* .................................................. 32

        C.      Defendants' Improper Authorization of Others' Use of
                Steinbeck Works ................................................................. 35

                1.      *The Long Valley- Flight* ........................................... 35

                2.      Other Instances of Defendants' Improper
                        Authorization of Others' Use of Steinbeck Works .... 37

        D.      Defendants' Interference with the Estate's Agents ............. 39

                1.      RWSG ........................................................................ 39

                2.      Intellectual Property Group ...................................... 43

i

E.  Defendants' Assertions in the Media and the Industry ..................... 44

III.  Harm Caused by Defendants' Improper Conduct ......................................... 46

A.  Harm to Plaintiff Regarding Negotiations with Universal/Imagine for *East of Eden* ................................... 46

B.  Harm to Plaintiff  Regarding Negotiations with DreamWorks for *The Grapes of Wrath* .............................. 47

C.  Harm to the Steinbeck Works as a Whole ......................................... 48

Conclusions of Law ........................................................................................ 52

ii

Plaintiff Waverly Scott Kaffaga, as executor of the Estate of Elaine Anderson Steinbeck ("Plaintiff" or the "Estate"), respectfully submits this statement of uncontroverted facts and conclusions of law in support of Plaintiff's Notice of Motion and Motion for Summary Judgment pursuant to Local Rule 56-1.

### Statement of Uncontroverted Facts

## I.    Background

| Uncontroverted Fact | Supporting Evidence |
| --- | --- |
| 1.    During his lifetime, John Steinbeck authored no fewer than thirty-five works and obtained copyright registrations for each. | Amended Complaint ("AC") (Dkt. No. 11) ¶ 17; Answer (Dkt. No. 28) ¶ 17. |
| 2.    John Steinbeck was married to his third wife, Elaine Anderson Steinbeck ("Elaine"), at the time of his death in 1968. At the time of his death, they had been married for eighteen years. | Declaration of Susan J. Kohlmann in Support of Plaintiff's Notice of Motion and Motion for Summary Judgment ("Kohlmann Decl.")  ¶ 2, Ex. 1 (April 29, 2003 Obituary of Elaine Anderson Steinbeck). |
| 3.    John Steinbeck had two sons by a previous marriage, Thomas Steinbeck ("Thom") and John Steinbeck IV ("John IV"). | *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 (S.D.N.Y. 2006). |
| 4.    ███████████████████ ████████████████ ██████████ | Kohlmann Decl. ¶ 4,  Ex. 3 (STEINBECK008566). |
| 5.    John IV passed away in 1991, leaving behind one child, Blake Smyle ("Blake"), and a former wife, Nancy | *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 400 (S.D.N.Y. 2006); Kohlmann Decl. ¶ 3,  Ex. 2 (G. |

| Steinbeck ("Nancy"). | Steinbeck Tr. at 22:20–21). |
|---|---|
| 6.      In 1995, Thom married Gail Knight Steinbeck ("Gail"). | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 22:8–9); Kohlmann Decl. ¶ 5, Ex. 4 (February 3, 2016 Deposition of Thomas Myles Steinbeck ("T. Steinbeck Tr.") at 15:1). |
| 7.      In 1996, Gail and Thom formed the Palladin Group, Inc. ("Palladin"), a California management and production corporation. | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 11:21–12:3). |
| 8.      Thom is a fifty percent owner of Palladin.  According to Palladin's bylaws, Thom is the "Incorporator" or "First Director." | Kohlmann Decl. ¶ 6, Ex. 5 (STEINBECK_HARDCOPY_ 0000007); Kohlmann Decl. ¶ 5, Ex. 4 (T. Steinbeck Tr. at 18:2–4). |
| 9.      Gail is also a fifty percent owner of Palladin.  According to Palladin's bylaws, Gail is the "Secretary." | Kohlmann Decl. ¶ 6, Ex. 5 (STEINBECK_HARDCOPY_ 0000007); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 12:4–7). |
| 10.     Gail holds Thom's "complete power of attorney." | Kohlmann Decl. ¶ 5, Ex. 4 (T. Steinbeck Tr. at 31:24–32:15); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 18:11–18). |
| 11.     Gail has held Thom's power of attorney intermittently since approximately 1998. | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 26:1–16). |
| 12.     Most recently, the power of attorney that Thom executed on | Kohlmann Decl. ¶ 7, Ex. 6  (February 2010 Power of Attorney). |

2

| | |
|---|---|
| February 20, 2010 appoints Gail as his attorney-in-fact<br><br>"to exclusively manage, control, and conduct all business in [his] name, on [his] behalf of whatever kind or nature, related to or affecting . . . any and all trademarks, publicity rights, literary copyrights, renewals and termination rights to the works of [his] father, John E. Steinbeck" and gives her the authority to "appear in [his] stead in any court proceedings and speak on [his] behalf as well as negotiate and sign or renew any contracts be they new or renewal, grants and agreements on my behalf, directly or through such agents or attorneys-in-fact as she, in her sole discretion may appoint." | |
| 13.    Gail has acknowledged that she personally has no interests in the Steinbeck Works. | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 28:16–18). |
| 14.    Gail testified that the power of attorney enables her to act "with respect to all of [Thom's] interests in the John Steinbeck works," including advising third parties as to his rights, and essentially doing everything except file and sign a termination notice on his behalf. | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 35:17–38:23). |
| 15.    McIntosh & Otis ("M&O") has been the literary agency managing the Steinbeck Works since the late 1920s. | Kohlmann Decl. ¶ 8,  Ex. 7 (February 10, 2016 Deposition of Elizabeth Winick Rubinstein ("Winick Rubinstein |

| | |
|---|---|
| | Tr.") at 19:14–19). |
| 16.     Elizabeth Winick Rubinstein is President and Managing Agent of M&O. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 8:25–9:6). |
| 17.     RWSG Literary Agency ("RWSG") is a Los Angeles-based film and television agency that served as a sub-agent of M&O in representing the Steinbeck Works with respect to film and television projects, including film adaptation projects for *East of Eden* and *The Grapes of Wrath*. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 28:7–11; 71:16–72:19; 76:21–77:4). |
| 18.     Jeff Sanford is a film agent at RWSG. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 48:25). |
| 19.     Jill Gillett is a television agent at RWSG. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 28:7–8). |
| 20.     Robert Bookman is a senior agent at Paradigm Talent Agency ("Paradigm"). | Kohlmann Decl. ¶ 9,  Ex. 8 (February 5, 2016 Deposition of Robert Bookman ("Bookman Tr.") at 24:20–25:1). |
| 21.     According to Gail, Paradigm, and Mr. Bookman specifically, is Thom's and Gail's literary agent and represents their "own intellectual property." | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 38:24–39:6). |
| **A.     Ownership in the Steinbeck Works** | |
| 22.     At the time the Steinbeck Works were written and first published, federal law allowed an author to renew a | *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008); *Steinbeck v. McIntosh & Otis, Inc.*, 433 |

4

| | |
|---|---|
| copyright twenty-eight years after the copyright was originally obtained for an additional period of twenty-eight years. | F. Supp. 2d 395, 399 n.12–13 (S.D.N.Y. 2006). |
| 23.    During his lifetime, John Steinbeck filed copyright renewal registrations for the following works, among others: *Cup of Gold* (©1929), *The Pastures of Heaven* (©1932), *To a God Unknown* (©1933), *Tortilla Flat* (©1935), *In Dubious Battle* (©1936), *The Red Pony* (©1937), *Of Mice and Men* (©1937), *Of Mice and Men* (Play) (©1937), *Murder at Full Moon* (©1938), *The Long Valley* (©1938), *The Grapes of Wrath* (©1939), *The Forgotten Village* (©1941), and *The Sea of Cortez* (©1941).  These works are referred to herein as the "Early Works." | *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 n.12 (S.D.N.Y. 2006). |
| 24.    John Steinbeck also authored the following works that were published in or after 1942, and thus entered their renewal term after his death in 1968: *The Moon Is Down* (©1942), *The Moon Is Down* (Play) (©1942), *Bombs Away* (©1942), *Cannery Row* (©1945), *The Pearl* (©1945), *The Wayward Bus* (©1947), *A Russian Journal* (©1948), | *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 n.13 (S.D.N.Y. 2006). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  14-CV-08699-TJH (FFM)

| | |
|---|---|
| *Burning Bright* (©1950), *The Log from the Sea of Cortez* (©1951), *East of Eden* (©1952), *Sweet Thursday* (©1954), *The Short Reign of Pippin IV* (©1957), *Once There Was a War* (©1958), *The Winter of Our Discontent* (©1961), and *Travels with Charley* (©1962).  These works are referred to herein as the "Late Works." The Early Works and the Late Works are collectively referred to herein as the "Steinbeck Works." | |
| 25.     When John Steinbeck died in 1968, he left a will in which he passed all his copyright interests to Elaine. | Kohlmann Decl. ¶ 10,  Ex. 9 (Last Will and Testament of John Ernest Steinbeck ("John Steinbeck's Will) ¶ 6); *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 (S.D.N.Y. 2006). |
| 26.     In his will, John Steinbeck left Thom and John IV each a sum total of $50,000 in trust but did not leave them any interest in his intellectual-property rights. | Kohlmann Decl. ¶ 10,  Ex. 9 (John Steinbeck's Will ¶¶ 6–7); *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 (S.D.N.Y. 2006); *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008). |
| 27.     With respect to the Early Works, Elaine inherited the entire copyright interest in the Early Works as those rights passed through John Steinbeck's will. | *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 (S.D.N.Y. 2006). |

| | |
|---|---|
| 28.    With respect to the Late Works, which were not yet subject to renewal at the time of John Steinbeck's death, Thom and John IV—in addition to Elaine—jointly own and share in the renewal copyright royalties derived from those Late Works, pursuant to the statutorily created renewal provisions that existed at the time under the Copyright Act of 1976, 17 U.S.C. § 304(a)(1)(C). | AC ¶ 22; Answer ¶ 22; *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497(GBD), 2009 WL 928189, at *3 (S.D.N.Y. Mar. 31, 2009); AC ¶ 22; Answer ¶ 22. |
| 29.    Thom, John IV, and Elaine were parties to a 1974 royalty distribution agreement, under which Thom and John IV each received one-quarter of the royalties in the Late Works while Elaine received the remaining half. | AC ¶ 23; Answer ¶ 23. |

### B.    The 1983 Agreement

| | |
|---|---|
| 30.    In 1981, Thom and John IV sued Elaine in the United States District Court for the Southern District of New York ("Southern District"), seeking to upend the 1974 royalty distribution agreement, alleging that it was a product of fraud and misrepresentation. | AC ¶ 24; Answer ¶ 24. |
| 31.    In 1982, the Southern District granted Elaine's motion for summary | Kohlmann Decl. ¶ 11,  Ex. 10 (*John Steinbeck, IV and Thomas Steinbeck v.* |

7

| | |
|---|---|
| judgment, concluding that the 1974 royalty distribution agreement was "specific and unambiguous." | *Elaine Steinbeck*, No. 81 Civ. 6105 (S.D.N.Y. Dec. 8, 1982)); *Steinbeck v. McIntosh & Otis, Inc.*, No.04 CV 5497(GBD), 2009 WL 928189, at *3 (S.D.N.Y. Mar. 31, 2009). |
| 32.     Thom and John IV appealed the district court's decision to the United States Court of Appeals for the Second Circuit (the "Second Circuit"). | *Steinbeck v. McIntosh & Otis, Inc.*, No.04 CV 5497(GBD), 2009 WL 928189, at *3 (S.D.N.Y. Mar. 31, 2009). |
| 33.     In 1983, Thom, John IV, and Elaine entered into a settlement agreement (the "1983 Agreement"). | Kohlmann Decl. ¶ 12,  Ex. 11 (1983 Agreement); *Steinbeck v. McIntosh & Otis, Inc.*, No.04 CV 5497(GBD), 2009 WL 928189, at *3 (S.D.N.Y. Mar. 31, 2009). |
| 34.     Defendants do not dispute that Thom voluntarily entered into the 1983 Agreement. | AC ¶ 6–7, 25–26; Answer ¶ 6–7, 25–26. |
| 35.     Under the 1983 Agreement, Thom and John IV (on behalf of themselves and their heirs and assigns) ceded "complete power and authority" to Elaine (and her heirs and assigns) "to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck in which [John IV] and [Thom] have or will have renewal or | Kohlmann Decl. ¶ 12,  Ex. 11 (1983 Agreement ¶ 5). |

8

| | |
|---|---|
| termination rights." | |
| 36.    Under the 1983 Agreement, in exchange for ceding all control, Thom's and John IV's royalty shares in the Late Works increased from a quarter each to one-third each while Elaine's share decreased from one-half to one-third. | Kohlmann Decl. ¶ 12,  Ex. 11 (1983 Agreement ¶ 2); *Steinbeck v. McIntosh & Otis, Inc.*, No.04 CV 5497(GBD), 2009 WL 928189, at *3 (S.D.N.Y. Mar. 31, 2009). |
| 37.    The 1983 Agreement states that it "shall bind the Parties and their heirs, successors and assigns." | Kohlmann Decl. ¶ 12,  Ex. 11 (1983 Agreement ¶ 14); AC ¶ 28; Answer ¶ 28. |
| 38.    The 1983 Agreement also appointed M&O as agent for the Steinbeck Works. | Kohlmann Decl. ¶ 12,  Ex. 11 (1983 Agreement ¶ 5); *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497(GBD), 2009 WL 928171, at *8 (S.D.N.Y. Mar. 31, 2009). |
| 39.    As a result of the 1983 Agreement, Thom and John IV, and their heirs and assigns, have been collecting increased royalties of one-third each on the Late Works for decades. | *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928171, at *3 (S.D.N.Y. Mar. 31, 2009). |
| 40.    Today, John IV's one-third share is split between his daughter Blake and former wife Nancy. | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 23:6–24:16) |
| **C.    Elaine Anderson Steinbeck's Death** | |
| 41.    Elaine passed away in 2003. | *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008). |

9

| | |
|---|---|
| 42. Elaine's Will passed her copyright interests to Waverly and other named beneficiaries, and appointed Waverly as the executrix of her Estate, which manages Elaine's assets pursuant to her will. | Kohlmann Decl. ¶ 13, Ex. 12 (Last Will and Testament of Elaine Anderson Steinbeck ("Elaine's Will") ¶¶ 7, 11.A, 12); *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008). |
| 43. Elaine's Will grants Waverly, as executor of the Estate, the "power and authority to negotiate, arrange, execute, acknowledge, contract and deliver . . . any and all contracts for the sale, leasing, licensing, sub-licensing or other disposition of any literary or other works owned or controlled" by Elaine. | Kohlmann Decl. ¶ 13, Ex. 12 (Elaine's Will ¶ 12). |

### D. The 2004 Litigation

| | |
|---|---|
| 44. In 2004, Thom and Blake sued the Estate and M&O, along with several other defendants associated with the Steinbeck Works, in the Southern District, alleging that the Estate had engaged in a conspiracy to deprive them of their rights in the Steinbeck Works. They brought claims of breach of fiduciary duty and unjust enrichment, among others. Plaintiff asserted several counterclaims against Thom and Blake, including a declaratory judgment claim | *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928189, at *1, *11 (S.D.N.Y. Mar. 31, 2009); Kohlmann Decl. ¶ 14, Ex. 13 (Answer, Affirmative Defenses, and Counterclaims of Defendant and Counterclaim Plaintiff the Estate of Elaine Steinbeck, *Penguin Grp. (USA) v. Steinbeck*, No. 04-CV-5497 (GBD) (S.D.N.Y. Sept. 30, 2004), Dkt. No. 20). |

| | |
|---|---|
| that the 1983 Agreement is valid. | |
| 45.    In 2009, the Southern District granted summary judgment in favor of the Estate on all of Thom's and Blake's claims. | *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928189, at *12 (S.D.N.Y. Mar. 31, 2009). |
| 46.    In 2010, the Second Circuit affirmed the district court's summary judgment decision just five days after oral argument. | *Steinbeck v. Steinbeck Heritage Foundation*, 400 F. App'x 572, 574 (2d Cir. 2010). |
| 47.    Thom and Blake sought review by the Supreme Court and, on June 13, 2011, the Supreme Court declined review. | *Steinbeck v. McIntosh & Otis, Inc.*, 131 S. Ct. 2991 (2011); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. 42:2–3). |
| 48.    Throughout the 2004 Litigation, Thom at all times was represented by counsel, including attorneys from Manatt, Phelps & Phillips LLP; Holland & Knight LLP; and Baker & McKenzie LLP. | *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 202 (2d Cir. 2008); Kohlmann Decl. ¶ 15,  Ex. 14 (Stipulation and Order with Respect to Counterclaim and Intervenor Complaint, *Penguin Group (USA) v. Steinbeck*, No. 04-CV-5497 (GBD) (S.D.N.Y. Dec. 2, 2009)); *Steinbeck v. Steinbeck Heritage Foundation*, 400 F. App'x 572 (2d Cir. 2010); |
| 49.    Thom testified that he has not read the multiple court decisions from the 2004 Litigation and had "[o]nly marginally" discussed them with Gail. | Kohlmann Decl. ¶ 5,  Ex. 4 (T. Steinbeck Tr. at 36:20–37:5). |

| | |
|---|---|
| He stated, "I had no intention of stopping my challenge to all of these things, so it really didn't make a lot of difference to me that a decision would go one way or the other until I'd finally won." | |
| 50.    Gail similarly testified, "It's not that we're not inclined to abide by the court ruling, it's just that in most places a ruling like that won't stand and it's always going to be nebulous, it's always going to be at risk." | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 137:24–138:4). |

**E.    The 2014 Litigation**

| | |
|---|---|
| 51.    In 2014, Thom and Blake again filed suit against the Estate, M&O, and others who had exploited the Steinbeck Works in connection with Estate, in the United States District Court for the Central District of California (the "Central District"), calling into question the Estate's ability to control the Steinbeck Works. | Kohlmann Decl. ¶ 16, Ex. 15 (Complaint, *Steinbeck v. Kaffaga*, No. 14-cv-08681-PJW (C.D. Cal. November 7, 2014)). |
| 52.    On August 11, 2015, this Court granted the defendants' motion to dismiss the case in its entirety. | Kohlmann Decl. ¶ 17, Ex. 16 (Order, *Steinbeck v. Kaffaga*, No. 14-08681 TJH (FFMx) (C.D. Cal. Aug. 11, 2015)). |
| 53.    On August 31, 2015, the Central District entered judgment against Thom | Kohlmann Decl. ¶ 18, Ex. 17 (Judgment, *Steinbeck v. Kaffaga*, No.14- |

12

| | |
|---|---|
| and Blake, and, on February 18, 2016, entered an order granting attorneys' fees to certain defendants in that action. | 08681 TJH (FFMx) (C.D. Cal. Aug. 31, 2015)); Kohlmann Decl. ¶ 19, Ex. 18 (Order, *Steinbeck v. Kaffaga*, No-14-08681 TJH (JCx) (C.D. Cal. Feb. 18, 2016)). |

## II.    Defendants' Pattern of Improper Conduct

### A.    Defendants' Interference with the Estate's Negotiations

#### 1.    *East of Eden*

| | |
|---|---|
| 54.    In 2010, the Estate entered into negotiations for the television rights to *East of Eden* with Warner Brothers Television ("WBTV") for a television mini-series. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 26:21–27:3). |
| 55.    On January 3, 2011, Gail emailed Richard Green, an agent at Creative Artists Agency ("CAA"), about the WBTV *East of Eden* deal: "Anything [redacted in document as produced by CAA] does now will be with a cloud on the title.  Unless Thom agrees to that deal, if we get heard and if we win, the contract will be worthless. . . . He should know about this before he tries to sign a deal." | Kohlmann Decl. ¶ 20,  Ex. 19 (CAA005396); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 82:18–19). |
| 56.    That same day, on January 3, 2011, Mr. Green responded to Gail's email, "I will let the Wells team know | Kohlmann Decl. ¶ 20,  Ex. 19 (CAA005396). |

| | |
|---|---|
| the latest." | |
| 57.    CAA ultimately forwarded the above-quoted portion of Gail's January 3, 2011 email to the producer, who responded, "WB legal wants to get on the phone with me and whoever at CAA is best to discuss this with." | Kohlmann Decl. ¶ 20,  Ex. 19 (CAA005396). |
| 58.    After other film and television studios had expressed interest in the rights to *East of Eden*, in 2013, M&O and RWSG began negotiating a deal for the film rights with Universal/Imagine. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 47:11–21, 48:17–21); Kohlmann Decl. ¶ 21,  Ex. 20 (M&O007987). |
| 59.    In September 2013, M&O accepted a financial offer from Universal/Imagine for the film rights to *East of Eden*. | Kohlmann Decl. ¶ 22, Ex. 21 (M&O007962). |
| 60.    ███████████████ ████████████████ ████████████████ ███████████ ████████████████ █████████████████ ███████████████ ██████████ █████████████ ███████████████ █████████████ | Kohlmann Decl. ¶ 23,  Ex. 22 (UNIVERSAL0000083). |

14



| | |
|---|---|
| 61. ██████████ ██████ █████ | Kohlmann Decl. ¶ 24, Ex. 23 (STEINBECK001857). |
| 62.    A public article reported the deal on September 25, 2013 and linked Brian Grazer and Anna Culp, Imagine producers, to the project. | Kohlmann Decl. ¶ 25, Ex. 24 (*Deadline* article re *East of Eden*). |
| 63.    On September 27, 2013, Myrica Taylor, a writer, emailed Gail a link to an article about the *East of Eden* deal and Gail responded, "litigation city." | Kohlmann Decl. ¶ 26, Ex. 25 (STEINBECK005278); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 123:17–19). |
| 64.    On September 30, 2013, Carol Robles, a Steinbeck scholar and historian, emailed Gail an article about the *East of Eden* deal and Gail responded, "We shall see about that." She later added, "I'm afraid it will be riddled with lawsuits." | Kohlmann Decl. ¶ 27, Ex. 26 (STEINBECK005282); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 125:7–8). |
| 65.    On October 6, 2013, just weeks | Kohlmann Decl. ¶ 28, Ex. 27 |

15

| | |
|---|---|
| after the *East of Eden* deal went public, Gail filed a Petition against RWSG with the California State Labor Commissioner (the "RWSG Petition"), alleging that RWSG's agents, in their negotiation of the *East of Eden* deal, had been operating without a license.   The RWSG Petition claimed that Thom "owns or controls" two-thirds of the domestic rights to *East of Eden*. | (KAFFAGA0001237). |
| 66.    Gail testified that, once news of the *East of Eden* deal with Universal/Imagine went public, she attempted to contact Brian Grazer (Producer, Imagine). | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 105:12–106:7); Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 50:23–51:4). |
| 67.    When Mr. Grazer failed to return her calls, Gail spoke with Anna Culp (Imagine) instead, and told her that Thom and Blake had the ability to terminate the film rights to *East of Eden* and if Universal/Imagine "decided to move forward, then we'd just have to go ahead and terminate the rights and create a brand-new set of rights and start all over again." | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 106:4–16; 122:3–10). |
| 68.    ███████████████ ███████████████████ | Kohlmann Decl. ¶ 29, Ex. 28 (STEINBECK004847; |

16

| | STEINBECK004848; STEINBECK004852). |
|---|---|
| 69.    Finally, Gail testified that she informed Ms. Culp, "As far as we're concerned, [the agents at M&O] don't represent us on a copyright termination because it creates a brand-new set of rights.  We do not use them because we believe that they are double-dipping on commissions and that they've hired someone we don't know who is out there marketing these rights, and Brian [Grazer (Imagine)] needs to call me because somebody could get in trouble, and we don't want that to happen." | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 121:10–18). |
| 70.    Gail testified that she "called Imagine in an attempt to put Brian Grazer on notice that we needed to sit down at the table, what he was doing was in bad form, and that we should talk again about doing 'East of Eden,' and if he didn't want to do that, then we would | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 128:2–11). |

| | |
|---|---|
| go ahead and move forward with the copyright termination." | |
| 71.    On October 13, 2014, in response to media reports of the RWSG Petition, Erica Huggins (Imagine) forwarded Mr. Grazer and Ms. Culp an article about the RWSG Petition and reported, "Per Masako [another Imagine employee], Gail Steinbeck is going through with her lawsuit.  No one thinks she has a leg to stand on, however, now we will have to wait for the outcome to close the deal." | Kohlmann Decl. ¶ 30,  Ex. 29 (IE0000002). |
| 72.    On November 11, 2014, the *Daily Journal* publicly announced Thom and Blake's lawsuit. | Kohlmann Decl. ¶ 31, Ex. 30 (*Daily Journal* article). |
| 73.    Later that same day, Universal/Imagine decided to back away from its negotiations with M&O and the Estate for a film version of *East of Eden.* | Kohlmann Decl. ¶ 32,  Ex. 31 (M&O021501); Kohlmann Decl. at ¶ 33, Ex. 32 (November 22, 2014 email from P. Lojo to S. Kohlmann and others). |
| 74.    In backing away, Universal told Ms. Winick Rubinstein of M&O that they "can't stomach" the project, in reference to the "cost of litigation" and the "time spent." | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at  56:19–57:8). |
| 75.    Universal/Imagine informed Ms. Winick Rubinstein that "[t]hey had | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 55:2–9). |

18

| | |
|---|---|
| major concerns with moving forward with developments and spending money with the constant threat of litigation. And time had passed, and they just felt it wasn't worth the efforts that it would take to move towards development given the background." | |
| 76.    Imagine remained "quite passionate about the project" and told Ms. Winick Rubinstein to alert them "when things get resolved between Gail, Thom and the estates" because they "would still like to move forward, if possible."  According to Ms. Winick Rubinstein, Imagine wanted to see, before they moved forward, "another judgment against Gail and Thom, et al, stating that they cannot make these threats because there is no legal backing behind them, and what it's doing is scaring off potential producers, studios, etc." | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at  56:19–57:15). |
| 77.    During her deposition, Gail acknowledged that the RWSG Petition caused Universal/Imagine to back away from the deal. | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 178:24–179:4). |
| 78.    Gail informed Mr. Bookman that | Kohlmann Decl. ¶ 34,  Ex. 33 |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  14-CV-08699-TJH (FFM)

| | |
|---|---|
| "Imagine and Universal dropped out because of the litigation." | (STEINBECK003603). |
| 79.    In February 2015, Mr. Bookman emailed Gail an inquiry from J.P. Sarni, a producer, about the film rights to *East of Eden*.  Gail responded, "The fact is that Imagine and Universal dropped out because of the litigation, so if they want to begin a dialogue with you and me, then that would be fine. . . .  Because of the litigation, I believe he stands a better chance dealing with us as well as since [*sic*] we are likely to terminate those rights.  The bottom line is that they need to talk with us.  I see no reason whey [*sic*] you can't ask them if they would like to take a meeting."  Mr. Bookman then forwarded Gail's response to Mr. Sarni. | Kohlmann Decl. ¶ 34,  Ex. 33 (STEINBECK003603). |

### 2.    *The Grapes of Wrath*

| | |
|---|---|
| 80.    *The Grapes of Wrath* originally was adapted to film by 20th Century Fox ("Fox") in 1940. | Kohlmann Decl. ¶ 35,  Ex. 34 (February 17, 2016 Declaration of  Kathryn Arnold ("Arnold Decl.") ¶ 58). |
| 81.    In June 2013, M&O and RWSG entered into negotiations with DreamWorks Pictures ("DreamWorks") for a film adaptation of *The Grapes of* | Kohlmann Decl. ¶ 36,  Ex. 35 (M&O013460). |

20

| | |
|---|---|
| *Wrath*, with Steven Spielberg and Daniel-Day Lewis attached to the project. | |
| 82.   In July 2013, DreamWorks made an initial offer to the Estate for the domestic film rights to *The Grapes of Wrath* for a purchase price of ███ with an ███████ option period for ████ (credited against the purchase price) and an ███████ option extension for ████ (not credited against the purchase price). | Kohlmann Decl. ¶ 37,  Ex. 36 (KAFFAGA0000306). |
| 83.   ███████████████ | Kohlmann Decl. ¶ 38,  Ex. 37 (M&O015155). |
| 84.   ███████████████ | Kohlmann Decl. ¶ 38,  Ex. 37 (M&O015155). |

21

| | |
|---|---|
| 85.    Pursuant to the 1983 Agreement, Thom and Blake received a portion of the initial payment of ▬▬▬ and will receive royalty payments going forward if the film is made. | Kohlmann Decl. ¶ 39,  Ex. 38 (M&O013387); Kohlmann Decl. ¶ 40, Ex. 39 (M&O014330); Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 145:20–22); Kohlmann Decl. ¶ 8, Ex. 7 (Winick Rubinstein Tr. at 64:14–65:14). |
| 86.    ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬ ▬▬▬▬▬▬ ▬▬▬▬▬ ▬▬▬▬▬▬▬ ▬▬▬ | Kohlmann Decl. ¶ 41,  Ex. 40 (STEINBECK000001); ¶ 42. |
| 87.    Specifically, on  July 2, 2013, *Deadline* published an article about the DreamWorks deal and noted that "this suddenly became a hot movie property, and . . . Steven Spielberg swooped in to take it off the table over other bidders." | Kohlmann Decl. ¶ 43, Ex. 41 (*Deadline* article re *The Grapes of Wrath*). |
| 88.    That same day, Mr. Bookman emailed Gail a link to the *Deadline* article and Gail responded, "I'm just pissed.  Now I have to get my lawyer's [*sic*] on the case and it's so damned expensive. . . .  Thanks so much for the heads up.  I love that I had to hear about it in the trades.  You cannot imagine | Kohlmann Decl. ¶ 44,  Ex. 42 (STEINBECK004977). |

| | |
|---|---|
| how much I loathe that agency." | |
| 89.     That same day, Gail wrote to an acquaintance about the Estate's negotiations with DreamWorks: "This will end up in the courts and is not likely to evolve into a film." | Kohlmann Decl. ¶ 45, Ex. 43 (STEINBECK004975). |
| 90. ███████████ ████████████ ████████████ ███████████ █████████ ███████████ ██████████ ████ | Kohlmann Decl. ¶ 46, Ex. 44 (STEINBECK001713); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 141:2–7). |
| 91. ███████████ ██████████ ██████████ ██████████ ███ | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 143:12–144:4). |
| 92. ███████████ █████████ ██████████ ██████████ ██████████ ███████████ █████████ ██████████ | Kohlmann Decl. ¶ 47, Ex. 45 (STEINBECK005290). |

23



| | |
|---|---|
| | |
| 93. | Kohlmann Decl. ¶ 47,  Ex. 45 (STEINBECK005290). |
| | |
| 94. | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 145:8–19). |
| 95. | Kohlmann Decl. ¶ 48,  Ex. 46 (STEINBECK010431). |



| | |
|---|---|
| ████████████ | |
| 96.   ████████████ | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 169:17–23). |
| 97.   Because of Defendants' communications with DreamWorks, there was significant delay in the Estate's negotiations with DreamWorks, ████████████ | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 62:5–17). |
| 98.   In addition, "DreamWorks decided to hire outside counsel to review all the Court documents and | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 59:3–60:6). |

| | |
|---|---|
| make a decision about what the truth really was regarding the decision-making for the Steinbeck titles." | |
| 99.  | Kohlmann Decl. ¶ 9,  Ex. 8 (Bookman Tr. at 68:2–7). |
| 100. | Kohlmann Decl. ¶ 41,  Ex. 40 (STEINBECK000001); Kohlmann Decl. ¶ 49,  Ex. 47 (STEINBECK002839; STEINBECK002840). |
| 101. | Kohlmann Decl. ¶ 41,  Ex. 40 (STEINBECK000001 (Agreement ¶ 5.2)); Kohlmann Decl. ¶ 50, Ex. 48 (STEINBECK_HARDCOPY_ 0000035). |
| 102. | Kohlmann Decl. ¶ 41,  Ex. 40 (STEINBECK000001 (Cover Letter ¶ 1); (Agreement ¶ 4.2)); Kohlmann Decl. ¶ 35,  Ex. 34 (Arnold Decl. ¶ 64). |

26



| | |
|---|---|
| **103.** ▮▮▮▮▮ | Kohlmann Decl. at Ex. 40 (STEINBECK000001 (Cover Letter ¶ 1)); Kohlmann Decl. ¶ 35, Ex. 34 (Arnold Decl. ¶ 64). |
| **104.** ▮▮▮▮▮ | Kohlmann Decl. at Ex. 49 (STEINBECK001970). |
| **105.**   Thom testified that he had never before served as an executive producer for a feature film, ▮▮▮▮ ▮▮▮▮ He testified that such credits "are givens, that's fluff, that's given away." | Kohlmann Decl. ¶ 5, Ex. 4 (T. Steinbeck Tr. at 24:6–14; 53:25–54:6; 68:13–19). |
| **106.** ▮▮▮▮▮ | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 149:20–150:10). |



| 107. | Kohlmann Decl. ¶ 52. |

| 108. | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 145:20–22); ¶ 53. |

**B.    Defendants' Unauthorized Exploitation of the Steinbeck Works**

**1.    Thom's Screenplays**

| 109.   Gail acknowledged that the Estate enjoys "unfettered control" over most of the Steinbeck Works, but nevertheless believes that she and Thom can market and exploit their own adaptations (including screenplays written by | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 41:2–10; 99:21–100:2; 221:9–222:23) |

28

| | |
|---|---|
| Thom) of the Steinbeck Works without informing or consulting the Estate and without referring inquiries to M&O. | |
| 110.   When asked whether she refers interested parties to M&O, Gail testified, "I don't owe them a fiduciary duty.  They don't owe me one." | Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 99:21–100:2). |
| 111.   One adaptation of a Steinbeck Work by Defendants is a screenplay adaptation of *The Pearl* that Thom authored in the mid-1990s. | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 76:13–24); Kohlmann Decl. ¶ 5,  Ex. 4 (T. Steinbeck Tr. at 13:14–23); Kohlmann Decl. ¶ 9,  Ex. 8 (Bookman Tr. at 22:9–10). |
| 112.   At her deposition, Gail acknowledged that *The Pearl* is a Late Work and its exploitation is thus governed by the 1983 Agreement. | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 77:11–78:1). |
| 113.   ████████████████ ████████████████████ ████████████████████ ██████████████████ ██████████████  Gail confirmed during her deposition that she had in fact represented to Mr. Bookman that Defendants control the underlying rights to *The Pearl.* | Kohlmann Decl. ¶ 29,  Ex. 28 (STEINBECK004847); Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 89:14–90:1). |
| 114.   ████████████████ ██████████████████ | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 79:11–19); Kohlmann |

29

| | |
|---|---|
| ████████████████████ | Decl. ¶ 9, Ex. 8 (Bookman Tr. at 32:22–33:3). |
| 115.   On January 16, 2014, Mr. Bookman informed Gail that he had "heard back" from an executive in Business Affairs at Disney, about *The Pearl*, and the executive had "[m]ade it clear they are open to negotiations 'with great enthusiasm." | Kohlmann Decl. ¶ 54, Ex. 50 (PARADIGM-001818); Kohlmann Decl. ¶ 9, Ex. 8 (Bookman Tr. at 110:16–18). |
| 116.   Gail responded, "We can look to fund independently and maybe do a distribution deal with Disney." | Kohlmann Decl. ¶ 54, Ex. 50 (PARADIGM-001818). |
| 117.   On March 27, 2014, a colleague of Mr. Bookman forwarded Gail a list of potential financial partners who had been sent a copy of Thom's screenplay of *The Pearl*. | Kohlmann Decl. ¶ 55, Ex. 51 (STEINBECK001263). |
| 118.   On May 1, 2015, two years after Gail initially approached Paradigm about exploiting *The Pearl*, a colleague of Mr. Bookman emailed Gail a list of "the companies/individuals we are currently engaging with on THE | Kohlmann Decl. ¶ 56, Ex. 52 (PARADIGM-001943). |

| | |
|---|---|
| PEARL." | |
| 119.   Gail responded that she and Mr. Bookman were "still hopeful we can get it off the ground.  I'm working with a Hedge Fund group out of New York who have expressed serious interest in funding the production of the project as well as the acquisition of the script for 'The Pearl.'" | Kohlmann Decl. ¶ 56,  Ex. 52 (PARADIGM-001943). |
| 120.   Ms. Winick Rubinstein confirmed that M&O had not been consulted about or involved in marketing a film production of *The Pearl* that would have used Thom's screenplay. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 92:19–22). |

**2.    *The Long Valley* Audio Book**

| | |
|---|---|
| 121.   Thom recorded an audio version of *The Long Valley*. | Kohlmann Decl. ¶ 5,  Ex. 4 (T. Steinbeck Tr. at 39:18–24). |
| 122.   Gail and Thom currently offer Thom's version for sale, pursuant to a license of a third party not affiliated with the Estate, and have sold copies through his website, Amazon.com, and the National Steinbeck Center between 2011 and 2014. | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 64:17–21); Kohlmann Decl. ¶ 57, Ex. 53 (STEINBECK_ EMAIL_0000027); Kohlmann Decl. ¶ 58, Ex. 54 (STEINBECK004872); Kohlmann Decl. ¶ 59, Ex. 55 (Screenshot of Thom Steinbeck's Website); Kohlmann Decl. ¶ 60, Ex. 56 (Screenshot of Amazon Page); |
| 123.   Gail has told potential publishers | Kohlmann Decl. ¶ 61,  Ex. 57 |

31

| | |
|---|---|
| that Thom "own[s] the rights to the copyright of that particular CD." | (STEINBECK007930); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 64:22–24). |

### 3.   *The Moon Is Down*

| | |
|---|---|
| 124.   In December 2008, Palladin entered into an agreement for the foreign film rights to *The Moon Is Down* with Twentieth Century Fox. | Kohlmann Decl. ¶ 62, Ex. 58 (M&O011244); Kohlmann Decl. ¶ 63, Ex. 59 (M&O011483). |
| 125.   In February 2009, Palladin assigned to Wayfarer, Inc. ("Wayfarer"), a company run by Edwin ("Ed") Elbert, the foreign film rights to *The Moon Is Down* for consideration of one dollar. | Kohlmann Decl. ¶ 64, Ex. 60 (M&O011254); Kohlmann Decl. ¶ 3, Ex. 2 (G. Steinbeck Tr. at 109:7–13). |
| 126.   On December 1, 2010, Mr. Elbert approached RWSG about acquiring the domestic film rights to *The Moon Is Down* and stated, "[I]t would be preferable both legally and creatively to reach an arrangement with the Steinbeck estate that couple their rights to the international rights from Twentieth Century Fox which we already have. This would allow greater creative freedom to create the best script, and the unquestioned right to market the resulting film in the United States."  Mr. | Kohlmann Decl. ¶ 65, Ex. 61 (M&O011679). |

| | |
|---|---|
| Elbert implied that, should the Estate decline to grant him the domestic film rights, he would proceed anyway with the foreign rights and a potential non-exclusive grant of domestic rights allegedly owned by Fox.  Critically, Mr. Ebert did not inform RWSG that he was connected to Defendants. | |
| 127.   At some point, Ms. Winick Rubinstein realized that Mr. Elbert was operating as "somewhat of a puppet for Thom and Gail." | Kohlmann Decl. ¶ 66,  Ex. 62 (M&O011453). |
| 128.  | Kohlmann Decl. ¶ 67,  Ex. 63 (STEINBECK002207). |
| 129. | Kohlmann Decl. ¶ 4,  Ex. 3 (STEINBECK008566). |
| 130. | Kohlmann Decl. ¶ 4,  Ex. 3 |

33

| | |
|---|---|
|  | (STEINBECK008566). |
| 131.   On March 8, 2011, Mr. Elbert emailed Ms. Winick Rubinstein to inform her that he had "just received information that puts the rights situation in a clearer light," as a legal opinion requested by Palladin had taken the position that "a recent court opinion has placed a cloud over the Steinbeck family's rights as regards nonexclusive rights in the U.S."  Mr. Elbert suggested that he and M&O "come to terms in some way about how to work together to combine both sets of rights." | Kohlmann Decl. ¶ 68,  Ex. 64 (M&O030948). |
| 132. | Kohlmann Decl. ¶ 69, Ex. 65 (STEINBECK009244). |
| 133.   Mr. Elbert and M&O reached an agreement regarding the film rights to | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 91:7–9); Kohlmann |

| | |
|---|---|
| *The Moon Is Down* in December 2011. | Decl. ¶ 70,  Ex. 66 (M&O016634). |
| 134.   In February 2014, Mr. Elbert emailed Gail a summary of the project that listed her and Thom as executive producers. | Kohlmann Decl. ¶ 71, Ex. 67 (STEINBECK002234; STEINBECK002235). |

### C.    Defendants' Improper Authorization of Others' Use of Steinbeck Works

#### 1.    *The Long Valley- Flight*

| | |
|---|---|
| 135.   *The Long Valley* is a collection of short stories written by John Steinbeck, one of which is *Flight*. | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 43:11–15). |
| 136.   In September 2011, Gail asserted to Emily Parker of Rightscenter, a database of film and television rights to literary works relied on by film producers and studios, that Palladin represents the "film and/or stage rights" to the short stories in *The Long Valley*, including *Flight*. | Kohlmann Decl. ¶ 72,  Ex. 68 (M&O078213). |
| 137.   In December 2012, Summer-Joy Main of Tica Productions approached Gail about obtaining permission to create a film adaptation of *Flight* in connection with the American Film Institute ("AFI") Directing Workshop for Women. | Kohlmann Decl. ¶ 73,  Ex. 69 (STEINBECK000737). |
| 138.   On December 19, 2012, Gail | Kohlmann Decl. ¶ 74,  Ex. 70 |

| | |
|---|---|
| wrote and signed a letter to AFI that served as "an informal statement of a non-exclusive, one time Grant of Rights to the Underlying Literary Property '*Flight*.' The letter stated: "On behalf of Thomas Steinbeck, as the copyright owner to film and television rights, with authority to grant said rights, we warrant that we will grant these rights to Summer-Joy 'SJ' Main to adapt the story entitled 'Flight' into a short film should she be accepted to your Women's Directing Program.'" | (December 19, 2012 letter from Gail to AFI). |
| 139.   In January 2016, the Estate learned for the first time that Tica Productions and Ms. Main had made a short film based on *Flight* and that the film is currently in post-production. | Kohlmann Decl. ¶ 75. |
| 140.   The Estate first learned of the *Flight* film when it came across Gail's and Thom's Internet Movie Database ("IMDb") pages, which, as of January 4, 2016, listed them as executive producers for this film adaptation of *Flight*. | Kohlmann Decl. ¶ 76,  Ex. 71 (Screenshots of *Flight* IMDb Pages). |
| 141.   Ms. Winick Rubinstein testified that M&O did not know about, let alone approve, this adaptation of *Flight*. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 95:12–14). |

## 2. Other Instances of Defendants' Improper Authorization of Others' Use of Steinbeck Works

| | |
|---|---|
| 142.   In November 2010, Gail asserted to Robert Kanter, an Emmy Award-winning producer who had approached M&O about the film rights to *The Log from the Sea of Cortez* that "any attempts to move forward with a project without Thomas Steinbeck's permission could place the project in jeopardy." | Kohlmann Decl. ¶ 77,  Ex. 72 (STEINBECK007917). |
| 143.   When Mr. Kanter informed Gail in August 2011 that he had acquired the rights from M&O, Gail asserted, "It is my job to protect the copyright interests of the Steinbeck family.  Until I see a proper grant of rights for a license to perform any of the Steinbeck properties in which my clients have an interest and mind you, I represent John Steinbeck's blood heirs, then I must take the position that you do not have a clear chain of title. . . ." | Kohlmann Decl. ¶ 78,  Ex. 73 (STEINBECK009568). |
| 144.   In response to a September 2011 inquiry from James Franco about the film rights to *Tortilla Flat*, among other rights, Gail wrote, "Tortilla Flat is a good piece and would be wonderful for James to direct.  But you should know | Kohlmann Decl. ¶ 79,  Ex. 74 (CAA006481). |

| | |
|---|---|
| that nothing is completely conflict free. . . .  Thom has agreed to let James have '*Tortilla Flat*,' so if the deal is fair, and we have a copy of the contract, then it will be conflict free." | |
| 145.   In August 2014, Gail agreed to grant David Avshalomov, a composer, permission to stage an opera version of *The Pearl*.  The agreement that Gail sent to Mr. Avshalomov warranted that Thom "owns certain rights to THE PEARL written by John Steinbeck" and purports to grant "the rights [Thom] holds on a non-exclusive basis" to present an opera adaptation of *The Pearl*. | Kohlmann Decl. ¶ 80,  Ex. 75 (STEINBECK001310) |
| 146.   Mr. Avshalomov's opera adaptation of *The Pearl* was performed on August 17, 2014 at St. Mark's Episcopal Church in Glendale, California. | Kohlmann Decl. ¶ 81,  Ex. 76 (Screenshot of Avshalomov's Website). |
| 147.   On the website for the adaptation, Mr. Avshalomov includes a "Special thanks to Thomas and Gail Steinbeck for granting formal permission to use John Steinbeck's novella, 'The Pearl' as the basis for the libretto and lyrics for | Kohlmann Decl. ¶ 81,  Ex. 76 (Screenshot of Avshalomov's Website). |

| | |
|---|---|
| this showcase." | |
| 148.   Ms. Winick Rubinstein confirmed that M&O was not aware of, and did not authorize, this opera adaptation of *The Pearl*. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 96:4–11). |
| 149.   In October 2013, Thom granted an author permission to use a passage from *Cannery Row*  in a book and added, "Should you need any more legal proof than [this email], please send it along.  I would be happy to sign off on whatever you might need." | Kohlmann Decl. ¶ 82, Ex. 77 (STEINBECK005332). |
| 150.   In June 2014, Gail granted a congressional candidate permission to use a passage from *The Grapes of Wrath* in a campaign advertisement. | Kohlmann Decl. ¶ 83,  Ex. 78 (STEINBECK002431). |
| 151.   Ms. Winick Rubinstein testified that she does not believe M&O licensed this use and clarified that Thom and Gail were not empowered to grant this right. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 97:5–12). |

### D.   Defendants' Interference with the Estate's Agents

#### 1.   RWSG

| | |
|---|---|
| 152.   As noted above (*see* SUF ¶ 65), in October 2013, Gail filed the RWSG Petition, asserting that RWSG was not properly licensed in the state of | Kohlmann Decl. ¶ 28,  Ex. 27 (KAFFAGA0001237). |

39

| | |
|---|---|
| California and therefore had no right to make any deal related to the Steinbeck Works.  The RWSG Petition was brought by Palladin on behalf of Thom and Nancy. | |
| 153.   In the RWSG Petition, Palladin claims that Thom and Nancy "were never presented with nor did they sign a contract with Respondents.  The parties hereto never entered into a written contract for representation by Respondents or any affiliates of Respondents." | Kohlmann Decl. ¶ 28,  Ex. 27 (KAFFAGA0001237). |
| 154.   The RWSG Petition asserts that "Thomas either owns or controls 2/3's of those domestic intellectual property rights [to *East of Eden* and *The Grapes of Wrath*]." | Kohlmann Decl. ¶ 28,  Ex. 27 (KAFFAGA0001237). |
| 155.   The RWSG Petition further asserts that "Respondents were never hired by the Steinbeck family, nor were the Steinbecks aware of Respondents [*sic*] relationship with M&O until their discovery of that relationship through *Nikki Finke's Deadline.com*." | Kohlmann Decl. ¶ 28,  Ex. 27 (KAFFAGA0001237). |
| 156.   The RWSG Petition sought a judgment: | Kohlmann Decl. ¶ 28,  Ex. 27 (KAFFAGA0001237). |

40

| | |
|---|---|
| "requiring that Respondents refrain from representing Petitioners as a client in any manner whatsoever. . . . Petitioners demand that Respondents inform all parties with whom they have negotiated on behalf of Petitioners in all of the United States that they had no right to represent the Steinbeck family and that due to their actions, those parties do not now nor have they ever had a clean chain of title in the Steinbeck intellectual properties and to correct or obtain those rights they must contact the Steinbeck family directly." | |
| 157.   Gail testified that, in the RWSG Petition, she took the position that she and Thom had "blocking rights" and M&O did not represent her and Thom "for any of our blocking rights." | Kohlmann Decl. ¶ 3,  Ex. 2 (G. Steinbeck Tr. at 135:13–22). |
| 158.   RWSG withdrew from its representation of the Estate because it "did not want to risk the threat of lawsuit." | Kohlmann Decl. ¶ 84,  Ex. 79 (RWSG0000095). |
| 159.   On September 29, 2014, in accordance with the procedure of the State Labor Commissioner of the State of California, Gail officially served the RWSG Petition on Mr. Sanford that she had filed a year earlier. | Kohlmann Decl. ¶ 85,  Ex. 80 (STEINBECK002827); Kohlmann Decl. ¶ 28, Ex. 27 (KAFFAGA0001237). |
| 160.   On October 1, 2014, Gail emailed a public relations agency a copy of the | Kohlmann Decl. ¶ 86, Ex. 81 (STEINBECK006140–42). |

41

| | |
|---|---|
| RWSG Petition along with a press release with instructions to circulate the documents to several news outlets, including the *Hollywood Reporter*. | |
| 161.   In an interview published on October 10, 2014 in the *Hollywood Reporter* (a major trade magazine in the industry), Gail announced to the entertainment community that RWSG had no right to make any deal without consulting with the Steinbeck family and getting their agreement, and they did not have that consent. | Kohlmann Decl. ¶ 87, Ex. 82 (*Hollywood Reporter* article). |
| 162.   In March 2015, Palladin and RWSG entered into a settlement agreement in which the RWSG Petition was dismissed with prejudice and both parties released all claims against each other. | Kohlmann Decl. ¶ 88, Ex. 83 (STEINBECK004506). |
| 163.   Ms. Winick Rubinstein testified that the dispute was resolved when "the attorney for Palladin Group agreed to let the claims go because he did not believe they had merit." | Kohlmann Decl. ¶ 8, Ex. 7 (Winick Rubinstein Tr. at 75:23–76:4). |
| 164.   Ms. Winick Rubinstein testified that, "if the film agent we were working with had a threat of litigation by a party | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 77:25–78:8). |

42

| | |
|---|---|
| connected with the actual property, then it would make producers and studios nervous, and give them pause to actually move forward with anything." | |
| 165.   Ms. Winick Rubinstein further testified that "[m]ost film agents are, because of the RWSG situation, nervous about contemplating work on behalf of the [Steinbeck Works]." | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 79:9–11). |

**2.    Intellectual Property Group**

| | |
|---|---|
| 166.   Leslie Conliffe is a film agent at Intellectual Property Group ("IPG"), a talent agency, who has worked as a sub-agent with M&O on various Steinbeck Works. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 79:2–15). |
| 167.   In October 2014, after news of the RWSG Petition appeared in the media, Ms. Conliffe emailed Ms. Winick Rubinstein, requesting a conversation about the possibility of indemnification for IPG by the Estate due to Gail and Thom's "litigious nature." | Kohlmann Decl. ¶ 89,  Ex. 84 (M&O018241). |
| 168.   Ms. Winick Rubinstein testified that the project IPG was working on during that time period did not move forward because IPG's attorney "required some sort of indemnity, and | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 82:6–18). |

43

| | |
|---|---|
| the estate would not agree to that. Ultimately, they didn't want to risk a lawsuit . . . brought by Thom or Gail Steinbeck." | |

**E.     Defendants' Assertions in the Media and the Industry**

| | |
|---|---|
| 169.    On September 11, 2011, Gail told Emily Parker of the Rightscenter that Palladin "represents these film and/or stage rights based upon the works of John Steinbeck: *The Grapes of Wrath*, *Of Mice and Men*, *The Red Pony*, the short stories included in *The Long Valley*; *Flight*, *The Chrysanthemums*, *The White Quail*, *The Snake*, *Breakfast*, *The Raid*, *The Harness*, *The Vigilante*, *Johnny Bear*, *The Murder*, and *Saint Katy the Virgin*." | Kohlmann Decl. at Ex. 68 (M&O078213). |
| 170.    In response to a November 2011 inquiry about the theatrical rights to *Of Mice and Men*, Gail stated, "If your goal is to do the piece you want to do without conflict, then you will have to wait until the rights revert directly to the Steinbeck family." | Kohlmann Decl. ¶ 90,  Ex. 85 (STEINBECK000310). |
| 171.    In July 2012, Gail corresponded with Adam Freudenheim of Pushkin Press about the 2004 Litigation and | Kohlmann Decl. ¶ 91,  Ex. 86 (STEINBECK000691). |

44

| | |
|---|---|
| stated, "It was a real shame, but it isn't going to be over until I draw my last breath." | |
| 172.   In June 2013, Gail informed a journalist for *Vanity Fair*:<br><br>"Thom still owns rights in what are termed *the later works*; the titles that JS did not renew during his lifetime, around 18 titles.  The earlier works were in Elaine's name, but Thom and Blake had a termination interest in those titles.  The court gave those titles to the Scott family.  It is all based on copyright law and the way the copyrights are supposed to flow to the 'blood heirs'.  Thom still owns the copyrights, but M&O managed to strip Thom of his rights to control the licensing of those rights, by lying to the court and filing false documents with the court and the copyright office." | Kohlmann Decl. ¶ 92,  Ex. 87 (STEINBECK004937). |
| 173.   In the resulting July 2013 *Vanity Fair* article "To *Steal* a Mockingbird?," the journalist writes that Gail and Thom<br><br>"told a sad tale, complete with an allegedly evil stepmother, John Steinbeck's third wife and widow, Elaine, who according to a lawsuit Thomas and his father's only granddaughter filed in 2004, conspired with her husband's literary agents Eugene Winick and, later, Sam Pinkus in a '30-year hidden conspiracy to deprive John | Kohlmann Decl. ¶ 93,  Ex. 88 (July 2013 *Vanity Fair* article). |

| | |
|---|---|
| Steinbeck's blood heirs of their rights in the intellectual properties of John Steinbeck.'" | |
| 174.   In July 2013, Gail informed a *Wall Street Journal* reporter that her "job is the management of the copyrights of rights of John Steinbeck's blood heirs."  She added, "[W]e lost the right to control some of our copyrights.  Not all, but some." | Kohlmann Decl. ¶ 94, Ex. 89 (STEINBECK001726). |
| 175.   In August 2013, Gail asserted to Mr. Winick that "John Steinbeck's family controls 2/3's of the <u>character rights</u>" in *Of Mice and Men*. | Kohlmann Decl. ¶ 95, Ex. 90 (STEINBECK001002). |

**III.   Harm Caused by Defendants' Improper Conduct**

> **A.   Harm to Plaintiff Regarding Negotiations with Universal/Imagine for *East of Eden***

| | |
|---|---|
| 176.   Defendants' interference with the Universal/Imagine *East of Eden* deal, in the form of threats made to Universal/Imagine executives and in the RWSG Petition, troubled Universal/Imagine and, as acknowledged by Defendants, caused the studios to abandon the project due to the fear of litigation and the costs of continuing with the negotiations. | Kohlmann Decl. ¶ 35, Ex. 34 (Arnold Decl. ¶ 50). |
| 177.   At a minimum, as a result of the | Kohlmann Decl. ¶ 35,  Ex. 34 (Arnold |

46

| | |
|---|---|
| Defendants' interference with the Universal/Imagine *East of Eden* deal, the Estate lost the agreed-upon purchase price of ███████, but it also lost the possibility of profit participation in the form of █████████████, which likely would have been substantial due to the talent attached to the project. | Decl. ¶¶ 52–53). |
| 178.   In their negotiations, Universal/Imagine and M&O left open the possibility that the film would be produced in two parts with the second film carrying the same financial terms as the first.  Due to Defendants' interference, the Estate may have lost an additional ███████ purchase price with ██████████, with respect to a second film. | Kohlmann Decl. ¶ 35, Ex. 34 (Arnold Decl. ¶ 55). |

### B.   Harm to Plaintiff  Regarding Negotiations with DreamWorks for *The Grapes of Wrath*

| | |
|---|---|
| 179.   With regard to the DreamWorks *The Grapes of Wrath* deal, the fee Defendants negotiated likely detracted from the amount that DreamWorks was willing to pay the Estate in the authorized deal for the underlying rights | Kohlmann Decl. ¶ 35, Ex. 34 (Arnold Decl. ¶¶ 68–69). |

47

| | |
|---|---|
| since film studios typically have a specific overall budget for a project and any amount dedicated to paying off Defendants would need to come from the budget for acquiring the underlying rights from the Estate. | |
| 180.   As a result, due to Defendants' interference, the Estate lost, at minimum, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ with respect to its *The Grapes of Wrath* deal with DreamWorks.  Additionally, the Estate would have received an increased percentage of net profits had DreamWorks not reserved a certain percentage for Defendants. | Kohlmann Decl. ¶ 35, Ex. 34 (Arnold Decl. ¶ 70). |

### C.    Harm to the Steinbeck Works as a Whole

| | |
|---|---|
| 181.   In general, due to Defendants' interference, the film industry has been dissuaded from engaging with Steinbeck Works.  The inability of the Estate to enter into Steinbeck-related deals has resulted in the devaluation of the Steinbeck library as a whole. | Kohlmann Decl. ¶ 35,  Ex. 34 (Arnold Decl. ¶¶ 36, 71–74). |
| 182.   Defendants' wrongful claims of | Kohlmann Decl. ¶ 35, Ex. 34 (Arnold |

48

| | |
|---|---|
| right in the industry and the media have clouded the Estate's title to the Steinbeck Works. | Decl. ¶¶ 75–80). |
| 183.   Defendants' interference has also made it difficult for the agent-of-record of the Steinbeck Works, M&O, and M&O's designated sub-agents, to negotiate Steinbeck-related projects. | Kohlmann Decl. ¶ 35, Ex. 34 (Arnold Decl. ¶¶ 81–83). |
| 184.   Ms. Winick Rubinstein testified, "When attempting to execute and negotiate film contracts specifically, film and TV contracts, not stage ,there have been many issues with the studios and/or producers, business managers, attorneys calling or emailing saying that they have some concerns, because they've heard from an outside party that McIntosh & Otis does not have the rights to be negotiating for the titles." Winick Rubinstein confirmed that this "outside party" was Gail and Palladin. | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 22:23–23:17). |
| 185.   Ms. Winick Rubinstein further testified:<br><br>"There have been cases where deals have been negotiated, and the producers and/or studios, after receiving calls and threats, decided to back away from the deals.  And this isn't after initial inquiries were | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 23:22–24:13). |

49

| | |
|---|---|
| made.  This is after months of negotiation.  And in another case, we had to pause negotiation while the studio decided to hire outside legal counsel to review all of the court documents, which stated that the estate of Elaine Steinbeck and Waverly Kaffaga had sole decision-making power on the works." | |
| 186.   Due to Defendants' interference, the Estate has lost revenue from supplementary book sales, merchandise, and other ancillary products that would have been developed in conjunction with film and television properties. | Kohlmann Decl. ¶ 35, Ex. 34 (Arnold Decl. ¶ 85). |
| 187.   In her testimony, Ms. Winick Rubinstein discussed the impact film negotiations can have on the sale of the underlying literary work: "[I]f a film was distributed, most likely the book would have ended up on the bestseller list again.  Not just in the United States, but worldwide." | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 56:4–18). |
| 188.   Ms. Winick Rubinstein further testified that she absolutely had to provide enhanced representations, warranties, and/or indemnifications in connection with Steinbeck Works:  "[b]ecause of threats that have been made publicly and person-to-person, meaning Gail or Palladin Group | Kohlmann Decl. ¶ 8,  Ex. 7 (Winick Rubinstein Tr. at 100:13–101:13). |

50

| | |
|---|---|
| calling a studio or producer and making said threats about the appropriate rightsholders and decision-makers.  Whereas as agents for the estate, we hold ourselves out to be the agents for the works as the Courts upheld, and as per the Settlement Agreement that was entered into in the '80s.  So even though we have the Court judgments and rulings on our side, and that initially gives people the willingness to begin negotiations, as negotiations evolve and move on, issues in every instance have arisen about concerns with regard to possible litigation from other members of the family." | |

## **Conclusions of Law**

Based on these uncontroverted facts, the following conclusions of law should be made:

1.      "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

2.      "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3.      Plaintiff is entitled to a declaration that Defendants are collaterally estopped from asserting any claim with respect to (1) control over the exploitation of the Steinbeck Works and (2) ownership of the copyrights in the Early Steinbeck Works.

4.      Defendants intentionally interfered with Plaintiff's prospective economic advantage by making baseless claims and threats that have led to the abandonment or diminished outcome of Plaintiff's negotiations for the exploitation of the Steinbeck Works.

5.      Defendants slandered Plaintiff's title to the Steinbeck Works by asserting falsely throughout the industry and the media that they have an interest in and/or control over the Steinbeck Works.

6.      Defendant Thomas Steinbeck breached the 1983 Agreement by negotiating, authorizing, and taking action with respect to the exploitation of the Steinbeck Works.

1   Dated:  April 1, 2016          JENNER & BLOCK LLP

2

3

By:        /s/ Susan J. Kohlmann

4                                     Susan J. Kohlmann

5                           Counsel for Plaintiff Waverly Scott Kaffaga, as Executor of the Estate of Elaine Anderson

6                           Steinbeck

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
CASE NO.  14-CV-08699-TJH (FFM)